1   JAMES R. HARVEY, Esq.
    State Bar No. 273790
2   Clifford & Brown, P.C.
    1430 Truxtun Avenue
3   Bakersfield, California  93301
    (661) 322-6023
4   Facsimile — (661) 322-3508
    E-Mail — jharvey@clifford-brownlaw.com
5
    W. JAMES YOUNG, Esq.*
6   c/o National Right to Work Legal
            Defense Foundation, Inc.
7   8001 Braddock Road, Suite 600
    Springfield, Virginia  22160
8   (703) 321-8510
    Facsimile — (703) 321-9319
9   E-Mail — wjy@nrtw.org

10  ATTORNEYS FOR PROPOSED PLAINTIFFS-INTERVENORS

11  _____

12          UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF CALIFORNIA
13                  FRESNO DIVISION

14
    WONDERFUL NURSERIES LLC,            CASE NO. 1:24-cv-01601-KES-CDB
15
            Plaintiff,                  PROPOSED PLAINTIFFS-INTERVENORS
16                                      CLAUDIA CHAVEZ ET AL.'S
    v.                                  MEMORANDUM OF POINTS AND
17                                      AUTHORITIES IN SUPPORT OF THEIR
    AGRICULTURAL LABOR RELATIONS BOARD  MOTION FOR LEAVE TO INTERVENE AND
18  ET AL.,                             FILE COMPLAINT IN INTERVENTION
19          Defendants.                 Rule 24, FED.R.CIV.P.
20                                      Hearing Date: Monday, 10 March 2025
                                        Time: 1:30 p.m.
21                                      Location: Courtroom 6, 7th Floor

22          COME NOW Proposed Plaintiffs-Intervenors Claudia Chavez, Maria Ester Gutierrez, Francisco

23  Antonio, Erik Ferrer Chacon, Maria Chacon, Florentina Torres Cruz, Ines Cruz, Gloria Gonzales,

24  Lorenzo Hernandez, Selene Lizzaraga, Yolanda Martinz, Ana Molina, Leticia Navarro, Ana Ortiz,

25  Maria C. Pedro, Jose Ruiz, Maria C. Sanchez, Angelina Torres, Etelverto Torres, and Domatila

26  Vasquez ("the Employees"), and for their Memorandum of Points and Authorities in Support of Their

27

28      * Pro Hac Vice Motion filed concurrently herewith.

1  Motion for Leave to Intervene and File Complaint in Intervention state as follows:

2

3  **I.    INTRODUCTION AND BACKGROUND**

4  Pursuant to Rule 24, FED.R.CIV.P., and due process requirements of the Fourteenth

5  Amendment to the United States Constitution, the Employees, by their undersigned counsel,

6  respectfully move to intervene as full parties in the above-referenced proceedings.

7  As set forth in the [Proposed] Plaintiffs-Intervenors' Complaint (attached hereto as Exhibit A),

8  the Employees are employed by Plaintiff Wonderful Nurseries, LLC ("Wonderful") and/or labor

9  contractors for Wonderful in a bargaining unit for which the United Farm Workers of America ("the

10  UFW" or "union") has been certified as the monopoly bargaining representative, in opposition to the

11  Employees' wishes.  As detailed in Wonderful's Complaint ("Wonderful Comp."), Clerk's Docket No.

12  1, the Employees are subject to monopoly representation by the UFW based upon union authorization

13  cards which were (allegedly) secured by the UFW through fraud, duress, trickery, deceit,

14  misrepresentation, and/or other unlawful conduct.  Nevertheless, a certification of the UFW was the

15  monopoly bargaining representative of Wonderful employees was issued by Defendant Agricultural

16  Labor Relations Board ("ALRB" or "Board") on 4 March.[1]  On 11 March, Wonderful moved to stay

17  certification and filed a Petition objecting to the certification, noting sixteen (16) discrete objections to

18  the adjudication of the UFW's majority-support petition ("MSP").  On 18 March, the Board issued an

19  Order[2] denying Wonderful's Renewed Motion to Stay Certification, dismissing ten (10) of

20  Wonderful's objections, and setting hearing on the remainder.

21  The Employees sought intervention in those proceedings on 28 March, which was opposed by

22  the UFW (Wonderful took no position).  The Investigative Hearing Officer ("IHE") at the time (four

23  have been assigned to the case) denied the Employees' intervention by Order dated 22 April.

24  Wonderful Comp. at 130-37, Ex. 9.  The Employees timely sought leave for a special appeal to the

25  Board, and while leave to appeal was granted, the Board affirmed the IHE.  Administrative Order

26

27  [1]  Unless otherwise stated herein, all dates are in 2024.

28  [2]  Administrative Order No. 2024-04.  The Board's administrative orders  are available at
https://www.alrb.ca.gov/legalsearches/decision-index/admin-orders/administrative-orders-2024/.

2024-12 (6 May); Wonderful Comp. at 139-48, Ex. 10.  Proceedings were on-going before the IHE, until they were briefly enjoined by the California Superior Court for Kern County.  Wonderful Comp., ¶¶ 52-57.

The Employees seek to intervene herein for the same reason that they sought intervention before the Board: they are at serious risk by the mandatory mediation and conciliation ("MMC") currently pursued by the Board and the UFW, just as they are at issue in the Board's administrative proceedings challenging the legitimacy of the UFW's claims of majority support within their bargaining unit.  Should an MMC "contract" be imposed upon Wonderful by the Board, the rights of individuals in the bargaining unit will be extinguished, and the UFW will be deemed the monopoly bargaining representative over the terms and conditions of employment of **all** employees in the Wonderful bargaining unit for the period of the agreement imposed upon Wonderful and its employees.  Moreover, for the reasons stated in in Wonderful's Complaint, the predictable outcome of the MMC procedure threatens serious infringements upon the Employees' constitutional and workplace rights, including, but not limited to: (1) the right to strike; (2) the right to decline to support financially the monopoly bargaining representative imposed upon them; (3) the right for redress of workplace grievances; (4) the right to vote on employment terms; (5) the right to dismiss an unwanted monopoly bargaining representative; and (6) the freedom of labor.  Thus, the Employees clearly possess an interest in those proceedings.  Moreover, as the State-mandated MMC process is all but certain to impose an "agreement" containing a forced-unionism or "union security" clause, it constitutes a direct threat to the First Amendment rights of the Employees.  *See Janus v. AFSCME District Council 31*, 585 U.S. 878, 916 (2018) (barring state action to impose and/or enforce forced-unionism requirements).

Here, Wonderful seeks judicial intervention to prevent the Board's gross violations of not only its rights, but of the Employees' rights under the MMC statute.  *See* CAL. LAB. CODE §§ 1164 *et seq*. (the "MMC Statute"); *see* Wonderful Comp.  It is only just and proper that employees themselves be permitted to intervene to vindicate their own rights, parallel to, but discrete from, those of Wonderful.

II.    **STANDARDS FOR GRANTING INTERVENTION**

Rule 24, FED.R.CIV.P., provides that:

(a)    **Intervention of Right.**  On timely motion, the court must permit anyone to intervene who:
****
(2)    claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.
(b)    **Permissive Intervention.**
(1)    In General. On timely motion, the court may permit anyone to intervene who:
****
(B)    has a claim or defense that shares with the main action a common question of law or fact.
****
(3)    Delay or Prejudice. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.
(c)    Notice and Pleading Required. A motion to intervene must be served on the parties as provided in Rule 5. The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought.

Rule 24, FED.R.CIV.P.  As the Ninth Circuit has recently observed:

Intervening is a means to an end, not an end in and of itself.  *See*, *e.g.*, Fed.R.Civ.P. 24 (noting prerequisite of intervention for any purpose is that the intervenor have an interest in a claim or defense in the litigation); 7C Charles A. Wright, Arthur R. Miller, Mark K. Kane, *Fed. Prac. & Proc.* § 1901 (3d ed. 2021) (discussing one purpose of intervention is allowing "those on the outside" of a lawsuit to become a party if they "believe that a decision may have an effect on them").

*Cooper v. Newsom*, 13 F.4th 857, 870 (9TH CIR. 2021); *cf. San Bernardino Cnty. v. Harsh Cal. Corp.*, 340 P.2d 617, 621 (CAL. 1959) ("The purposes of intervention are to protect the interests of those who may be affected by the judgment and to obviate delay and multiplicity of actions, but intervention may be denied if these objectives are outweighed by the rights of the original parties to conduct their lawsuit on their own terms.") (citations omitted).

Mandatory intervention is governed by Rule 24(a)(2), which provides that:

On timely motion, the court must permit anyone to intervene who... claims an interest relating to the property or transaction that is the subject of the action, and he is so situated that the disposition of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless the existing parties adequately represented that interest.

1   Rule 24(a)(2), FED.R.CIV.P.[3]   The Employees here seek mandatory intervention though, if denied,

2   permissive intervention.  Rule 24(b)(1)(B), FED.R.CIV.P.

3   **III.   ARGUMENT**

4       The Ninth Circuit has long applied a four-part test for determining the propriety of intervention

5   as of right under Rule 24(a)(2), as follows:

6       (1) the applicant's motion must be timely; (2) the applicant must assert an interest
        relating to the property or transaction which is the subject of the action; (3) the
7       applicant must be so situated that without intervention the disposition of the action may,
        as a practical matter, impair or impede his ability to protect that interest; and (4) the
8       applicant's interest must be inadequately represented by the other parties.

9   *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9TH CIR. 1983); *see also Smith v. Pangilinan*,

10  651 F.2d 1320, 1323-24 (9TH CIR. 1981).  Furthermore:

11      In evaluating whether these requirements are met, courts "are guided primarily by
        practical and equitable considerations."  *Id.*  Further, courts generally "construe[] [the
12      Rule] broadly in favor of proposed intervenors."  *United States ex rel. McGough v.
        Covington Techs. Co.*, 967 F.2d 1391, 1394 (9TH CIR. 1992). "'A liberal policy in favor
13      of intervention serves both efficient resolution of issues and broadened  access to the
        courts.  By allowing parties with a practical interest in the outcome of a particular case
14      to intervene, we often prevent or simplify future litigation involving related issues; at
        the same time, we allow an additional interested party to express its views before the
15      court.'"  *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 n.8 (9TH
        CIR. 1995) (quoting *Greene v. United States*, 996 F.2d 973, 980 (9TH CIR. 1993)
16      (Reinhardt, J., dissenting)).

17  *United States v. City of Los Angeles*, 288 F.3d 391, 397-398 (9TH CIR. 2002).  The Employees meet all

18  of these standards, as demonstrated below.

19          **A.      The Motion is timely.**

20      This Motion to Intervene is being filed promptly, within sixty-five (65) days of Wonderful's

21  filing of its Complaint.  The Motion is timely and no party is or would be prejudiced by the

22  Employees' intervention.

23
            **B.      Intervention is justified because the Employees have significant, legally-
24                    protectable interests at stake in this case.**

25      While Wonderful's constitutional rights are primarily at stake in this case — it did, after all,

26  initiate this action — the Employees' constitutional rights to freedom of speech and association, as

27  _____

28      [3]  In applying those tests, Rule 24(a) is construed "broadly in favor of potential intervenors," *City of Los
    Angeles,* 288 F.3d at 397, and in light of the liberal policies favoring intervention.

1   well as their due process rights, are also at stake.

2       Specifically, as discussed in both Wonderful's Complaint, Wonderful's Comp., ¶¶ 3-21 & 61-

3   81, while its own rights are at stake herein, Wonderful Comp. at 5 & ¶¶ 1, 2, *etc.*, this case is rife with

4   legitimate concerns about the rights of the Employees, as well. *Id.*, at ¶¶ 1, 3, 4, *etc.* Indeed, it is those

5   rights which lie at the very heart of these proceedings.

6       The Employees therefore have a significant legal interest in protecting them, justifying

7   intervention, whether it be of right or permissive. At bottom, this entire case is about the Employees'

8   (and other Wonderful employees') rights and preferences, especially since this case is about the

9   legitimacy of a majority-showing petition which is and remains highly suspect as to whether it

10  ascertains the majority sentiment in the bargaining unit, thus (perhaps) imposing an unwanted

11  representative upon all Wonderful employees, CAL. LAB. CODE § 1156.37 ("the MSP Statute"), as

12  well as how the Employees terms and conditions of employment will be determined: freely; or as

13  mandated by the State of California. CAL. LAB. CODE § 1164 *et seq.* ("the MMC Statute"). "It is

14  enough that his interest is practically impaired. Compare *Atlantis Development Corp. v. United States*,

15  379 F.2d 818 (5TH CIR. 1967), with *Sam Fox Publishing Co. v. United States*, 366 U.S. 683 (1961)."

16  *Stockton v. United States*, 493 F.2d 1021, 1023 (9TH CIR. 1974). As one court has noted:

17      Professor Shapiro has identified five categories of interests that courts consider
18      sufficient to warrant intervention, one of which is where a private party seeking
        intervention has no legal claim that can be independently asserted against any of the
19      parties and is subject to no claim that can be asserted against it but, nevertheless, has an
        identifiable interest — usually but not always economic — that sets it apart from an
20      ordinary member of the public. *See* David L. Shapiro, Some Thoughts on Intervention
        Before Courts, Agencies, and Arbitrators, 81 HARV.L.REV. 721, 740 (1968).

21  *Habitat Educ. Ctr., Inc. v. Bosworth*, 221 F.R.D. 488, 494 (E.D.WIS. 2004) (footnote omitted)

22      Thus, this case is **not** solely about Wonderful's interests. As both the National Labor Relations

23  Board and the United States Supreme Court have noted in the context of the National Labor Relations

24  Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, the primary focus of the NLRA is the protection of *employees'*

25  rights—not the rights of unions or employers. "'The [NLRB] is not just an umpire to referee a game

26  between an employer and a union. It is also a *guardian of individual employees.* Their voice, though

27  still and small, commands a hearing.'" *McCormick Constr. Co.*, 126 NLRB 1246, 1259-60 (1960)

28  (emphasis added) (quoting *Shoreline Enter. of Am., Inc. v. NLRB*, 262 F.2d 933, 944 (5TH CIR. 1959)).

In fact, like the ALRA, "the NLRA confers rights *only on employees*," and any authority that a labor union enjoys is merely derivative of the employees' Section 7 rights. *Lechmere, Inc. v. NLRB,* 502 U.S. 527, 532 (1992) (emphasis added); *NY NY, LLC,* 356 NLRB 907, 914 (2011); *Leslie Homes, Inc.,* 316 NLRB 123, 127 (1995). "If the rights of employees are being disregarded," it is incumbent upon the Board "to take affirmative action to effectuate the policies of the Act" and ensure that "those rights be restored." *McCormick Constr.,* 126 NLRB at 1259.[4]

In this case, the Employees have taken a principled stand against the UFW and (they allege) its unlawful, misleading, and fraudulent tactics to contrive a fraudulent majority, which has now led to its invocation of a process by which the State imposes terms and conditions of employment upon the Employees. As such, their core § 1152 right to freely choose or reject a bargaining agent — a right at the very "essence" of its counterpart, § 7 of the NLRA, 29 U.S.C. § 157— is being threatened by the UFW's [allegedly-] fraudulently-contrived certification. And if so, the Board may be cementing into place a minority representative by imposing an MMC "contract" upon them, thus cementing the UFW's status for the term of any such "contract."

Under the NLRA, "There could be no clearer abridgment of § 7 of the Act..." than for a union and employer to engage in collective bargaining when a majority of employees do not support union representation. *Int'l Ladies' Garment Workers Union v. NLRB*, 366 U.S. 731, 737 (1961). Thus, it is clear that the Employees, victims of the UFW's misconduct, have a legally protectable interest in this case. *See*, *e.g.*, *Retail Clerks Union 1059 v. NLRB*, 348 F.2d 369, 370 (D.C.Cɪʀ. 1965) (recognizing a union's standing to appeal because it has a "practical interest" in the outcome of the case).

*Inter alia*, the Employees' exclusion from the Board's proceeding inflicts irreparable damage on the rights the ALRA is designed to protect, justifying their resort to judicial intervention. The Board's statutory charge of vindicating employees' rights cannot be accomplished if it excludes the very employees who oppose the certification and were victims of the UFW's allegedly deceitful and fraudulent conduct, and refuses to provide them any role in the litigation over *their* §§ 1152, 1154, and 1156.3 rights. To the contrary, such a result serves as a glaring example of how the MSP statute, the

---

[4] The ALRB is statutorily directed to "follow applicable precedents of the National Labor Relations Act, as amended." Cᴀʟ. Lᴀʙᴏʀ Cᴏᴅᴇ § 1148.

MMC statute, and the Board's process can utterly disregard employees' rights and preferences by imposing unwanted collective bargaining relationships upon them. *Garment Workers,* 366 U.S. at 737. It is therefore the Board's own disregard of the Employees' rights which require their resort to this judicial forum.

In short, the Employees have more than enough interest to intervene in this case as of right or permissively.

**C.    No current party can adequately represent the Employees nor protect their rights.**

Rule 24(a)(2), FED.R.CIV.PRO requires allowing intervention "unless existing parties adequately represent that interest." But an applicant for intervenion need not demonstrate that the existing parties **will** engage in conduct detrimental to his interests. To the contrary, the requirement of inadequacy of representation "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be minimal." *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n.10 (1972) (citation omitted); *see also  Tech. Training Assocs. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 697 (11TH CIR. 2017). Thus, an aspiring intervenor "must show under Rule 24(a) is that his interest may not be adequately represented; no showing of actual inadequacy is required." *Providence Journal Co. v. FBI*, 460 F.Supp. 762, 766 (D.R.I. 1978). As one California court observed, Ninth Circuit courts "'liberally construe[ ],'" *City of Malibu v. California Coastal Com.,* 128 Cal.App.4th 897, 902, 27 Cal.Rptr.3d 501 (2005), the adequacy of existing representation, resolving "[a]ny doubt as to whether the existing parties will adequately represent the [nonparty's interest] ... in favor of intervention." *California Dump Truck Owners Ass'n v. Nichols*, 275 F.R.D. 303, 307 (E.D.CAL. 2011); *see also Friends of Oceano Dunes v. California Coastal Com.*, 307 Cal. Rptr. 3d 495, 500, *reh'g denied* (CAL.APP.2D DIST. 2023), *ordered not to be officially published* (16 Aug. 2023).[5]

While Wonderful is engaged in yeoman's service in attempting to vindicate its employees'

---

[5]  Whether representation may be inadequate has nothing to do with the quality of the parties' attorneys: related Federal "Rule 24 requires that we look to the adequacy or inadequacy of representation by 'existing parties,' not counsel." *Sagebrush Rebellion, Inc.* v. *Watt,* 713 F.2d 525, 529 (9TH CIR. 1983).

1    rights against an unwanted union, there can be no confusion that it is the **employer's** interests that it is

2    attempting to vindicate, not the **employees'**, and it therefore cannot be depended upon to protect

3    adequately the Employees' constitutional rights.  Indeed, before this Court, Wonderful has not even

4    challenged the MSP Statute or procedures, even though they constitute facts underlying the invocation

5    of the MMC procedure.  Contending that Wonderful can adequately represent the Employees' interests

6    defies common sense and contradicts the fundamental premises upon which the ALRA — and most if

7    not all other labor relations statutory schemes (and certainly UFW rhetoric) — is based.  The ALRA

8    does not differ from its national counterpart in this regard: "The Act was premised on the view  that

9    there is a fundamental conflict between the interests of the employers and employees engaged in

10    collective bargaining...."  *Brown Univ.,* 342 NLRB 483, 487-88 (2004); *Boston Med. Ctr. Corp.,* 330

11    NLRB 152, 178 (1999).  Recognizing this, the NLRB and the federal courts have resoundingly rejected

12    the notion of an employer serving as the "vindicator of its employees' organizational freedom."

13    *Corrections Corp. of Am.,* 347  NLRB 632, 655 n.3 (2006), citing *Auciello Iron Works,* 517 U.S. 781,

14    792 (1996).  By very definition, "[t]he employer has its self-interest to watch over and those interests

15    are not necessarily aligned with those of its employees."  347 NLRB at 655 n.3.  Accordingly, "[t]he

16    Board is ... entitled to suspicion when faced with an employer's benevolence as its workers' champion

17    against their certified union...."  *Auciello,* 517 U.S. at 790; *Int'l Ladies' Garment Workers Union,* 366

18    U.S. at 738-39.

19           So it should be with this Court.  Here, the Board allowed challenge to proceed on Wonderful's

20    allegations that the UFW *violated* the rights of the employees it purports to represent.  And while

21    demonstrating such violations would certainly serve Wonderful's interests in avoiding dealings with a

22    contentious union, it is not identical to the employees' rights to avoid representation by an unwanted

23    minority union **and** forced subsidizatioin of that union's activities.   Hence, Wonderful has interests

24    distinct from the Employees.  And it is obviously logically inconsistent to conclude that the UFW can

25    simultaneously serve as both violator and *vindicator* of the Employees' interests.  But even where

26    Wonderful's and the Employees interests overlap, the defense of those interests will necessarily be

27    undertaken from the unique perspective of each party.  Although Wonderful and the Employees may

28    desire the same outcome in this case, Wonderful may not have the Employee's best interests in mind

1   or adequately protect or argue their position.

2       This conflict and these distinct interests are particularly acute with regard to the Employees'

3   challenge to the MMC Statute.  There, they are **barred** from participation, whereas Wonderful is a full

4   participant.  The Employees have no opportunity to vote on the forced contract resulting from MMC,

5   let alone to participate in (or to observe even silently) the MMC process.  *See Gerawan Farming, Inc.*

6   v. *ALRB*, 40 Cal.App.5th 241, 278 (2019) (*Gerawan II*) (no constitutional right of public access to on-

7   the-record MMC proceedings).  And the Employees are accorded no standing to challenge, before the

8   Board or the courts, the outcome of its processes.

9       Practically, Wonderful's economic interests could lead it to settle the objections case to save

10  itself the cost and disruption of further litigation.  For business or financial reasons, any rational

11  employer might choose to settle or withdraw objections and accept an unpopular union despite proof

12  of the employees' opposition to union representation.  *See Nova Plumbing v. NLRB,* 330 F.3d 531, 537

13  (D.C. Cir. 2003).  Wonderful has business interests to defend while the Employees have constitutional

14  rights to vindicate.

15      Without intervention and full party status, the Employees are powerless to contest any

16  resolution to this lawsuit, which pursues constitutional claims for Wonderful which, while they bear

17  close relationship to constitutional claims possessed by the Employees, are separate and distinct,

18  particularly as relates to the First Amendment rights of the Employees endangered by a prospective

19  State-imposed  MMC "contract" containing a forced-unionism clause.  Thus, while some of

20  Wonderful's claims parallel the Employees' claims, they are also distinct from those of the Employees.

21  And even if Wonderful vigorously pursue those claims, there is no guarantee that it or any other party

22  will act in the **Employees'** best interest.

23      There are several tactical considerations Wonderful may take that harm the Employees' rights

24  without directly opposing their position.  The parties may enter into factual stipulations effectively

25  limiting the testimony and evidence introduced at hearing, or they may make strategic decisions to

26  forego the introduction of relevant testimony.  This is not hypothetical, as employers in other cases

27  have made tactical missteps, such as by failing to call employee-petitioners even though their

28  testimony was central to the case.  *See Veritas Health Serv., Inc.,* 363 NLRB 963 (2016), *enf'd.* 895 F.

3d 69, 89 (D.C. CIR. 2018) (Millett, J., concurring, "express[ing her] concerns about the Board's continued failure to establish any discernible, consistent standard for granting and denying intervention in agency proceedings").

Consequently, absent the Employees' intervention, there is a real and substantial risk that the Employees — the only individuals whose interests the Board proceedings are intended to protect — will be denied a voice in a case concerning their own representational desires. As such, no existing party can or will adequately represent the Employees' interests: not Wonderful; not the Board; and certainly not the UFW.

### D. Due process requires that intervention be allowed.

Finally, the Due Process Clause of the Fourteenth Amendment requires intervention be granted because a judicial decision denying intervention would undermine the Employees' free association right not to be represented by an employer, or a minority labor union against their will. *Mulhall v. IAM Local 355,* 618 F.3d 1279, 1286-87 (11TH CIR. 2010) (employee has standing to challenge forced representation by a labor union he opposes); *Int'l Ladies' Garment Workers' Union,* 366 U.S. at 738-39; *see also Gibson v. Fla. Legislative Investigation Comm.,* 372 U.S. 539, 544 (1963) (freedom of association "inseparable" aspect of liberty guaranteed by Due Process Clause); *Roberts v. U.S. Jaycees,* 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate."); *Thomas v. Collins,* 323 U.S. 516, 532 (1945) ("The right thus to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly"). These rights are protected by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

To bring a claim under the Due Process Clause, a party must show: (a) deprivation of a protected liberty or property interest, *see General Electric Co. v. Jackson,* 610 F.3d 110, 117 (D.C. CIR. 2010); (b) by the government, *see American Manufacturers Mutual Insurance Co. v. Sullivan,* 526 U.S. 40, 50 (1999); (c) without the process that is 'due' under the Fifth Amendment, *see Mathews v. Eldridge,* 424 U.S. 319, 334-35 (1976). Denial of intervention under the circumstances of this case would satisfy these criteria.

The Employees have the greatest protected liberty interest at stake because this case will

1   determine whether they have the right to be free from coercive, fraudulent union conduct in

2   ascertaining if there is to be a monopoly bargaining agent, and a resulting "contract" imposed by the

3   State, which all but certainly (if history is any guide) will contain a forced-unionism clause requiring

4   them to contribute financially to that monopoly bargaining agent.  So obvious are the First Amendment

5   interests of the Employees that further elaboration here is unnecessary.  *See Mulhall,* 618 F.3d at 1287

6   ("regardless of whether [an employee] can avoid contributing financial support to or becoming a

7   member of the union ... its status as his exclusive representative plainly affects his associational

8   rights.") (citation omitted).  Furthermore, the Employees' right to freely associate with, or reject, a

9   union is fundamental under the Act, CAL. LABOR CODE § 1152, too, and the Board cannot cavalierly

10  adjudicate those rights without allowing the affected employees to be heard.  The right to freely

11  associate or disassociate from a union is found not only in the Act, § 1152, but within the Constitution.

12  *Janus*, 585 U.S. at 916 (2018) (barring state action to impose and/or enforce forced-unionism

13  requirements).  Because the ALRA gives the Employees the right to oppose the UFW and be free of

14  forced unionization by a minority union, they are entitled to due process of law under the Fourteenth

15  Amendment when that right is adjudicated in a manner that harms them.  ***Cf.*** *NB ex rel. Peacock v.*

16  *D.C.,* 794 F.3d 31, 41 (D.C. CIR. 2015) ("certain government benefits give rise to property interests

17  protected by the Due Process Clause").

18         Here, the UFW has enlisted the Board in its effort to cement the UFW into power over the

19  Employees as the exclusive representative and, through the MMC process, to cement that status for the

20  length of an imposed "contract" which threatens to impose a forced-unionism obligation.  Thus,

21  similar to the NLRA, the "grant of power to a union to act as exclusive collective bargaining

22  representative" necessarily results in a "corresponding reduction in the individual rights of the

23  employees so represented."  *Vaca v. Sipes,* 386 U.S. 171, 182 (1967).  The Employees opposes such

24  reduction of their liberty and property rights in the face of what they believe to have been a majority-

25  showing petition rooted in fraud, deceit, and transitory expressions of union support, an injury to

26  which the Board now threatens to add insult by pursuing and MMC process which will inevitably

27  impose upon the Employees a forced-unionism obligation requiring them to pay union dues or agency

28  fees.

"'[T]he root requirement' of the Due Process Clause'" is "'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Boddie v. Conn.,* 401 U.S. 371, 379 (1971) (emphasis in original)).  And the core purpose of the ALRA is to protect employee rights *from* employers and unions.  Here, consistent with the Due Process Clause, the ALRB may not deny the Employees the opportunity to be heard in this case.

**E.    Judicial economy is served by allowing intervention.**

Even if the Employees are found to have failed to state a case for intervention as of right, permissive intervention pursuant to Rule 24(b)(1)(B), FED.R.CIV.P., is justified here.  Were intervention to be denied upon the instant Motion, the Employees would be forced to initiate separate proceedings which would have substantial, if not overwhelming, overlap with Wonderful's case, and would almost certainly be subject to consolidation with Wonderful's case.  This would waste both the Employees' resources, and those of the Court, to say nothing of Defendants' resources, and therefore justifies permissive intervention under Rule 24(b)1(B), FED.R.CIV.P., if intervention of right is denied under Rule 24(a)(2), FED.R.CIV.P..

The more responsible and economical course (for all concerned) is to allow intervention here.

**IV.    CONCLUSION**

The Motion to for Leave to Intervene and File a Complaint in Intervention should be granted.  The Employees have tangible statutory and pecuniary interest at stake in this case that are separate and distinct from those of Wonderful.  Their participation will not burden, delay, or extend the

////
////
////
////
////
////
////
////

1  proceedings.  Intervention of right is appropriate here, or, in the alternative, permissive intervention

2  should be allowed here.

3  DATED: 3 February 2025

4                                          Respectfully submitted,

5                                          /s/ James R. Harvey

6                                          JAMES R. HARVEY, Esq.
                                           State Bar No. 273790
7                                          Clifford & Brown, P.C.
                                           1430 Truxtun Avenue
8                                          Bakersfield, California  93301
                                           (661) 322-6023
9                                          Facsimile — (661) 322-3508
                                           E-Mail — jharvey@clifford-brownlaw.com
10
                                           /s/ W. James Young
11
                                           W. JAMES YOUNG, Esq.
12                                         c/o National Right to Work Legal
                                               Defense Foundation, Inc.
13                                         8001 Braddock Road, Suite 600
                                           Springfield, Virginia  22160
14                                         (703) 321-8510
                                           E-Mail — wjy@nrtw.org
15
                                           ATTORNEYS FOR PROPOSED INTERVENORS
16

17
                    H:\WP\California Cases\Chavez.ALRB\Federal Lawsuit - Wonderful\Intervention\Memorandum.wpd
18                                      Monday, 3 February  2025, 12:18:24 PM

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I, James R. Harvey, counsel for Plaintiffs-Intervenors, hereby certify that I electronically filed with the Clerk of Court the foregoing PROPOSED PLAINTIFFS-INTERVENORS CLAUDIA CHAVEZ *ET AL.*'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR LEAVE TO INTERVENE AND FILE COMPLAINT IN INTERVENTION, using the CM/ECF system which will send notification of such filing to Defendants' Counsel and all other Counsel of Record, this 3d day of February, 2025.

_____/s/ James R. Harvey_____

JAMES R. HARVEY

1 | JAMES R. HARVEY, Esq.
State Bar No. 273790
2 | Clifford & Brown, P.C.
1430 Truxtun Avenue
3 | Bakersfield, California 93301
(661) 322-6023
4 | Facsimile — (661) 322-3508
E-Mail — jharvey@clifford-brownlaw.com
5 |
6 | W. JAMES YOUNG, Esq.
c/o National Right to Work Legal
       Defense Foundation, Inc.
7 | 8001 Braddock Road, Suite 600
Springfield, Virginia 22160
8 | (703) 321-8510
Facsimile — (703) 321-9319
9 | E-Mail — wjy@nrtw.org

10 | ATTORNEYS FOR PLAINTIFFS-INTERVENORS

11 |
12 | UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION
13 |

14 | WONDERFUL NURSERIES LLC,

15 |        Plaintiff,

16 | CLAUDIA CHAVEZ; MARIA ESTER
GUTIERREZ; FRANCISCO ANTONIO; ERIK
17 | FERRER CHACON; MARIA CHACON;
FLORENTINA TORRES CRUZ; INES CRUZ;
18 | GLORIA GONZALES; LORENZO HERNANDEZ;
SELENE LIZZARAGA; YOLANDA MARTINEZ;
19 | ANA MOLINA; LETICIA NAVARRO; ANA
ORTIZ; MARIA C. PEDRO; JOSE RUIZ; MARIA
20 | C. SANCHEZ; ANGELINA TORRES; ETELVERTO
TORRES; AND DOMATILA VASQUEZ,
21 |
        Plaintiffs-Intervenors,
22 |
v.
23 | AGRICULTURAL LABOR RELATIONS BOARD
ET AL.,
24 |
        Defendants.

CASE NO. 1:24-cv-01061-KES-CDB

**PLAINTIFFS-INTERVENORS CLAUDIA
CHAVEZ *ET AL.*'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Hearing Date: Monday, 3 March 2025
Time: 1:30 p.m.
Location: Courtroom 6, 7th Floor

**Exhibit
A**

26 | COME NOW Plaintiffs-Intervenors Claudia Chavez, Maria Ester Gutierrez, Francisco
27 | Antonio, Erik Ferrer Chacon, Maria Chacon, Florentina Torres Cruz, Ines Cruz, Gloria Gonzales,
28 | Lorenzo Hernandez, Selene Lizzaraga, Yolanda Martinz, Ana Molina, Leticia Navarro, Ana Ortiz,

Maria C. Pedro, Jose Ruiz, Maria C. Sanchez, Angelina Torres, Etelverto Torres, and Domatila

Vasquez ("the Employees"), and state for their Complaint as follows:

## I.    INTRODUCTION

1.     Plaintiff Wonderful Nurseries LLC's ("Wonderful") original Complaint (Docket No. 1;

"Wonderful Comp.") presents the question whether a state may impose a collective bargaining

"agreement" ("CBA") on a private employer and its employees by force of law by means of

nonconsensual "arbitration."  Under 2002 amendments to California's Agricultural Labor Relations

Act ("ALRA"), the Agricultural Labor Relations Board ("ALRB" or the "Board") may compel a

private agricultural employer into a state-administered process referred to as "mandatory mediation

and conciliation" ("MMC"), in which the ALRB imposes upon the employer and its workers a CBA.

*See* CAL. LAB. CODE §§ 1164 *et seq*. (the "MMC Statute").  Once imposed, the MMC CBA entrenches

a union by barring employees' right to petition for a secret ballot decertification election during the

term of this State-dictated "agreement."  This constitutionally-indefensible treatment of farmers

farmworkers infringes upon the liberty and property interests and associational rights of both, and

violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S.

Constitution, and additionally unconstitutionally violates the First Amendment rights of farmworkers.

2.     Outside of very circumscribe occasions (war-time or other national emergencies), the

Constitution bars a state from dictating to one employer specific contract terms simply because it is the

government's preferred labor policy.  Nevertheless, MMC imposes terms and conditions applicable to

only one employer and one workplace bargaining unit, while denying — during the term of the

"agreement" — the right of employees to dismiss an unwanted representative.  This is the antithesis of

equal protection, because each imposed "agreement" will be its own set of rules applicable to one

employer and its employees, but not to others in the same legislative classification.  It therefore

presents legal issues of utmost importance to California agricultural workers, and the Employees seek

this Court's immediate intervention to protect their fundamental liberty interests, especially their

freedom of association between and amongst themselves, and with their employer, and their correlative

rights to be free from State-compelled monopoly representation by a labor organization not

legitimately chosen by a majority of employees, and from State-mandated payment of union dues or

fees.  The certification of a labor organization as the monopoly or exclusive bargaining agent of agricultural employees not only affects their fundamental right to work for a living, but is a grant of a public right.  Like Wonderful, the Employees have a significant interest in assuring that this privilege is extended only to a union freely chosen by a majority of workers in their bargaining unit, and without infringing on their First Amendment rights.

3.    The Supreme Court **has already** unanimously struck down a compulsory arbitration scheme closely analogous to MMC because it: (a) infringed on the liberty and property interests of private employers and employees without due process of law; and (2) violated the employees' freedom of association.[1]  The *Wolff Packing* line of cases established the constitutional dividing line between mandatory collective bargaining and compulsory imposition of terms which has guided American labor law for a century.[2]

4.    Thus, when the Supreme Court stated that the Kansas Act at issue in the *Wolff Packing* line of cases compelled a worker "to give up that means of putting himself on an equality with his employer which action in concert with his fellows gives him," *Wolff I,* 262 U.S. at 540, it recognized that true "freedom of contract" was illusory so long as workers were not allowed to engage in their constitutionally-protected rights of free speech, association, and collective action (including the right to strike) necessary to obtain bargaining equality.  The workers' "fundamental right" to engage in collective action, *Jones & Laughlin,* 301 U.S. at 33, along with the employer's right not to be compelled to make contract concessions or to be forced into state-mandated contract terms, is the constitutional premise upon which the NLRA rests.[3]

---

[1] *See Wolff Packing Co. v. Indus. Court* ("*Wolff I*"), 262 U.S. 522 (1923); *Dorchy v. Kansas*, 264 U.S. 286 (1924) ("*Dorchy I*"); *Wolff Packing Co. v. Indus. Court*, 267 U.S. 552 (1925) ("*Wolff II*") (collectively, "*Wolff Packing*" or "the *Wolff* trilogy"); *see also Dorchy v. Kansas*, 272 U.S. 306, 307 (1926) ("*Dorchy II*") (recognizing the qualified constitutional right to strike)

[2] *See, e.g.*, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45 (1937) (American labor law "does not compel agreements between employers and employees," and "does not compel any agreement whatever"); *Associated Press v. NLRB*, 301 U.S. 103, 120 (1937) (upholding NLRA against due process challenge because statute "does not fix wages or hours, or provide for compulsory arbitration of labor disputes"); *Virginian Ry. Co. v. Ry. Employees*, 300 U.S. 515, 543, 548 (1937) (upholding constitutionality of amendments to the Railway Labor Act based on the distinction between the "voluntary submission to arbitration" and compelled agreements between employer and employees).

[3] Congress excluded agricultural laborers from the provisions of the NLRA, leaving regulation of their employment to the States.  29 U.S.C. § 152(3).  Nevertheless, the ALRA expressly states that the ALRB "shall follow applicable precedents of the NLRA."  *See* CAL. LAB. CODE § 1148.

5.    *Wolff Packing* has never been overruled or even questioned by the Supreme Court, or by any state court, save one.  In *Gerawan Farming, Inc. v. ALRB*, 3 Cal.5th 1118 (2017) ("*Gerawan I*"), *cert. denied*, 586 U.S. 908 (2018), the California Supreme Court upheld the MMC Statute against a due process and equal protection challenge, dismissing *Wolff Packing* as a "completely repudiated" relic of the *Lochner* era.  However, the Court's most vociferous contemporary critics of *Lochner,* Justices Holmes and Brandeis; both joined the unanimous decisions in *Wolff Packing,* with Justice Brandeis writing the opinion of the Court in *Dorchy I*.

6.    The California Supreme Court did not dispute that the State's compulsory arbitration scheme implicates significant liberty and property interests, but neither did it distinguish MMC from the forced contracting scheme invalidated in *Wolff Packing,* even though the similarities are too obvious to ignore.  While labeling *Wolff Packing* a "*Lochner* era relic" disingenuously avoids any discussion of the actual holdings, it is not a substitute for analysis,[4] as follows:

a.    *First*, dismissing *Wolff Packing* as a "*Lochner* era relic" ignores the distinction between the New Deal Court's repudiation of a substantive due process right to be free from **general** minimum wage and maximum hour legislation and the actual holdings in *Wolff Packing*, which struck down Kansas's **particularized** efforts to restrict the rights of **one employer** and its employees through selective and procedurally-unfair unilateral legislative fiat;

b.    *Second*, the *Lochner* era cases regulated hours, pay, and working conditions, not speech, association, or the right to organize or strike, fundamental individual rights that were abridged by the "system of compulsory arbitration" condemned in *Wolff Packing*; and

c.    *Third*, *Wolff*'s core holding is that the state's system of compelled "arbitration" violates both the "freedom of labor" and the "freedom of contract."  *Wolff I*, 262 U.S. at 534, 542.  "Without this joint compulsion, the whole theory and purpose of the act would fail." *Wolff II*, 267 U.S. at 568.  As *Wolff I* explained, the statute "shows very plainly that its purpose is not to regulate wages or hours of labor either generally or in particular classes of businesses," *id.* at 565, but "is intended to compel ... the owner and employees to continue the business on

---

[4] *Cf.* Tribe, *American Constitutional Law* 435 (1978), cited in *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 521 (2018) ("'*Lochnerizing*' has become so much an epithet that the very use of the label may obscure attempts at understanding").

terms which are not of their making." *Id*. at 569.

7. This Court has an obligation to decide whether a state law violates the Federal Constitution, regardless of any pronouncement of the California Supreme Court. *See Moore v. Harper*, 600 U.S. 1, 34, 35 (2023). When a state court flouts the Supreme Court's holdings, Federal court invervention is essential to maintain uniformity of Federal law. The proper practice is for lower courts to "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

8. The California Supreme Court also avoided other constitutionally-problematic aspects of the MMC Statute. *See* Wonderful Comp., ¶¶ 9-14. Thus, under MMC, each individual employer targeted for MMC will have a distinct, unequal, individualized set of rules imposed upon it, without any assurance of (discretionary) statutory review, along with other serious difficulties. However, as to the "contract" resulting from MMC, farmworkers like the Employees have no recourse whatsoever.

9. The facts here illustrate the need for judicial resolution of the MMC's constitutionality, as follows:

a. *First*, the union that compelled Wonderful into MMC, the United Farm Workers of America ("UFW"), was certified by the Board as the exclusive bargaining representative of Wonderful's agricultural laborers on 4 March 2024,[5] pursuant to 2023 amendments to the ALRA, *i.e.*, the so-called "Majority Support Petition ("MSP") Election" procedures, also known as "Card Check." *See* CAL. LAB. CODE § 1156.37 *et seq*. (the "MSP Statute"). This is not an election in any generally accepted sense of that word. Card Check allows a union to, in essence, "self-certify" as the monopoly or exclusive bargaining representative by submitting authorization cards purportedly signed by a majority of the employees in the bargaining unit, albeit without any mechanism to allow the employer (or the Board) to verify the authenticity of individual card signatures or the circumstances surrounding their solicitation and collection. The MSP Statute limits the ALRB's role in certifying the union to comparing the names on the authorization cards against the employer's payroll roster. At the same time, the MSP Statute

---

[5] Unless otherwise specified, all dates herein are in 2024.

requires the ALRB provides employees with no notice or opportunity to challenge a union's claims prior to certification, and to withhold the evidence of "proof" of majority support, thus eliminating any meaningful opportunity to challenge, or for a court to review, whether the authorization cards themselves are the product of fraud or forgery ***before*** the ALRB certifies a union, thereby forcing the employer to recognize and to negotiate with the union, and/or to be forced into MMC, and forcing employees to be represented by a monopoly or exclusive bargaining representative;

b.     *Second*, under Card Check's "certify first, investigate later" regime, a union is immediately certified as the representative of workers following the Board's confirmation of the results of the so-called MSP "election."  Once certified, employees are foreclosed from seeking to decertify the union for at least for at least 12 months after the certification issues (*i.e.*, the "election bar").  *See* CAL. LAB. CODE §§ 1156.37(l), 1156.5(a).  In *Gerawan I,* the California Supreme Court upheld the MMC Statute in part based on the availability of a secret ballot election *before* an MMC contract would be imposed.  *Gerawan I*, 3 Cal.5th at 1158 (citation and quotation omitted) ("So long as the employees can petition for a new election if they wish to remove the union, the employer has no real cause for concern about whether it is bargaining with the true representative of its employees").  Card Check had not been enacted when the Court offered these assurances, subsequently rendered empty by passage of Card Check.  Under the MSP Statute, a union may be certified, without any of the safeguards of a secret ballot election, without first considering objections as to the "proof" of majority support, and without the availability of a secret ballot election before the MMC "contract" is imposed by final Board order; and

c.     *Third*, once the MMC "contract" is imposed, the workers are barred from petitioning for a decertification election during the term of the "agreement."  *See* CAL. LAB. CODE § 1156.7(b).  As this case illustrates, there is "real cause for concern" that the combination of the "election bar" and the "contract bar" denies the right of workers to seek decertification *for years*.

10.     As with the scheme invalidated in *Wolff Packing*, California's system of compulsory

1    arbitration *requires* the abridgement of the liberty and property interests of the employer *and* its

2    employees, a point best illustrated by the fact that, on information and belief, every State-imposed

3    MMC "contract" dictated by the State requires the employer to fire any employee who refuses to

4    surrender a portion of their paycheck to the union.  *Cf. Janus  v.  AFSCME Council 31*, 585 U.S. 878,

5    916 (2018) (barring state action to impose and/or enforce forced-unionism requirements).

6    **II.    THE PARTIES**

7              11.    Plaintiffs-Intervenors Claudia Chavez, Maria Ester Gutierrez, Francisco Antonio, Erik

8    Ferrer Chacon, Maria Chacon, Florentina Torres Cruz, Ines Cruz, Gloria Gonzales, Lorenzo

9    Hernandez, Selene Lizzaraga, Yolanda Martinz, Ana Molina, Leticia Navarro, Ana Ortiz, Maria C.

10   Pedro, Jose Ruiz, Maria C. Sanchez, Angelina Torres, Etelverto Torres, and Domatila Vasquez ("the

11   Employees") are employees of Plaintiff Wonderful Nurseries, LLC ("Wonderful"), and/or labor

12   contractors providing workers to Wonderful, and are included in the bargaining unit of Wonderful

13   employees certified by the Board through the MSP procedure as represented by the UFW.

14             12.    Plaintiff Wonderful is a Delaware limited liability company with agricultural operations

15   in Wasco, Shafter, McFarland, and Kern Counties, California.  Wonderful produces grapevines and

16   trees for sale to commercial agricultural producers through cane cutting, bareroot vine harvesting,

17   grafting, potting, irrigation, sorting and grading, shipping, and more.  The UFW designated farm

18   workers performing work for Wonderful as the bargaining unit for purposes of its MSP "election."  On

19   or about 30 December 2024, Wonderful filed a Complaint ("Wonderful Comp.") with this Court,

20   designated as Case No. 1:24-cv-01061-KES-CDB, and assigned to the Honorable Kirk E. Sherriff.

21             13.    Defendant Agricultural Labor Relations Board is a state agency with its principal office

22   at 1325 J Street, Suite 1900, Sacramento, California  95814-2944. The ALRB has statutory authority to

23   order parties to MMC and to issue orders imposing CBA terms pursuant to CAL. LAB. CODE § 1164 *et*

24   *seq*.  On 10 July, the ALRB directed Wonderful into MMC, at the request of the United Farm Workers

25   of America ("UFW"), the labor organization certified on 4 March, to represent Wonderful's

26   agricultural employees pursuant to the so-called MSP "election" procedures, CAL. LAB. CODE

27   § 1156.37 *et seq*.

28             14.    Each of the following individuals is named in his or her official capacity as Board

members, officers, or personnel of the ALRB:

a.     Defendant Victoria Hassid is Chairperson of the ALRB, and Defendants Isadore Hall III, Barry Broad, Ralph Lightstone, and Cinthia N. Flores are members of the ALRB.  In their official capacities, each member of the Board is responsible for the exercise of statutory powers vested in the Board, *inter alia*, "to determine the unit appropriate for the purpose of collective bargaining, to investigate and provide for hearings, to determine whether a question of representation exists, to direct an election by a secret ballot pursuant to the provisions of Chapter 5 (commencing with CAL. LAB. CODE § 1156), and to certify the results of such election, or to certify a labor organization pursuant to CAL. LAB. CODE § 1156.37 and to investigate, conduct hearings and make determinations relating to unfair labor practices."  CAL. LAB. CODE § 1142(b).  The Board is also charged with the responsibility of overseeing the MMC process, and enforcing a final order of the Board imposing an MMC "contract"; and

b.     Defendant Santiago Avila-Gomez is Executive Secretary of the ALRB.  The Executive Secretary is appointed by the Board, CAL. LAB. CODE § 1145, and has been delegated by the Board "such powers as it deems appropriate" to perform its statutory functions in connection with the administrative determinations, certification, and investigation of the MSP, and under the MMC statute.  CAL. LAB. CODE §§ 1142(b) & 1145.  On behalf of the Board, the Executive Secretary issued and signed the 4 March Certification of the UFW on behalf of the Board (Wonderful Comp., Ex. 5), and issued and signed various orders pertinent to the conduct of the MMC proceedings at issue here.

III.    **JURISDICTION AND VENUE**

15.    This case is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the First and Fourteenth Amendment to the United States Constitution.

16.    The case presents a federal question within this Court's jurisdiction under Art. III, § 2 of the United States Constitution and 28 U.S.C. §§ 1331 & 1343.

17.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 & 2202.

18.    Venue is proper in this Court under 28 U.S.C. § 1391 because Wonderful has its principal place of business in the County of Kern, and because a substantial part of the events giving

1   rise to this claim occurred in this District.

2   **IV.**   **THE MMC STATUTORY SCHEME**

3       19.    MMC is a highly-expedited, compulsory process, whereby a Board-appointed

4   "mediator" dictates the terms of a CBA between a union and an employer, which then becomes an

5   enforceable Board order. The terms of that "contract" are subject to limited, discretionary

6   administrative review. By its own terms, the MMC "contract" may be imposed upon an employer by a

7   final Board order as soon as 60 to 90 days after the parties are directed into the process.

8       20.    Under CAL. LAB. CODE § 1164 *et seq.*, a certified labor union may file a declaration

9   with the Board stating that the parties have not been able to reach an agreement and requesting that the

10   Board order the parties to "mandatory mediation and conciliation" of their issues. The declaration may

11   be filed at any time at least 90 days after an initial demand to bargain has been made by a certified

12   labor organization. *Id.*, § 1164(a)(2).

13       21.    The mediator can communicate "informally" and off the record with the parties to

14   "clarify or resolve issues." CAL. CODE REG , tit. 8 ("Regs."), § 20407(a)(2). At the conclusion of the

15   mediation period, unless the parties mutually agree to extend the period for another 30 days, the

16   mediator certifies that the mediation phase of the MMC process has been "exhausted." CAL. LAB.

17   CODE § 1164(c). The mediator, now acting as an "arbitrator" (though, again, not necessarily with the

18   consent of all of the parties) presides over the "on-the-record" phase of MMC, including the

19   presentation of witnesses, the admission of exhibits, the administering of oaths, and the power to

20   sanction employers who refuse to "participate or cooperate" in the MMC process, including by

21   adopting the union's proposed contract terms. *See* Regs. § 20407(a). Absent agreement, and based on

22   the "record" of testimony and admitted evidence, the mediator dictates the terms of the "contract," a

23   function beyond the role of "mediator" in the ordinary sense of that term.

24       22.    The statutory "mediator" has broad discretion to set the terms in accordance with his or

25   her own views of industrial policy, and may impose conditions on one bargaining unit that are not

26   imposed on others; in fact, nothing in the MMC Statute prohibits dissimilar terms between similar

27   agricultural businesses. The mediator "may consider" certain statutory factors to guide his or her

28

1  decisionmaking,[6] but there is no legal requirement that s/he apply those criteria in reaching his or her

2  decision. CAL. LAB. CODE § 1164(e). The statutory criteria are "nonexclusive" and do not preclude

3  the "mediator" from considering factors not listed. Nor does the statute provide guidance as to how

4  s/he should weigh each listed factor, should s/he decide to apply them.

5      23.    The California Court of Appeals found this process to be "the very antithesis of equal

6  protection," explaining that "the necessary outworking of the MMC statute is that each individual

7  employer (within the class of agricultural employers who have not entered a first contract) will have a

8  distinct, unequal, individualized set of rules imposed on it." *Gerawan Farming, Inc. v. ALRB*, 187

9  Cal.Rptr.3d 261, 294-95 (2015), *rev'd*, 3 Cal.5th 1118 (2017).

10     24.    After the "mediator" decides the CBA's terms, only the employer and the union — but

11  not the workers, like the Employees, who are excluded from participating in MMC — have the

12  statutory authority to petition the ALRB for modification of that decision within seven days. CAL.

13  LAB. CODE § 1164.3(a). ALRB review is discretionary, highly deferential, and limited to considering

14  whether certain provisions are "unrelated to wages, hours, or other conditions of employment," "based

15  on clearly erroneous findings of material fact," or "arbitrary or capricious." *Id.*[7] If, upon review, the

16

17

---

18  [6] The MMC Statute provides that:

19  In resolving the issues in dispute, the mediator may consider those factors commonly considered in
    similar proceedings, including:

20          (1)    The stipulations of the parties.
            (2)    The financial condition of the employer and its ability to meet the costs of the contract

21          in those instances where the employer claims an inability to meet the union's wage and benefit
            demands.

22          (3)    The corresponding wages, benefits, and terms and conditions of employment in other
            collective bargaining agreements covering similar agricultural operations with similar labor

23          requirements.
            (4)    The corresponding wages, benefits, and terms and conditions of employment prevailing

24          in comparable firms or industries in geographical areas with similar economic conditions, taking
            into account the size of the employer, the skills, experience, and training required of the
            employees, and the difficulty and nature of the work performed.

25          (5)    The average consumer prices for goods and services according to the California
            Consumer Price Index, and the overall cost of living, in the area where the work is performed.

26  CAL. LAB. CODE § 1164(e).

27      [7] The grounds for such review are that a provision of the CBA set forth in the mediator's report is: (1) unrelated to
    wages, hours, or other conditions of employment; (2) based on clearly erroneous findings of material fact; or (3) arbitrary or

28  capricious in light of the mediator's findings of fact. *Id.* If a *prima facie* case for review is not shown, or if no petition is
    filed, the report becomes the final order of the Board. CAL. LAB. CODE § 1164.3(a).

1   Board finds that one or more grounds for review have been established, it will order the mediator to

2   modify the CBA's problematic terms. *Id.*, § 1164.3(c).

3       25.    Within thirty (30) days after the ALRB's order becomes final, the employer and the

4   union — but not the workers — may seek review before either a California appeals court or the

5   California Supreme Court. CAL. LAB. CODE § 1164.5(a). Judicial review is limited to examining

6   whether the ALRB "acted without, or in excess of, its powers or jurisdiction;" the ALRB failed to

7   "proceed[] in the manner required by law;" or "[t]he order or decision of the [ALRB] was procured by

8   fraud or was an abuse of discretion." *Id.*, § 1164.5(b). A court may also determine whether the order

9   violates the U.S. Constitution or the California Constitution. *Id.*, § 1164.5(b)(4).[8]

10      26.    The MMC order is treated by law as if it were a consensual CBA, with the consequence

11  that employees may not seek to decertify the union until the end of the contract's final year. By

12  invoking MMC, therefore, a union facing the prospect of decertification can maintain its position as

13  exclusive bargaining representative for years, without any showing of support by the workers it

14  purportedly represents, and barring their ability to dismiss an unwanted bargaining representative.

15  **V.    PROCEDURAL BACKGROUND**

16      **A.    The Majority Support Petition ("MSP") Certification**

17      27.     On Friday, 23 February, the UFW filed with the Board a majority support petition

18  ("MSP"), alleging that there were 350 employees in the bargaining unit, and that the MSP was

19  "accompanied by evidence of support by a majority of the employees currently employed in the unit as

20  required by Section 1156.37(c) of the Act." *See* Wonderful Comp., Ex. 1.

21      28.     In a highly-expedited process, and notwithstanding serious deficiencies in the original

22  MSP, and 148 timely-filed employee declarations in which workers claimed to have been misled into

23  signing card authorizations, explicitly informing the Board that did not want to be represented by the

24

---

25      [8] Although the employer (or labor organization) may seek judicial review of the final ALRB order, the parties are
26  required to immediately implement the terms of the "contract" imposed under MMC. *See* CAL. LAB. CODE § 1164.3(f)(2).
    The filing of a petition for review does not stay the final Board order unless the court finds, "by clear and convincing
    evidence," that the petitioner will be irreparably harmed by the implementation of the Board's order and has a likelihood of
27  success on appeal. *Id.*, § 1164.3(f)(3). A bond must be posted by the party seeking review "in the amount of the entire
    economic value of the contract as determined by the board as a condition to filing a petition for a writ of review." *Id.*,
28  § 1164.5(d). "[T]he 'entire economic value of the contract' means the difference between the employees' existing wages
    and economic benefits and those set forth in the contract." *Ibid.*

UFW (Wonderful Comp., Exs. 3 & 4), the ALRB, acting through its Regional Director, concluded it lacked statutory authority to investigate allegations of misconduct, including those relating to forgery of signatures, stating: "[N]either the Act, regulations, nor proposed regulations require or contemplate a procedure whereby the Regional Director must compare signatures of workers to make her determination as to the showing of majority support." Wonderful, Comp., Ex. 4. Specifically, on Friday, 1 March, the Regional Director determined that the UFW had provided 327 authorization cards (out of 640 employees determined to comprise the bargaining unit), or a bare majority showing of 51%. Wonderful Comp., Ex. 3. On Monday morning, 4 March, the ALRB certified the UFW as the exclusive representative of Wonderful's agricultural laborers (the "Certification"). *Id.,* Ex. 5. That evening, the UFW sent a letter requesting Wonderful to bargain over the terms of a CBA, *id.*, Ex, 6, thus triggering the 90-day period before MMC may be demanded. *See* CAL. LAB. CODE § 1164(a)(2).[9]

29.    Notwithstanding repeated attempts, both before and after the Certification, the Board refused to hold the Certification and the MMC process in abeyance pending investigation of employee allegations that UFW representatives falsely assured Wonderful's agricultural laborers that their authorization cards were *not* a vote for the union, but were needed to obtain or confirm a $600 payment from the federal government for COVID-19 related relief. *See, e.g.,* ALRB Admin. Order No. 2024-02, at 2 (6 March); ALRB Admin. Order No. 2024- 04 (18 March); ALRB Admin. Order No. 2024-08 (12 April) (citing CAL. LAB. CODE § 1156.37(f)(3), which explicitly states that post-certification objection proceedings "shall not diminish the duty to bargain or delay the running of the 90-day period" between the union's initial demand to bargain and its right to invoke the MMC process, pursuant to CAL. LAB. CODE § 1164(a)).[10]

30.    In similar disregard of the explicit desires of Wonderful's workers, the Board's investigative hearing examiner ("IHE") — appointed to preside over the post-certification objections hearing — denied the request of thirteen Wonderful workers, including all of the Employees, to intervene in the election objection proceedings. Wonderful Comp. at 130-37, Ex. 9. Shortly

---

[9]  The UFW did not ask for available dates for contract negotiations until 2 May (Wonderful Comp., Ex. 7), or roughly sixty (60) days after the union was certified and Wonderful's bargaining obligations incepted.

[10]  The Board's administrative orders  are available at https://www.alrb.ca.gov/legalsearches/decision-index/admin-orders/administrative-orders-2024/.

1   thereafter, the Board affirmed the IHE's order.  *Id.* at 139-48, Ex. 10.  The Board also refused the

2   workers' California Public Records Act ("PRA") requests to inspect the 327 authorization cards

3   deemed to be valid proof of majority support or to even disclose whether the cards of these 13 workers

4   who made the PRA requests were included as part of the "proof" of majority support.

5
6   **D.     Wonderful Is Compelled into MMC and the Superior Court Preliminarily Enjoins Enforcement of the MSP Statute.**

7         31.     On 26 June, the UFW petitioned the ALRB to refer Wonderful into MMC.  *See* ALRB

8   Admin. Order No. 2024-23 (10 July).  Wonderful Comp., Ex. 8.  The Board rejected Wonderful's

9   request to defer MMC until the California Superior Court for Kern County adjudicated Wonderful's

10  pending constitutional challenge to the MSP Statute,[11] and referred the parties into MMC on 10 July,

11  finding that the UFW satisfied "the statutory and regulatory criteria for referral to MMC."  Wonderful

12  asked the Board (a defendant in the pending Superior Court proceedings) to defer its decision to

13  compel Wonderful into MMC pending a judicial determination as to whether the MSP "election"

14  Certification was the invalid result of a constitutionally defective process., and the Board concluded it

15  was without authority "to declare or refuse to enforce the provisions of [the MSP Statute] or [the

16  MMC Statute] as unconstitutional."  *Id.*, at 5.

17        32.     On 18 July, the Superior Court granted Wonderful's motion for preliminary

18  injunction,[12] enjoining the Board and UFW from: (1) enforcing the Certification; and (2) continuing to

19
20
21        [11]  On 13 May, Wonderful filed a verified petition for writ of mandate and complaint challenging the
22  constitutionality of the MSP Statute alleging, *inter alia*, that the certification process of the MSP Statute, facially and as
    applied, violates the Due Process Clauses of the California and United States Constitutions, and violates the Separation of
23  Powers and the Judicial Powers Clauses of the California Constitution.  On 12 June, the Employees sought to intervene in
    that action, and were denied intervention in the state court action on 11 July.

24        [12]  The Superior Court found that: (a) "Wonderful is likely to prevail on its due process challenges to Labor Code
25  section 1156.37"; (b) "the harm suffered by Wonderful if it is forced to comply with a process that is likely unconstitutional
    while waiting until the Agricultural Labor Relations Board's final order becomes effective to challenge the certification
26  (which Wonderful credibly contends is erroneous) is largely irreparable"; and (c) "the public interest weighs in favor of
    preliminary injunctive relief given the constitutional rights at stake in this matter, … [and] Wonderful has met its burden
27  that a preliminary injunction should issue until the matter may be heard fully on the merits."  The Superior Court held that
    Wonderful was not required to await a "final" order of the Board before seeking judicial relief because: first, Wonderful
28  had brought a facial challenge to § 1156.37; second, because Wonderful did not have a plain, speedy, or adequate means to
    challenge the constitutionality of the MSP Statute; and third, that there was substantial uncertainty that Wonderful could
    ever obtain judicial review of the Certification.

1   conduct the post-Certification objections proceedings.  The Preliminary Injunction Order ("PI Order")

2   was entered on 12 August.

3       33.     On 19 July, the Board notified the parties that the post-Certification objections

4   proceedings (ALRB Case No. 2024-RM-002) and the MMC proceedings (ALRB Case No. 2024-

5   MMC-001) were stayed pending further notice.  On 12 August, the ALRB and the UFW both sought a

6   stay of the PI Order.  On 23 August, the Superior Court overruled the Board's and UFW's demurrers.

7   The Superior Court declined the ALRB and UFW's request for a stay of the Preliminary Injunction on

8   12 September.

9       34.     On 20 August, the ALRB and UFW filed separate Notices of Appeal of the PI Order in

10  the California Court of Appeal for the Fifth District, Case Numbers F088515 and F088520 (the

11  "Appeals").  The Appeals were consolidated on 23 September.

12      35.     On 12 and 13 September, respectively, the ALRB and UFW filed separate petitions for

13  a writ of supersedeas vacating the PI Order pending resolution of the Appeals (the "Supersedeas

14  Writ").  In addition, the ALRB and UFW each filed petitions for a writ of mandate directing the

15  Superior Court to vacate its order overruling their demurrers on the basis of failure to exhaust

16  administrative remedies, and dismiss the underlying action (the "Writ Proceedings").

17      36.     On 24 October, the Fifth District Court of Appeals issued the Supersedeas Writ and

18  ordered Wonderful to file written returns in the Writ Proceedings within 30 days, without explanation.

19  The UFW immediately demanded that the MMC process resume.  On 30 October, Defendant ALRB

20  Executive Secretary Avila-Gomez issued a "Notice Lifting Stay" in the MMC proceedings, notifying

21  the parties that the objections hearing would resume forthwith.  Hearings before the IHE (the fourth

22  assigned by the ALRB to oversee the objections hearing) recommenced on 10-13 December.  Future

23  hearing dates are calendared for January, 2025.

24      37.     On 6 December, upon Wonderful's request, the Fifth District Court of Appeals granted

25  the appeal of the PI Order calendar priority, so the Appeal will be placed on the first available calendar

26  once it is fully briefed.

27  ////

28  ////

### E.    The MMC Process Resumes.

38.    On or about 12 November, MMC mediator Matt Goldberg was empaneled by the Board.  The first "off-the-record" confidential mediation session was conducted on 19 December, and an"on-the-record" arbitration phase of the MMC proceedings was set for 25-27 February 2025.

39.    Assuming that the arbitration phase of MMC concludes on 27 February, the mediator shall file his report with the ALRB within 21 days "that resolves all of the issues between the parties and establishes the final terms of a CBA, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process."  CAL. LAB. CODE § 1164(d).

40.    Thus, the ALRB threatens to issue a final decision and order imposing an MMC "agreement" upon Wonderful and its employees, including the Employees herein, as early as the end of March 2025.  The Employees have no opportunity to vote on the forced contract resulting from MMC, let alone to participate in (or to observe even silently) the MMC process.  *See Gerawan Farming, Inc.* v. *ALRB*, 40 Cal.App.5th 241, 278 (2019) (*Gerawan II*) (no constitutional right of public access to on-the-record MMC proceedings)

## VI.    THE LEGAL AND PRACTICAL CONSEQUENCES OF MMC ON THE EMPLOYEES.

41.    The certification of a labor organization grants a monopoly right — akin to a public utility or common carrier — whereby the state designates the union as the workers' exclusive bargaining representative.[13]  Once certified, nothing — other than the passage of 90 days after a union's initial demand to bargain — stands between the Employees and a State-imposed MMC "contract."

### A.    Compelled Association

42.    The MMC "contract" forces Wonderful **and** the Employees to associate with the UFW against their will.  But the "[f]reedom of association ... plainly presupposes a freedom not to

---

[13]  *See Gay Law Students Assn. v. Pacific Tel. & Tel. Co.,* 24 Cal.3d 458, 481-82 (1979), quoting *James v. Marinship Corp.,* 25 Cal.2d 721, 731 (1944); *see also J. I. Case Co.* v. *NLRB,* 321 U.S. 332, 335 (1944) (likening terms of CBA to "to the tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service)

associate."  *See Janus*, 585 U.S. at 892.[14]  A compulsory CBA infringes on the right of *workers* — including the Employees — to speak and to associate, because the ALRA bars their right to seek to remove the union during the term of the MMC "agreement."  That amounts to state-compelled association, a direct impingement on the farm workers' liberty interests.

43.    In upholding the NLRA against a constitutional due process challenge, the Supreme Court held that laborers have a "fundamental right" to organize and to select representatives of their own choosing.  *See Jones & Laughlin,* 301 U.S. at 33, citing *American Steel Foundries v. Tri-City Council,* 257 U.S. 184, 209 (1921) (Taft, C.J.) (the employees' right of self-organization was "essential to give laborers opportunity to deal on an equality with their employer").  This right of self-determination "is guaranteed by the federal Constitution as an incident of freedom of speech, press and assemblage, and it is not dependent upon the existence of a labor controversy between the employer and his employee."  *See County Sanitation Dist. v. L.A. Cty. Employees*, 38 Cal.3d 564, 587-88 (1985) (citations omitted); *accord id.*, at 596 (Bird, C.J., concurring), *citing American Steel Foundries*, *supra*.

44.    Conversely, there could be "no clearer abridgement" of free choice than to grant exclusive bargaining status to a union "selected by a minority of ... employees, thereby impressing that agent upon the nonconsenting majority."  *Int'l Ladies' Garment Workers' Union v. NLRB,* 366 U.S. 731, 737 (1961).  Regulations that infringe on the freedom not to associate or that compel association may be justified only "to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Smith v. Regents of University of California,* 4 Cal.4th 843, 853 (1993) (internal quotation marks omitted).  Assuming that the State may place any limitations on the employee's right to withdraw his or her support for a union, "the resulting burden on freedom of association requires that the procedure be carefully tailored to minimize the infringement."  *Ibid*.

45.    There is no requirement that the MMC contract (or, as alleged by 148 (or roughly 25%) of Wonderful's agricultural employees, the UFW itself) enjoys majority support.  Quite the contrary,

---

[14]  *See Janus*, 585 U.S. at 892 ("[f]reedom of association ... plainly presupposes a freedom not to associate]; *see also Knox v. SEIU Local 1000*, 567 U.S. 298, 309 (2012) (same); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Infringements on [the right to associate for expressive purposes] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms")

1   the workers have had no opportunity to vote on the forced contract, let alone to participate in (or to

2   observe even silently) the MMC process.  *See Gerawan Farming, Inc. v. ALRB*, 40 Cal.App.5th 241,

3   278 (2019) ("*Gerawan II*") (no constitutional right of public access to on-the-record MMC

4   proceedings).

5        46.    The impairment of the Employees' associational rights is not limited to the

6   subordination of the individuals' economic interests to the collective.  Upon information and belief,

7   every Board-imposed MMC contract includes a forced-unionism or so-called "union security" clause,

8   a provision in requiring employees to surrender a portion of his wages to the union as "union dues" or

9   "agency fees," upon pain of discharge by the employer.[15]  Because the Board deems union security

10  clauses to be a standard or "typical" provision in virtually every union agreement, the employer's

11  refusal to accede to this clause has been held to constitute bad faith bargaining, *even where the

12  employer has been compelled into MMC.  See Gerawan III,* 52 Cal.App.5th at 183-184 & n. 19.  Upon

13  information and belief, an MMC "contract" imposed here will contain a forced-unionism or "union

14  security" clause, as has every MMC "contract" issued by the Board.

15       47.    Requiring an employer to fire an employee who refuses to subsidize the union's speech-

16  related activities infringes on the freedom of association between the employee and employer.  A state-

17  imposed contract containing a forced-unionism clause constitutes "state action" under 42 U.S.C.

18  § 1983 imposing a direct infringement on First Amendment rights, and therefore falls under the

19  restrictions of *Janus*, which barred state-mandated and -enforced forced-unionism schemes.  585 U.S.

20  at 916 ("It is ... not disputed that the State may require that a union serve as exclusive bargaining agent

21  for ... employees — itself a significant impingement on associational freedoms that would not be

22  tolerated in other contexts.  We simply draw the line at allowing the government to go further still and

23  require all employees to support the union irrespective of whether they share its views").

24

25
_____

26       [15]  *See also Gerawan Farming, Inc. v. ALRB,* 52 Cal.App.5th 141, 169 (2020) ("*Gerawan III*") (quoting testimony
    by UFW First-Vice President Elenes) (emphasis added) ("Well, obviously ... we have an obligation to represent all
27  employees ....  ***And again, all our contracts have some type of union security language*** that indicates that the employees
    are either going to pay agency fees or going to pay dues, membership dues.  And obviously we need that to be able to
28  collect dues, be able to collect agency fees so that we can fund the work that we're going to have to do to administer the
    contract and continue improving the conditions of other farm workers").

48.    These infringements do not strictly involve regulation of hours, pay, or working conditions.  They directly impact First Amendment rights, particularly as the MMC "contract" is imposed upon the employer and the employees by the State.  To again consider the analogy with a grant of a monopoly to a public utility:

> The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds.

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 639 (1943).

## B.    Freedom of Labor

49.    Farmworkers have some "generalized due process right to choose one's field of private employment," *Conn v. Gabbert,* 526 U.S. 286, 291-92 (1999), a right recognized by Justice Brandeis in the last of the Court's unanimous Kansas Act decisions.[16]  The right to hold specific private employment "free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment."  *Greene v. McElroy*, 360 U.S. 474, 492 (1959); *Merritt v. Mackey*, 827 F.2d 1368, 1370 (9TH CIR. 1987) ("It is indisputable that an individual may have a protected property interest in private employment.").

50.    A compulsory CBA impinges upon the "freedom of labor" *Wolff I*, 262 U.S. at 542, for not fewer than five reasons, as it:

a.    inherently eliminates an ***employee's right to individually bargain with the employer***.  An individual worker may negotiate on the basis of his or her own best interests.  A union has leeway to "subordinate the interests of an individual employee to the collective interests of … the bargaining unit."  *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 269 (2009).  Indeed, a union has "powers comparable to those possessed by a legislative body both to create and restrict the rights of  those whom it represents."  *Steele v. Louisville & Nashville R.R. Co*., 323 U.S. 192, 202 (1944);

---

[16]  *See Dorchy II*, 272 U.S. at 311 (Brandeis, J.) ("The right to carry on business — be it called liberty or property — has value. To interfere with this right without just cause is unlawful."); *see also Ry. Employees' Dep't v. Hanson,* 351 U.S. 225, 234 (1956) ("[T]he right to work, which the Court has frequently included in the concept of 'liberty' within the meaning of the Due Process Clauses may not be denied by the Congress").

b.      affects *the right to strike*. "Collective-bargaining contracts frequently have included certain waivers of the employees' right to strike." *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 356 (1956).  Upon information and belief, *every* MMC contract imposed by the ALRB includes such a waiver;

c.      affects *the right to redress for employment grievances*.  A union generally has "discretion" when performing its functions under "the collective bargaining system." *Electrical Workers v. Foust*, 442 U.S. 42, 51 (1979).  As a result, a worker has little ability to "force unions to process … claims" that the unions wish to drop.  *Id*.  Upon information and belief, every MMC contract supplants the right of workers to pursue claims as an individual with an intricate grievance and arbitration scheme whereby the union controls which workers are permitted to avail themselves of the process; and

d.      affects *the right to vote on employment terms*.  Workers ordinarily may vote (a so-called "ratification vote") on CBAs.  *See NLRB v. Rockaway News Supply Co*., 345 U.S. 71, 73 (1953).  But under the MMC Statute, the "contract" takes effect by force of law, and without submission to the workers for their approval; and

e.      directly affects *the right of workers to hold the bargaining representative accountable* for its actions.  Workers ordinarily have the right to "petition … for a decertification election, at which they would have an opportunity to choose no longer to be represented by a union." *Brooks v. NLRB*, 348 U.S. 96, 100-01 (1954).  The MMC contract extinguishes that right for the term of the "agreement."  Under Cal. Lab. Code § 1156.7(b), a CBA shall be a bar to a petition for election for the term of the agreement, but in any event such bar shall not exceed three years.

51.     All of these rights are therefore in tension with the union's interests in perpetuating its monopoly control over the bargaining rights of agricultural laborers (and, of course, its financial interest in continuing to compel farmworkers to hand over a portion of their paycheck as union fees).  "It is difficult to assume that the incumbent union has no self-interest of its own to serve by perpetuating itself as the bargaining representative." *NLRB v. Magnavox Co.*, 415 U.S. 322, 325 (1974).  The union invoking MMC has an interest in obtaining an "agreement" backed by the coercive

power of the State, precisely *because* it diminishes the farmworker's right to self-determination and his or her take-home pay.

52.     The necessary outworking of the MMC process is to empower a union to seize fees from unwilling workers; to subject to discharge workers who refuse to subsidize the UFW; and to bar farmworkers from seeking to decertify the union until the final year of the "contract."  At the same time, it forces employees (and their employer) to associate with a union they cannot dislodge, to pay union dues or fees under a CBA they did not ratify or even negotiate, and to relinquish myriad rights, including (as is standard in every MMC contract) the right to strike.

**C.     Freedom of Contract**

53.     A compulsory CBA involves a government takeover of the operations of the workplace — hours and breaks, pay and seniority, working conditions, and more — imposed by force of law.  It leaves both workers and the employer no flexibility, because it dictates precisely how long the employee must work, how much s/he must be paid, whether employees may engage in constitutionally-protected rights of collective action, including whether to oust and/or replace their bargaining representative, ande the payment of forced union dues or fees.

54.     A CBA "is more than a contract; it is a generalized code to govern a myriad of cases ... covering the whole employment relationship."  *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578-79 (1960).  Agreements reached through consensual negotiation are "an effort to erect a system of industrial self-government."  *Id*. at 580.

55.     A compulsory CBA involves a takeover of labor-management relations of the workplace by the State — hours and breaks, hiring and firing, pay and seniority, working conditions, the adjustment of grievances, and more — all imposed by force of law.  Unlike, for example, general minimum wage or maximum hours requirements where the state imposes floors or ceilings, California has undertaken to dictate every single term of the employment relationship at one particular workplace, including by curtailing the ability of farmworkers to exercise their constitutionally-protected right to replace or oust their bargaining representative.  This goes well beyond general police power legislation.

56.    Juxtaposed against this complete takeover of one employer's economic relationship with its farmworkers is the absence of any due process afforded the ostensible beneficiaries of the MMC Statute's protections.  Farmworkers are and have been prevented from "intervening" in MMC proceedings, denied any statutory right of judicial review of the "contract," and barred from even observing in silence the "on the record" arbitral phase of MMC.  *See Gerawan Farming, Inc.*, 39 ALRB No. 11, at 2, 7 (2013) ("The statutes and regulations governing MMC do not provide any mechanism for third parties to "intervene" in MMC proceedings," and concluding that intervention by workers "would be inconsistent with the structure of MMC and would undermine its functioning."); *Gerawan Farming, Inc.*, 39 ALRB No. 13 (2013) (barring worker access to the arbitration phase of MMC on the grounds that their presence was not in the public interest), *aff'd*, *Gerawan II*, 40 Cal.App.5th at 278.  The Employees here have likewise been denied such participation in any of the proceedings affecting their rights.  *See* ¶ 30, *supra*.  Instead, farmworkers must depend on the employer to raise their rights in the MMC proceedings, or *via* the statutory review procedures, a circumstance which places the guarantee of their rights into the hands of an employer who may be willing to surrender them for any number of reasons, including a balancing of calculable litigation costs against inchoate employee rights.

## VII.    THE MERITS OF THESE CONSTITUTIONAL CHALLENGES CAN AND SHOULD BE DECIDED NOW.

57.    No exhaustion or abstention considerations impede this Court from deciding the merits of the Employees' or Wonderful's federal constitutional challenges now, before they suffer further injury.  Even before the inevitable imposition of an MMC contract containing a forced-unionism clause, the Employees and Wonderful have suffered, and continue to suffer, from being thrust into an unconstitutional process.  *Axon Enterprise, Inc. v. Federal Trade Commission*, 598 U.S. 175, 191 (2023) ("The claim, again, is about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker").  The Employees will predictably suffer unconstitutional demands for union dues and/or agency fees from a state-imposed CBA resulting from the inexorable MMC process.  *But see Janus*, 585 U.S. at 916 ("We ... draw the line at allowing the government to go further still and require all employees to support the union irrespective of whether they share its views").

58.     Federal precedent tilts decisively favors expeditious judicial resolution of the Employees' facial constitutional challenges.  "The questions of law presented in these proceedings arise under the Constitution, not under the statute whose validity is challenged."  *See Johnson v. Robison,* 415 U.S. 361, 367 (1974) (citation and quotation marks omitted).  A declaratory relief action is uniquely suited to the expeditious resolution of pure questions of law, especially those involving the constitutionality of statutes.  One of the reasons why declaratory relief is appropriate is to avoid requiring a plaintiff to expose himself to the risk of violating the law in order to challenge it.  *See, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-129 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat") (emphasis original); *Maryland Right to Life State Political Action Committee v. Weathersbee*, 975 F.Supp. 791, 794 (D.MD. 1997) (plaintiff "not required to violate state law to challenge it as violative of the Constitution, he need only face 'a credible threat of prosecution'") (quoting *International Soc'y for Krishna Consciousness v. Eaves,* 601 F.2d 809, 819 (5TH CIR. 1979)).[17]

59.     The threat here is indisputably real.  Although the MMC process is moving forward, the Board, as an administrative agency, cannot decide the constitutionality of the MMC Statute.  *See* CAL. CONST. art. III, § 3.5.  At the same time, the Board has repeatedly stated that it has no authority to stay the MMC proceedings pending the outcome of the MSP objections hearing or of Wonderful's state case challenging the constitutionality of the MSP statute.  Wonderful Comp., Ex. 8, p. 5.  As the Supreme Court has held, "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to [42 U.S.C.] § 1983."  *Patsy v. Florida Board of Regents*, 457 U.S. 496, 516 (1982).

---

[17]  The justiciability of the Employee's facial constitutional challenges is explained by the distinction between reviewing a decision by the ***administrator*** made "under" the statute and reviewing the decision by the ***Legislature*** that created the statutory scheme.  The decision by the agency involves the application of a particular provision of the law to a particular set of facts or circumstances.  Under those circumstances, a court should be reluctant to inject itself *via* interlocutory rulings.  Among other reasons, interim agency orders and discretionary decisions may or may not prove dispositive, or even relevant, as to the final agency action.

60.     The Employees are not parties to the aforementioned Board proceedings, or to the MMC process, or to the state court suit, having been denied intervention in both, and thus their federal case cannot and should not be delayed because of those proceedings.[18]

61.     Even for those allowed to participate in MMC, the MMC Statute provides only discretionary and limited state court judicial review.  *See* CAL. LAB. CODE § 1164.5.[19]  Moreover, it would be an exercise in futility to ask a lower state court to disagree with the California Supreme Court's holding in *Gerawan I* (*see* ¶ 5, *supra*), or to expect the California Supreme Court to overturn its own decision.  *Cf. Sweet v. Cupp*, 640 F.2d 233, 236 (9TH CIR. 1981) (noting, in a *habeas* case: "A number of circuits have held that a petitioner may be excused from exhausting state remedies if the highest state court has recently addressed the issue raised in the petition and resolved it adversely to the petitioner, in the absence of intervening United States Supreme Court decisions on point or any other indication that the state court intends to depart from its prior decisions").  "[T]he futility doctrine … promotes comity by requiring exhaustion where resort to state courts would serve a useful function but excusing compliance where the doctrine would only create an unnecessary impediment to the prompt determination of individuals' rights."  *Id.*[20]

62.     The circumstances here therefore do not support this Court exercising discretion to abstain from deciding the Employees' federal constitutional claims,[21] *Younger v. Harris*, 401 U.S. 37 (1971), or Wonderful's related claims, as the Employees are not even parties to those proceedings, and are barred from becoming parties to them.  Therefore, even if the Employees could obtain full review on the merits in state court at some indefinite time in the future (the latter, if at all), *Younger* abstention requires state proceedings to be pending.  *See Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992)

---

[18]  The only proceedings involving the Employees are three separate but related unfair labor practice charges filed in April, which remain pending, and have been treated with considerably less dispatch than any other matters in these proceedings.

[19]  This is so, even though that holding is distinguishable from the procedural posture of Wonderful's case, *i.e.*, Gerawan's employees could seek to — and did — decertify the union **before** the MMC contract was imposed.

[20]  Although some of Wonderful's federal constitutional arguments have not been addressed by the California Supreme Court, *see* ¶¶ 5-6, *supra*, it would be inefficient (to say the least) for this Court to resolve only some of Wonderful's and the Employees' federal constitutional challenges.

[21]  "There is no discretion to abstain in cases that do not meet the requirements of the abstention doctrine being invoked. " *Martinez v. Newport Beach City*, 125 F.3d 777, 780 (9TH CIR. 1977) (citations omitted).

1  ("Absent any *pending* proceeding in state tribunals, therefore, application by the lowers courts of

2  *Younger* abstention was clearly erroneous") (emphasis original).  Moreover, the Supreme Court

3  recently reaffirmed the limited "scope" of the types of state proceedings warranting *Younger*

4  abstention.  *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) ( "'[O]nly exceptional

5  circumstances … justify a federal court's refusal to decide a case in deference to the States,'" quoting

6  *New Orleans Public Service, Inc. v. Council of City of New Orleans* ("*NOPSI*"), 491 U.S. 350, 368

7  (1989)).[22]  The only relevant ongoing state proceedings here involving the MMC Statute are the

8  mediation and negotiations before the mediator, which do not trigger *Younger*.[23]

9        63.      In *Sprint*, the Supreme Court held a state administrative action "does not fall within any

10  of the three exceptional categories … and therefore does not trigger *Younger* abstention."  571 U.S. at

11  70, 79.  The MMC proceedings are similar in relevant respects to the proceedings the Supreme Court

12  held in *Sprint* did not trigger *Younger*, having been "initiated" by the UFW (a private party and not the

13  state) following the parties failure to reach a C//BA (and not to punish Wonderful for any alleged

14  wrongful conduct).  Indeed, *Gerawan I* characterized MMC as a "quasi-legislative" proceeding.  Even

15  if Board review of the mediator's report and thereafter judicial review of the Board's resulting order is

16  sought, such review is initiated by a "party," and not the state.  CAL. LAB. CODE §§ 1164.3 & 1164.5.[24]

17        64.      More pertinent, the Ninth Circuit did not disturb the district court's holding in *Lopez v.*

18  *Shiroma*, 2014 WL 3689696, at **17-18 (E.D. CAL. 24 July 2014), *aff'd in part, rev'd in part, and*

19  *remanded*, 668 Fed.Appx. 804 (9TH CIR. 2016), that ongoing ALRB proceedings did not warrant

20  *Younger* abstention. In that case, the district court concluded:

21
22
> The facts of this case are similar to the facts of *Sprint* and *Readylink* in that ongoing
> ALRB proceedings were initiated to resolve a dispute between private parties.  Plaintiff

23      [22] Those circumstances are: (1) "state criminal prosecutions"; (2) "certain 'civil enforcement proceedings'"; and
24  (3) "'civil proceedings involving certain orders … uniquely in furtherance of the state courts' ability to perform their
    judicial functions.'"  571 U.S. at 78, quoting *NOPSI*, 491 U.S. at 368.

25      [23] In *Sprint*, as in *NOPSI*, the Supreme Court "assume[d] without deciding … that an administrative adjudication
26  and the subsequent state court's review of it count as a 'unitary process' for *Younger* purposes," instead answering the
    question whether the "initial [administrative] proceeding is of the 'sort … entitled to *Younger* treatment."  571 U.S. at 592
27  (quoting *NOPSI*, 491 U.S. at 369).

28      [24] Further *indicia* of the MMC process not being quasi-criminal is the California Supreme Court's characterization
    of the MMC process as "result[ing] in 'quasi-legislative action'" and "a continuation of the ordinary bargaining process."
    *Gerawan I*, 3 Cal.5th at 1133, 1156.

1
2
3
4
5

sought the Board's approval and oversight when she petitioned for a decertification election. Later, Plaintiff, Gerawan and the UFW sought review from the ALRB when each alleged objections to aspects of the election. Plaintiff alleges that Defendant [ALRB Regional Director]Shawver filed some enforcement actions against Gerawan during these proceedings. However, this Court finds that these activities are secondary to the larger issue in dispute — which is whether the decertification election was conducted properly. This is a dispute between Plaintiff, her employer and the Union; not, at this juncture, between the ALRB and Gerawan or the UFW. Thus, this is not the sort "exceptional case" where *Younger* applies.

6

2014 WL 3689696, at *8.[25] In sum, the exceptional circumstances allowing discretionary *Younger*

7

abstention are not present here.

8

## VIII. PLAINTIFFS-INTERVENORS' CLAIM FOR RELIEF

9

### (Violation of 42 U.S.C. § 1983 and the Constitution of the United States)

10

65. "No State shall ... deprive any person of life, liberty, or property, without due process of

11

law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. CONST.

12

amend. XIV, §1.

13

66. 42 U.S.C. § 1983 states:

14
15
16

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

17

### FIRST CAUSE OF ACTION

18
19
20

### VIOLATION OF THE FIRST AMENDMENT OF THE U.S. CONSTITUTION
### (Right to Freedom of Speech and Association)
### (Against All Defendants)
### (42 U.S.C. § 1983)

21

67. California's law mandating compulsory arbitration and allowing the ALRB to impose

22

contract terms on certain parties, including a forced unionism or "union security" provision upon

23

farmworkers violates the First Amendment rights of both free speech and association. *Janus*, 585 U.S.

24

at 916, 929-30.

25
26

---

27
28

[25] In *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund,* 754 F.3d 754, 760 (9TH CIR. 2014), the Ninth Circuit held that *Younger* abstention did not attach to a decision of the California Department of Insurance, when the adjudication was initiated to resolve a dispute between an employer and a state insurance fund that acted as a private party, explaining that "[i]f the mere 'initiation' of a judicial or quasi-judicial administrative proceeding were an act of civil enforcement, *Younger* would extend to every case in which a state judicial officer resolves a dispute between two private parties."

68.    In depriving and/or threatening to deprive the Employees of these rights, as more fully described above, Defendants acted and are acting under color of state law.  This deprivation under color of state law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

69.    The MMC Statute, CAL. LAB. CODE § 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the First Amendment to the U.S. Constitution.

## SECOND CAUSE OF ACTION

### VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION
### (Unlawful Delegation; Parallel to Wonderful's Third Cause of Action)
### (Against All Defendants)
### (42 U.S.C. § 1983)

70.    The Employees incorporate herein by reference and reallege each allegation set forth in Paragraphs 1 through 66, *supra.*  The Employees also adopt herein by reference the Third Cause of Action stated in Wonderful's Comp., ¶¶ 126-142.

### A.    The MMC Statute's Delegation of Coercive State Power to a Private, Self-Interested Union Violates Due Process of Law.

71.    Under the MMC Statute, a union – not the State of California – decides whether, when, and which employees and employers it will target for forced contracting.  The ALRB operates without any discretionary decisionmaking or control over a union's targeting, even to the degree that it disclaims interest in ascertaining the circumstances of the acquisition of "majority" support.  Its role in "referring" an employer into MMC requires nothing more than to confirm that 90 days have elapsed since the union's initial request to bargain.  The MMC Statute "abdicate[s] effective state control over state power [to] private parties, serving their own private advantage, [who] may unilaterally invoke state power" over another private party.  *Fuentes v. Shevin*, 407 U.S. 67, 69-70 (1972).

72.    In *Fuentes*, the Supreme Court struck down the delegation of regulatory authority to private parties – that case involved state power to replevy goods from another – as a violation of the Due Process Clause:

> No state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plaintiff provide any information to the court on these matters. The State acts largely in the dark.

407 U.S. at 69-70.  This constitutional due process rationale was recognized by the Supreme Court over a century ago,[26] and its continuing vitality has been reaffirmed in numerous contexts.[27]  "These opinions still stand for the proposition that a legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property in which other individuals have a property interest, without supplying standards to guide the private parties' discretion. " *General Elec. v. N.Y. State Dept. of Labor*, 936 F.2d 1448, 1455 (2D CIR. 1991) ("Otherwise, administrative decision-making [will be] made potentially subservient to selfish or arbitrary motivations or the whims of local taste") (citation and quotations omitted).  The Supreme Court has recently reaffirmed the rule. *See Chrysafis* v. *Marks*, 141 S.Ct. 2482 (2021) (in the context of landlord-tenant law, tenant may not unilaterally prevent eviction by self-certifying financial hardship, where the landlord has no access to a hearing to contest that certification).

73.    The due process violation in each of these cases involved vesting self-interested, private actors with unfettered and unreviewable power while divesting the government of any residual discretion over how that power may be invoked.  A state may not delegate power of decision to individuals who "are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily," *Roberge*, 278 U.S. at 122, because it incentivizes self-interested persons "to seek personal gain by placing arbitrary conditions on the liberty of their adversaries." *Texas v. United States*, 300 F.Supp.3d 810, 843 (N.D.TEX. 2018), *rev'd on other grounds, Texas v. Rettig*, 987 F.3d

---

26    Just to name a few, the Court has applied this constitutional "private nondelegation" doctrine in the context of industrial regulation, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (holding that a "majority" of industry participants "whose interests may be and often are adverse to theinterests of others in the same business" may not "regulate the affairs of an unwilling minority"), zoning decisions, *Eubank v. City of Richmond*, 226 U.S. 137, 143-44 (1912) (legislature may not delegate a power to some property owners to "virtually control and dispose of the property rights of others" when they can "do so solely for their own interest"); *see also Seattle Trust Co. v. Roberge*, 278 U.S. 116, 121-22 (1928), and creditor-debtor relations.  *Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337 (1969) (creditor may not simply freeze a debtor's wages or seize his goods without making some showing before a judge); *N. Ga. Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 606-07 (1975).

27    Although the Supreme Court was "given the opportunity in [*City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668 (1976)] to overrule the *Lochner*-era cases of *Eubank* and *Roberge,* the Court chose instead to distinguish them," noting that these cases "involved delegations by 'the legislature to a *narrow segment* of the community, not to the people at large.'"  *Silverman v. Barry*, 727 F.2d 1121, 1126 (D.C. CIR. 1984) (citing *City of Eastland*, *supra* at 677); accord *Rice v. Vill. of Johnstown, Ohio*, 30 F.4th 584, 589 (6TH CIR. 2022) ("The Court has never overruled *Eubank* or *Roberge.* And these cases have made occasional appearances in the Court's later opinions"); *Boerschig v. Pipeline*, 872 F.3d 701, 707 (5TH CIR. 2017), citing *General Elec.*, 936 F.2d at 1455 ("Although this so-called 'private nondelegation' doctrine has been largely dormant in the years since, its continuing force is generally accepted").

1   518 (5TH CIR. 2021).  This is "a situation where the Legislature has delegated authority to the very

2   individuals who are to be the subject of the regulations."  *Antoine v. Department of Public Health,* 33

3   Cal.App.3d 215, 227-28 (1973)*.  See also Department of Transportation v. Ass'n of American*

4   *Railroads,* 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("When it comes to [a legislative delegation

5   to] private entities, however, there is not even a fig leaf of constitutional justification").  Put another

6   way, "nothing opens the door to arbitrary action so effectively as to allow those officials to pick and

7   choose only a few to whom they will apply legislation," *Railway Express Agency v. New York*, 336

8   U.S. 106, 112 (1949) (Jackson, J., concurring) — except perhaps where that official power is wielded

9   by a private, self-interested union against an employer, and/or the employees it claims to represent.

10          74.     Under MMC, the mediator fixes the terms of the MMC "agreement."  The Board may

11   review them, within the narrow parameters allowed by the MMC Statute.  But *no one* — other than the

12   union triggering the compulsory arbitration process — decides whether, when, and which employees

13   and employers will be targeted for compulsion into MMC.   Once that happens, neither an employer

14   nor its employees have avenue to avoid the coercive results of this process.  Because bargaining to an

15   agreement is no longer consensual, the employer cannot refuse to accede to terms, or engage in other,

16   permitted tactics in any arms-length negotiation.  *See NLRB v. Insurance Agents' International Union*,

17   361 U.S. 477, 487-489 (1960) (employers and unions in collective bargaining "proceed from contrary

18   and to an extent antagonistic viewpoints and concepts of self-interest....  The presence of economic

19   weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the

20   system that the Wagner and Taft-Hartley Acts have recognized").  Although the employer can walk out

21   of "negotiations," this will not forestall the state-imposed arbitral decree, albeit absent the figh leave of

22   employer "participation."  A contract will be imposed, regardless of whether the employer participates

23   in the process, and without the approval of the "represented" employees.  *See* Regs., § 20407(a)(1)

24   ("The failure of any party to participate or cooperate in the mediation and conciliation process shall not

25   prevent the mediator from filing a report with the Board that resolves all issues and establishes the

26   final terms of a collective bargaining agreement, based on the presentation of the other party").

27   Likewise, employees are denied for the period of the contract of any avenue to dismiss an unwanted

28   and/or ineffective representative.

75.     The forced contract enriches and entrenches the union, allowing it to invoke the power of the State to force farmworkers to choose between losing their jobs and remitting a portion of their salary in union dues or agency fees, while barring a decertification election until the end of the term of the MMC contract.  The conflict of interest is made more palpable by the inability of the farmworkers to ratify that "agreement," or to participate (or even observe) the process triggered by the union's demand.

76.     In light of the Employees of the rights described *supra*, Defendants acted under color of state law.  This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

77.     An actual and substantial controversy exists between the Employees and the Board regarding the pending MMC process, and it is of no less import than, and closely related to, the actual and substantial controversy between Wonderful and the Board.  Both controversies are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issues involved, and the judgment will finalize the controversy and offer relief from uncertainty.

78.     The MMC Statute, CAL. LAB. CODE § 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

### THIRD CAUSE OF ACTION

### VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION
### (Denial of Participation in Proceedings Affecting Rights)
### (Against All Defendants)
### (42 U.S.C. § 1983)

79.     The Employees incorporate herein by reference and reallege each allegation set forth in Paragraphs 1 through 66, *supra*.

80.     In addition to due process violations identified in ¶¶ 143-162 of Wonderful's Complaint, the MMC Statute violates the Employees' due process rights because it excludes them from a government process — MMC — that will decides legal and workplace rights.  The Employees

are therefore deprived of any pre-deprivation process, and are left on the outside, not even allowed to look in. *Gerawan Farming, Inc*., 39 ALRB No. 13 (2013) (barring worker access to the arbitration phase of MMC on the grounds that their presence was not in the public interest), *aff'd*, *Gerawan II*, 40 Cal.App.5th at 278.

81.    In depriving the Employees of the rights described below, Defendants acted under color of state law.  This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

82.    An actual and substantial controversy exists between the Employees and the Board regarding the pending MMC process, in which the Employees have no right or power to participate. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

83.    The MMC Statute, CAL. LAB. CODE § 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

### FOURTH CAUSE OF ACTION

**VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**
**(Denial of Due Process)**
**(Against All Defendants)**
**(42 U.S.C. § 1983)**

84.    The Employees incorporate herein by reference and reallege each allegation set forth in Paragraphs 1 through 66, *supra*.

85.    Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST., amend. XIV, § 1.

86.    For the same reasons set forth in Paragraphs 27-30, *supra*, the MSP election and post-certification hearing procedures violate the Due Process Clause of the Fourteenth Amendment.

87.    The Employees therefore seek declaratory, equitable, and injunctive relief to prevent Defendants from depriving them of the protections afforded to them under the Due Process Clause of the Fourteenth Amendment.

88.    Specifically, the MSP statute, CAL. LAB. CODE § 1156.37, by requiring the Board to certify a union to be employees' representative without first giving those employees notice and an opportunity to be heard prior to the certification, deprives employees of their right to pre-deprivation due process.

89.    The MSP Statute, CAL. LAB. CODE § 1156.37, as well as the "election" and procedures conducted under it, and post-certification hearing procedures, violate the Due Process Clause of the Fourteenth Amendment should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

### FIFTH CAUSE OF ACTION

**FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(Against All Defendants)**
**(42 U.S.C. § 1983)**

90.    The Employees incorporate herein by reference and reallege each allegation set forth in Paragraphs 1 through 69, *supra*. The Employees also adopt herein by reference the Seventh Cause of Action stated in Wonderful's Comp., ¶¶ 198-197.

91.    The Employees desire a judicial determination of their rights, the Board's duties, and the constitutionality of the mandatory mediation and conciliation procedures under CAL. LAB. CODE § 1157 & CAL. LAB. CODE 1164 *et seq*., including that part which permits the State to impose a forced-unionism obligation upon the Employees.

92 .    A declaration is necessary and appropriate at this time so that the Employees, Wonderful, and the Board may be relieved from the uncertainty and insecurity giving rise to this controversy. A proper remedy to challenge an unconstitutional statute or regulation is an action for declaratory and injunctive relief.

93 .    Notwithstanding anything to the contrary under law, an injunction may be granted to prevent the execution of a public state statute, by officers of the law, where the statute violates the U.S.

Constitution. *See e.g., Ex parte Young,* 209 U.S. 123 (1908); *Citizens Comm. for Hudson Valley v. Volpe*, 297 F.Supp. 809, 814 (S.D.N.Y. 1969).

94 . In depriving the Employees and Wonderful of due process and equal protection under the law, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983 by, *inter alia*, a temporary and permanent injunction restraining the enforcement of the MSP and MMC Statutes, CAL. LAB. CODE § 1156.37 & CAL. LAB. CODE § 1164 *et seq*. As such, the Employees and Wonderful have stated a cause of action under § 1983.

95 . An actual and substantial controversy exists between the Employees and Wonderful, and the Board, regarding the pending MSP and MMC processes. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

96 . Pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983, CAL. LAB. CODE § 1156.37 & CAL. LAB. CODE § 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process and Equal Protection Clauses under the Fourteenth Amendment to the U.S. Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, the Employees pray:

A. An order declaring that the Defendants violated the Employees' rights protected under the Fourteenth Amendment of the United States Constitution and under 42 U.S.C. § 1983 by enforcing the MSP Statute against the Employees and Wonderful, and declaring that CAL. LAB. CODE § 1156.37 is unconstitutional on its face;

B. An order declaring that the Defendants violated the Employees' rights protected under the First and Fourteenth Amendments of the United States Constitution and under 42 U.S.C. § 1983 by enforcing the MMC Statute against the Employees and Wonderful, and declaring that CAL. LAB. CODE § 1164 *et seq*. is unconstitutional on its face;

C.      An order preliminarily and then permanently enjoining Defendants and their agents and all other persons or entities in active concert or privity or participation with them, from enforcing CAL. LAB. CODE § 1156.37 and CAL. LAB. CODE § 1164 *et seq.;*

D.      An entry of judgment for the Employees for nominal damages in the amount of $1  each against Defendants in their individual capacities;

E.      An award to the Employees of reasonable attorneys' fees, expenses, and costs incurred in connection with this action from Defendants under 42 U.S.C. §§ 1983 and 1988,, and any other relevant provision of law; and

F.      For such other and further relief as this court deems just and proper.

DATED: 31 January 2025

                              Respectfully submitted,

                              /s/ James R. Harvey

                              JAMES R. HARVEY, Esq.
                              State Bar No. 273790
                              Clifford & Brown, P.C.
                              1430 Truxtun Avenue
                              Bakersfield, California  93301
                              (661) 322-6023
                              Facsimile — (661) 322-3508
                              E-Mail — jharvey@clifford-brownlaw.com

                              /s/ W. James Young

                              W. JAMES YOUNG, Esq.
                              c/o National Right to Work Legal
                                     Defense Foundation, Inc.
                              8001 Braddock Road, Suite 600
                              Springfield, Virginia  22160
                              (703) 321-8510
                              E-Mail — wjy@nrtw.org

                              ATTORNEYS FOR PLAINTIFFS-INTERVENORS

                    H:\WP\California Cases\Chavez.ALRB\Federal Lawsuit - Wonderful\Intervention\Intervenors Complaint.3d.wpd
                                             Friday, 31 January  2025, 14:49:27 PM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I, James R. Harvey, counsel for Plaintiffs-Intervenors, hereby certify that I electronically filed with the Clerk of Court the foregoing **PLAINTIFFS-INTERVENORS CLAUDIA CHAVEZ *ET AL.*'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF,** using the CM/ECF system which will send notification of such filing to Defendants' Counsel and all other Counsel of Record, this 3d day of February, 2025.

_____/s/ James R. Harvey_____

JAMES R. HARVEY