1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   DAVID A. SCHWARZ, Cal Bar No. 159376
3  dschwarz@sheppardmullin.com
   BARBARA E. TAYLOR, Cal Bar No. 166374
4  btaylor@sheppardmullin.com
   KRISTA L. LANDIS, Cal. Bar No. 348262
5  klandis@sheppardmullin.com
   1901 Avenue of the Stars, Suite 1600
6  Los Angeles, California 90067-6055
   Telephone:    310.228.3700
7  Facsimile:    310.228.3701

8  Attorneys for Wonderful Nurseries, LLC,
   Western Growers Association and
9  Olive Hill Greenhouses, Inc.

10  (cont. on next page)

11                      U.S. DISTRICT COURT

12          FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 13  WONDERFUL NURSERIES, LLC, | <u>Lead Case</u>: 1:24-cv-01601-KES-CDB<br><u>Member Case</u>: 1:25-cv-00577-KES-CDB |
| 14              Plaintiff, | |
| | **CONSOLIDATED COMPLAINT FOR:** |
| 15  CLAUDIA CHAVEZ, et al., | |
| | **(1) VIOLATION OF DUE PROCESS, FIRST – FIFTH & NINTH CAUSES OF ACTION** [U.S. Const., amend. XIV; 42 U.S.C. § 1983 and § 1988]; |
| 16              Intervenor-Plaintiffs, | |
| 17          v. | |
| 18  AGRICULTURAL LABOR RELATIONS BOARD, et al.; and DOES 1 through 10 | **(2) VIOLATION OF EQUAL PROTECTION, SIXTH CAUSE OF ACTION** [U.S. Const., amend. XIV; 42 U.S.C. § 1983 and § 1988]; |
| 19  inclusive, | |
| 20          Defendants. | |
| 21  UNITED FARM WORKERS OF AMERICA | **(3) DECLARATORY AND INJUNCTIVE RELIEF, SEVENTH CAUSE OF ACTION** [28 U.S.C. §§ 2201, 2202]; |
| 22          Intervenor-Defendant. | |
| 23 | |
| 24  WESTERN GROWERS ASSOCIATION and OLIVE HILL GREENHOUSES, INC, | **(4) VIOLATION OF FIRST AMENDMENT, EIGHTH CAUSE OF ACTION** (U.S. Const., amends. I and XIV; 42 U.S.C. § 1983 and § 1988) |
| 25          Plaintiffs, | |
| 26          v. | |
| 27  CALIFORNIA AGRICULTURAL LABOR RELATIONS BOARD, et al.; and DOES 1 through 10 inclusive. | |
| 28 | |

CONSOLIDATED COMPLAINT FOR
                    DECLARATORY AND INJUNCTIVE RELIEF

Defendants.

UNITED FARM WORKERS OF AMERICA

Intervenor-Defendant

BARSAMIAN & MOODY
    A Professional Corporation
RONALD H. BARSAMIAN, Cal Bar No. 81531
ronbarsamian@aol.com
1141 West Shaw Avenue, Suite 104
Fresno, California 93711
Telephone:    559.248.2360
Facsimile:    559.248.2370

ROLL LAW GROUP P.C.
KRISTINA M. DIAZ, Cal Bar No. 151566
Kristina.Diaz@Roll.com
11444 W. Olympic Boulevard
Los Angeles, California 90064
Telephone:    310.966.8400
Facsimile:    310.966.8810

Attorneys for Wonderful Nurseries LLC

BARSAMIAN & MOODY
    A Professional Corporation
PATRICK MOODY, Cal Bar No. 156928
pmoody@theemployerslawfirm.com
1141 West Shaw Avenue, Suite 104
Fresno, California 93711
Telephone:    559.248.2360
Facsimile:    559.248.2370

Attorneys for Western Growers Association and
Olive Hill Greenhouses, Inc.

JASON E. RESNICK, Cal. Bar No. 179905
jresnick@wga.com
6501 Irvine Center Dr, Suite 100
Irvine, CA 92618
Telephone:    (949) 885-2253
Facsimile:    (949) 809-6253

Attorney for Western Growers Association

(cont. on next page)

SMRH:4905-9044-1555.3

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  JAMES R. HARVEY, Esq.
   State Bar No. 273790
2  Clifford & Brown, P.C.
3  jharvey@clifford-brownlaw.com
   1430 Truxtun Avenue
4  Bakersfield, California 93301
5  Telephone:    (661) 322-6023
   Facsimile:    (661) 322-3508
6
7  W. JAMES YOUNG, Esq.
   *Pro Hac Vice*
8  c/o National Right to Work Legal
       Defense Foundation, Inc.
9  wjy@nrtw.org
10  8001 Braddock Road, Suite 600
   Springfield, Virginia 22160
11  Telephone:    (703) 321-8510
   Facsimile:    (703) 321-9319
12

13  Attorneys for Intervenor-Plaintiffs Claudia Chavez et al.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1

## <u>TABLE OF CONTENTS</u>

2
<u>Page</u>

3    I.    INTRODUCTION .................................................................. 6

4    II.    THE PARTIES ..................................................................... 13

5    III.    JURISDICTION AND VENUE ................................................. 18

6    IV.    THE MMC STATUTORY SCHEME ......................................... 18

7    V.    WONDERFUL'S PROCEDURAL BACKGROUND ........................ 23

8          A.    The Majority Support Petition ("MSP") Certification ............... 23

9          B.    The ALRB Refuses To Stay The Legal Effect Of The Certification
                Pending Resolution Of Wonderful's "Election" Objections ......... 24

10         C.    The ALRB Denies The Farm Workers' Request To Intervene ..... 25

11         D.    Wonderful Is Compelled Into MMC .................................... 25

12         E.    The Superior Court Preliminarily Enjoins Enforcement Of The MSP
                Statute ................................................................... 26

13

14         F.    The Court of Appeal Vacates The Preliminary Injunction Pending
                Appeal .................................................................... 27

15         G.    The UFW Asks the Board to Withdraw Its MMC Petition ......... 28

16   VI.    OLIVE HILL'S PROCEDURAL BACKGROUND ......................... 29

17         A.    The Majority Support Petition ("MSP") Certification ............... 29

18         B.    The MMC Process Has Begun .......................................... 29

19   VII.    THE LEGAL AND PRACTICAL CONSEQUENCES OF MMC ......... 29

20         A.    Compelled Association ................................................... 30

21         B.    Freedom Of Labor ........................................................ 33

22         C.    Freedom Of Contract ..................................................... 36

23   VIII.    THE MERITS OF PLAINTIFFS' CONSTITUTIONAL CHALLENGES
              CAN AND SHOULD BE DECIDED NOW ............................... 38

24

25         FIRST CAUSE OF ACTION VIOLATION OF DUE PROCESS UNDER
              THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ....... 44

26         A.    California's Compulsory Arbitration Scheme Deprives Farm Owners
                Of Liberty And Property Without Due Process Of Law ............. 45

27

28

B.    The U.S. Supreme Court Has Already Concluded That Compulsory Arbitration Schemes Similar To California's MMC Statute Violate Due Process ................................................................. 47

SECOND CAUSE OF ACTION VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ............... 50

THIRD CAUSE OF ACTION VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ............... 53

FOURTH CAUSE OF ACTION VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ............... 58

A.    MMC Impermissibly Combines "Mediation" And "Adjudication" Functions In One Decision-Maker ................................................. 59

B.    The MMC Statute Precludes Admissibility Or Judicial Review Of "Off-The-Record" Or *Ex Parte* Mediation Communications ....................... 61

FIFTH CAUSE OF ACTION VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ................................................................................. 62

SIXTH CAUSE OF ACTION VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ............................................................. 65

SEVENTH CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF ....................................................................... 70

EIGHTH CAUSE OF ACTION  VIOLATION OF THE FIRST AMENDMENT OF THE U.S. CONSTITUTION ..................................................... 72

NINTH CAUSE OF ACTION  VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ............... 72

PRAYER FOR RELIEF ................................................................. 73

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Wonderful Nurseries LLC ("Wonderful"), Western Growers Association ("Western Growers" or "WGA") and Olive Hill Greenhouses, Inc. ("Olive Hill") (collectively, "Plaintiffs") and Intervenor-Plaintiffs Claudia Chavez, et al. ("Employees") allege in this consolidated complaint for declaratory and injunctive relief, and for nominal damages, violations of Plaintiffs' and Employees' constitutional and civil rights under 42 U.S.C. §§ 1983 and 1988 and the First and Fourteenth Amendment to the U.S. Constitution, by Defendants California Agricultural Labor Relations Board ("Board" or "ALRB") and each of its members in their official capacity (collectively, "Defendants"), as follows:

## I.    INTRODUCTION

1.    The question presented in this constitutional challenge is whether Defendant ALRB, an agency of the State of California, may dictate, at the behest of a union, every term of *one* employer's labor-management relationship – wages to be paid for each job classification, seniority rights, grievance procedures, and so forth – via a compulsory arbitration process known as "mandatory mediation and conciliation," under the California Agricultural Labor Relations Act ("ALRA"), Labor Code ("Lab. Code") § 1164 *et seq*. (the "MMC Statute"). Unlike laws of general application, such as minimum wage or maximum hours requirements, the "contract" imposed by the Board goes no further than to bind one employer and its farmworkers to a bespoke set of employment terms and conditions, without assuring any congruence with other MMC "contracts" imposed on similarly situated employers and their farmworkers.

2.    By operation of law, this "contract" bars farmworkers from petitioning the Board for a decertification election during the term of this "agreement," thereby entrenching the union which initiated this forced contracting process. In addition to barring strikes, these Board imposed "contracts" invariably include a so-called union "security agreement," which requires employers to fire any farmworker who refuses to hand over a percentage of his or her salary to the union, a form of compelled subsidization of union speech. The MMC Statute does not require or even permit employee ratification of the

-6-

terms of the "contract." Farmworkers are not permitted to intervene in MMC proceedings, or to even observe in silence the "on-the-record," arbitral phase of MMC. Because they are not "parties" to the MMC process, they have no statutory right to challenge the MMC contract via judicial review. This constitutionally indefensible treatment of farmers and farmworkers infringes upon the liberty and property interests and associational rights of an individual employer and its employees, and violates the Due Process and Equal Protection Clauses of the U.S. Constitution, as well as the First Amendment.

3.     Outside of times of war or other national emergencies where continuity of private business operations is in the vital public interest, the U.S. Constitution does not permit a state to force one employer to accept specific contract terms against its will simply because it is the government's preferred labor policy. MMC imposes terms and conditions applicable to only one employer and one workplace, while denying the employer its right to resist state-compelled contract concessions, and without any requirement that similar terms and conditions be applied to similarly situated competitors. This is the very antithesis of equal protection, because each imposed "agreement" will be its own set of rules applicable to one employer and its employees, but not to others in the same legislative classification, i.e., bargaining units of other agricultural employers without a first collective bargaining agreement with its certified union.

4.     In three related cases that are a foundation of modern labor law, the U.S. Supreme Court unanimously struck down a Kansas compulsory arbitration scheme closely analogous to MMC because it infringed on the liberty and property interests of private employers and employees without due process of law and violated the employees' freedom of association. *See Wolff Packing Co.* v. *Indus. Court* (*Wolff I*), 262 U.S. 522 (1923); *Dorchy* v. *Kansas*, 264 U.S. 286 (1924) (*Dorchy I*); *Wolff Packing Co.* v. *Indus. Court*, 267 U.S. 552 (1925) (*Wolff II*) (collectively, "*Wolff Packing*" or the "*Wolff* trilogy"); *see also Dorchy* v. *Kansas*, 272 U.S. 306, 307 (1926) (*Dorchy II*) (recognizing the qualified constitutional right to strike). *Wolff Packing* laid the foundation for the two constitutional premises of modern labor law, both of which are violated by the MMC Statute: the

-7-

freedom of association in the workers' choice of bargaining representative, *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937), and "freedom of contract, . . . without any official compulsion over the actual terms of the contract." *H.K. Porter Co., Inc.* v. *NLRB*, 397 U.S. 99, 105, 108 (1970) (citing *Jones & Laughlin*, 301 U.S. at 45). *Wolff Packing* established the constitutional dividing line between mandatory collective bargaining and compulsory imposition of terms which has guided American labor law ever since.[1]

5.     Thus, when the Supreme Court stated in *Wolff Packing* that the Kansas Act compelled a worker "to give up that means of putting himself on an equality with his employer which action in concert with his fellows gives him," *Wolff I,* 262 U.S. at 540, it recognized that true "freedom of contract" was illusory so long as workers were not allowed to engage in their constitutionally protected rights of free speech, association, and collective action (including the right to strike) necessary to obtain bargaining equality. The workers' "fundamental right" to engage in collective action, *Jones & Laughlin*, 301 U.S. at 33, along with the employer's right not to be compelled to make contract concessions or to be forced to agree to contract terms, is the constitutional premise upon which the NLRA rests.[2]

6.     *Wolff Packing* has never been overruled or even questioned by the Supreme Court, or by any state court – except one. In *Gerawan Farming, Inc.* v. *ALRB*, 3 Cal.5th 1118 (2017) (*Gerawan I*), *cert. denied*, 139 S. Ct. 60 (2018), the California Supreme Court upheld the MMC Statute against a due process and equal protection challenge, dismissing

---

[1] *See, e.g.*, *Jones & Laughlin*, 301 U.S. at 45 (U.S. labor law "does not compel agreements between employers and employees," and "does not compel any agreement whatever"); *Associated Press* v. *NLRB*, 301 U.S. 103, 120 (1937) (upholding NLRA against due process challenge because statute "does not fix wages or hours, or provide for compulsory arbitration of labor disputes"); *Virginian Ry. Co.* v. *Ry. Employees*, 300 U.S. 515, 543, 548 (1937) (upholding constitutionality of amendments to the Railway Labor Act based on the distinction between the "voluntary submission to arbitration" and compelled agreements between employer and employees).

[2] Although Congress excluded agricultural laborers from the protections of the NLRA, 29 U.S.C. § 152(3), the ALRA expressly states that the ALRB "shall follow applicable precedents of the NLRA." *See* Lab. Code § 1148.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

*Wolff Packing* as a "completely repudiated" relic of the *Lochner* era. This would come as a surprise to the Court's most vociferous contemporary critics of *Lochner,* Justices Holmes and Brandeis. Both Justices Holmes and Brandeis joined the unanimous decisions in *Wolff Packing,* with Justice Brandeis writing the opinion of the Court in *Dorchy I.*

7.     The California Supreme Court did not dispute that the State's compulsory arbitration scheme implicates significant liberty and property interests. Nor did it attempt to distinguish MMC from the forced contracting scheme invalidated in *Wolff Packing,* even though the similarities are too obvious to ignore. While labelling *Wolff Packing* a "*Lochner* era relic" is a disingenuous way to avoid any discussion of the actual holdings, it is not a substitute for analysis. *Cf.* L. Tribe, *American Constitutional Law* 435 (1978), cited in *Epic Sys. Corp.* v. *Lewis*, 138 S. Ct. 1612, 1630 (2018) ("'*Lochnerizing*' has become so much an epithet that the very use of the label may obscure attempts at understanding.").

8.     *First*, dismissing *Wolff Packing* as a "*Lochner* era relic" ignores the distinction between the New Deal Court's repudiation of a substantive due process right to be free from **general** minimum wage and maximum hour legislation and the actual holdings in *Wolff Packing*, which struck down Kansas's **particularized** efforts to restrict the rights of **one employer** and its employees through selective and procedurally unfair unilateral fiat. *Second*, the *Lochner* era cases regulated hours, pay, and working conditions – not speech, association, or the right to organize or strike, fundamental individual rights that were abridged by the "system of compulsory arbitration" condemned in *Wolff Packing*. *See Dorchy II*. *Third*, the core holding of *Wolff* is that the state's system of joint compulsion violates <u>both</u> the "freedom of labor" and the "freedom of contract." *Wolff I,* 262 U.S. at 534, 542. "Without this joint compulsion, the whole theory and purpose of the act would fail." *Wolff II*, 267 U.S. at 568. As *Wolff I* explained, the statute "shows very plainly that its purpose is not to regulate wages or hours of labor either generally or in particular classes of businesses," *id.* at 565, but "is intended to compel . . . the owner and employees to continue the business on terms which are not of their making." *Id*. at 569.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    These features distinguish *Wolff* from Lochner while highlighting the parallels between the

2    Kansas Act and the MMC Statute.

3        9.    This Court has an obligation to decide whether a state law violates the U.S.

4    Constitution, regardless of any pronouncement by the California Supreme Court. *See*

5    *Moore* v. *Harper*, 600 U.S. 1, 34, 35 (2023). When a state court flouts the U.S. Supreme

6    Court's holdings, judicial review is essential to maintain uniformity of federal law. The

7    proper practice is for lower courts to "follow the case which directly controls, leaving to

8    [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas*

9    v. *Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

10       10.    Even so, the California Supreme Court avoided other constitutionally

11   problematic aspects of the MMC Statute. *First*, the MMC Statute violates due process in

12   the most classical sense of that term, because it denies the employer and its employees

13   <u>existing</u> constitutional rights, not by general law but by arbitrary fiat. Neither employers

14   nor their employees agree to compulsory arbitration as a "bargained-for" exchange. While

15   states may deprive citizens of liberty and property through due process of law, they may

16   not do so "through arbitrary coercion." *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 587

17   (1996) (Breyer, J., concurring).

18       11.    *Second*, the Due Process Clause prohibits the delegation of the State's

19   coercive power to private, self-interested actors, and without any means to safeguard

20   against the arbitrary exercise of that power. Under the MMC Statute, the union dictates

21   whether, when, and which employer it will force into compulsory arbitration,

22   "'uncontrolled by any standard or rule prescribed by legislative action,'" *General Elec.* v.

23   *N.Y. State Dept of Labor*, 936 F.2d 1448, 1454-55 (2d Cir. 1991) (*General Elec.*)

24   (collecting cases and quoting *Seattle Trust Co.* v. *Roberge*, 278 U.S. 116, 122 (1928)

25   (*Roberge*)), and without any residual check to prevent the misuse of that power for

26   personal gain, private bias, or mere "'caprice.'" *Id.* at 1455. The MMC Statute allows the

27   ALRB ***no*** discretion in determining whether to compel an employer into MMC. "To put it

28   in the words of the constitutional guarantee, when private parties have the unrestrained

-10-

ability to decide whether another citizen's property rights can be restricted, any resulting deprivation happens without 'process of law.'" *Boerschig* v. *Pipeline*, 872 F.3d 701, 708 (5th Cir. 2017). Once MMC invoked, there is no statutory mechanism to avoid imposition of a government-drafted "contract" via final Board order.

12.      *Third*, a state-compelled contract will be imposed, whether or not the employer participates in the MMC process. The employer has no right to opt-out or to exit. There is no *ex ante* mechanism to ensure the employer can obtain a fair and reasonable return over the life of the initial "contract," let alone avoid operating at a loss should the economic "contract" terms dictated by the State turn confiscatory. Even the threat of resort to compulsory interest arbitration is coercive in nature, since it enables an interested party (a union) to exert pressure on an employer to either make bargaining concessions or to have the contract terms imposed by force of law. *Cf. Arnett* v. *Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting) ("[T]he value of a sword of Damocles is that it hangs — not that it drops.").

13.      *Fourth*, MMC requires the employer to submit to a hybrid mediation/ arbitration process in which confidential, "off-the-record" mediation discussions **and** the "on-the-record" arbitration phase are presided over by the **same** decision-maker. This coercive, hybrid process violates due process because it combines "mediation" and "adjudication" functions in one person. It also highlights the risk that the terms imposed will be based on the subjective leanings of each mediator, particularly as there is no objective standard upon which the mediator must base his determinations, whether standing alone or in comparison to other CBAs.

14.      The facts here illustrate the need for judicial resolution of the constitutionality of MMC. Both Olive Hill and Wonderful were thrust into MMC after the United Farm Workers of America ("UFW") was certified as the exclusive bargaining representative of their agricultural laborers pursuant to the ALRA's newly enacted "Majority Support Petition ("MSP") Election" procedures, also known as "Card Check." *See* Lab. Code § 1156.37 *et seq.* (the "MSP Statute"). This is not an "election" in any

-11-

accepted sense of the word. Card Check allows a union to, in essence, "self-certify" by submitting authorization cards purportedly signed by a majority of the employees in the bargaining unit, albeit without any mechanism to allow the employer (or the Board) to verify the authenticity of individual card signatures or the circumstances surrounding their solicitation.

15.     In *Gerawan I,* the California Supreme Court upheld the MMC Statute in part based on the availability of a secret ballot election *before* an MMC contract would be imposed. *Gerawan I*, 3 Cal.5th at 1158 (citation and quotation omitted) ("So long as the employees can petition for a new election if they wish to remove the union, the employer has no real cause for concern about whether it is bargaining with the true representative of its employees."). Card Check had not been enacted when the Court offered these assurances. Under the MSP Statute, a union may be certified, without any of the safeguards of a secret ballot election, without first considering objections as to the "proof" of majority support, and without the availability of a secret ballot election before the MMC "contract" is imposed by final Board order.

16.     While distinguishable on this basis alone, *Gerawan I* does not constitute grounds to avoid a determination of the facial constitutional defects of the MMC Statute, which exist independently from the lack of any adequate safeguards to assure majority rule. That determination may not be avoided by striking down a particular provision of the MMC Statute, or by excising a particular term of the MMC "agreement," where "[m]ost of the provisions of the [MMC Statute] are very intimately connected with the system of compulsory arbitration." *See Dorchy I*, 264 U.S. at 290. As with the scheme invalidated in *Wolff Packing*, California's system of compulsory arbitration *requires* the abridgement of the liberty and property interests of the employer *and* its employees, a point best illustrated by the fact that, on information and belief, every MMC "contract" dictated by the State requires the employer to fire any employee who refuses to surrender a portion of their paycheck to the union. "Without this joint compulsion, the whole theory and purpose of the act would fail." *Wolff I*, 262 U.S. at 541.

-12-

## II.    THE PARTIES

17.    Plaintiff Wonderful Nurseries LLC is a Delaware limited liability company with agricultural operations in Wasco, Shafter, and McFarland, California, all of which are in Kern County. Wonderful produces grapevines and trees for sale to commercial agricultural producers through cane cutting, bareroot vine harvesting, grafting, potting, irrigation, sorting and grading, shipping, and more.

18.    Wonderful's success depends on its ability to recruit, train, and motivate its most productive workers. High wages, good working conditions, and open communications with management are integral to maintaining low employee turnover and consistently high quality. As of the payroll period immediately preceding the March 4, 2024 certification of the UFW, Wonderful employed 688 full-time and seasonal agricultural employees, including both direct-hire employees and third-party contract laborers.

19.    Intervenor-Plaintiffs Claudia Chavez, Maria Ester Gutierrez, Francisco Antonio, Erik Ferrer Chacon, Maria Chacon, Florentina Torres Cruz, Ines Cruz, Gloria Gonzales, Lorenzo Hernandez, Selene Lizzaraga, Yolanda Martinez, Ana Molina, Leticia Navarro, Ana Ortiz, Maria C. Pedro, Jose Ruiz, Maria C. Sanchez, Angelina Torres, Etelverto Torres, and Domatila Vasquez ("the Employees") are or have been employees of Wonderful and/or farm labor contractors ("FLCs") providing workers to Wonderful, and are included in the bargaining unit of Wonderful employees certified by the Board through the MSP procedure. Like many California agricultural laborers engaged in seasonal employment, these employees have worked for many different agricultural employers over the span of their careers, including unionized and nonunion employers. This is especially the case with Employees hired through FLCs, who may work for several agricultural employers in a given year, and therefore face the prospect of having an MMC "contract" imposed on them by a certified union.

20.    Plaintiff Olive Hill Greenhouses, Inc. is a California corporation with agricultural operations in Fallbrook, California, in San Diego County. Olive Hill

SMRH:4905-9044-1555.3

specializes in growing indoor tropical plants like Bromeliads, Anthuriums, and foliage plants, which are ideal for interior plant scaping. Olive Hill sells its plants across Southern California, Arizona, Colorado, the Midwest, Pacific Northwest, Utah, and Texas.

21.    Olive Hill is a family operation. It began in Fallbrook in 1973, opened by husband-and-wife team, Tony and Sue Godfrey. Over the years, the business has grown into one of the largest interior plant producers in California. Olive Hill became a second-generation business in 2000, when Denise Godfrey, Tony and Sue's daughter, joined the business. Olive Hill is a member of WGA.

22.    Olive Hill's success depends on its ability to recruit, train, and motivate its most productive workers. High wages, good working conditions, attractive benefits, and open communications with management are integral to maintaining low employee turnover and consistently high quality. Despite the seasonal nature of most agricultural operations, Olive Hill's direct hire employees are employed full-time throughout the year. For decades, Olive Hill has paid employees above the minimum wage and offers numerous benefits in accordance with employee needs, such as an ACA-approved cross-border health plan, sick pay, bereavement pay, paid holidays, bonuses for production and non-production employees, as well as 401(k), Flexible Spending Accounts (FSA) and life insurance plans. There are no differences between the benefits extended to Olive Hill's agricultural employees and its management.

23.    Intervenor-Defendant UFW is a farm workers' labor organization. Plaintiffs are informed and believe, and on this basis alleges, that the UFW's principal office is at 29700 Woodford-Tehachapi Road, Keene, California 93531. UFW was certified as the bargaining representative for Olive Hill's farmworkers on January 16, 2024. At that time, the company employed 79 full-time, direct-hire agricultural employees. The certification was based on the UFW's January 10, 2024 majority support petition, which was accompanied by authorization cards allegedly signed by 47 Olive Hill agricultural employees. Olive Hill did not pursue its right to object to the certification, choosing instead to recognize and to diligently attempt to bargain with the UFW.

24.     On January 26, 2024, the UFW sent a letter requesting Olive Hill to bargain over the terms of a CBA (Exhibit 13), thus triggering the 90-day period before MMC may be demanded. *See* Lab. Code § 1164(a)(2). The UFW made its first non-economic proposal nearly two months after it requested bargaining, on March 20, 2024. The UFW never made any economic proposals until after the Board ordered the parties to MMC on November 22, 2024.

25.     The parties conducted five bargaining sessions. The first took place on March 26, 2024. The second took place on April 25, 2024. A third session took place on July 10, 2024, and a fourth session on August 12, 2024. Progress was made during these negotiations and tentative agreements were reached as to a number of non-economic terms. A fifth bargaining session began on September 12, 2024, but was terminated mid-session by the UFW, ostensibly to provide a counterproposal in writing to Olive Hill's pending non-economic counterproposal. The UFW never sent a counter nor suggested dates for further negotiations. The UFW agreed not to invoke MMC if progress was being made through negotiations. Nonetheless, for reasons never given, the next communication from the UFW was when Olive Hill was served with a copy of the union's November 12, 2024 petition requesting the Board refer the parties to MMC.

26.     The Board granted the UFW's petition on November 22, 2024 over Olive Hill's objections. *See* ALRB Admin. Order No. 2024-28 (November 22, 2024) (Exhibit 14). The Board found that the petition satisfied "the statutory and regulatory criteria for referral to MMC," i.e., (a) that the UFW is certified as the exclusive bargaining representative of Olive Hill's agricultural employees, (b) it has been over 90 days since the union's initial request to bargain, (c) the employer has employed 25 or more agricultural employees during any calendar week in the preceding year, and (d) the parties have not entered into a CBA. *See id.*, at p. 4 (citing MMC Statute, § 1164(a)(2), and Regs., § 20400(b)).

27.     Plaintiff Western Growers Association is a nonprofit association representing local and regional family farmers in California, Arizona, Colorado and New Mexico for

1    nearly a century. *See* https://www.wga.com. WGA members grow, pack, and ship over

2    half of the nation's fresh produce including nearly a third of America's fresh organic

3    produce. WGA member companies are dedicated to providing a great variety of safe and

4    healthy fresh fruits, vegetables and tree nuts to consumers. With offices and dedicated staff

5    in Sacramento, California and Washington, D.C., WGA is a leading public policy advocate

6    for the fresh produce industry and has a longstanding interest in employment and labor

7    matters. WGA has filed amicus briefs in labor and employment cases raising matters of

8    significance to its members. *See, e.g., Cedar Point Nursery* v. *Hassid*, 141 S. Ct. 2063

9    (2021); *Gerawan Farming, Inc.* v. *Agric. Labor Relations Bd.*, 3 Cal. 5th 1118 (2017)

10   (*Gerawan I*), *cert. denied,* 139 S.Ct. 60 (2018); *Hess Collection Winery* v. *Agric. Labor*

11   *Relations Bd.*, 140 Cal. App. 4th 1584 (2006); *S. G. Borello & Sons, Inc.* v. *Dep't of Indus.*

12   *Relations*, 48 Cal.3d 341 (1989). Two of these cases, *Hess Collection Winery* and

13   *Gerawan I*, involved state court challenges to the MMC process.

14          28.     WGA's members have been targeted with MMC in the past (such as

15   D'Arrigo Bros. Co. of California, George Amaral Ranches, Inc, San Joaquin Tomato

16   Growers, Inc, Dole Berry North, The DiMare Company, and Wonderful), or are currently

17   being targeted by MMC (such as Olive Hill), or expect to be targeted by MMC in the

18   future, particularly in light of the ease with which a union may obtain certification via Card

19   Check. WGA therefore alleges that MMC injures its members.

20          29.     "[A]n organization may have standing to assert the claims of its members

21   even where it has suffered no direct injury from a challenged activity." *Columbia Basin*

22   *Apartment Ass'n* v. *City of Pasco*, 268 F.3d 791, 798 (9th Cir. 2001). "To

23   establish associational standing and bring suit on behalf of its members, [WGA] must

24   establish that: '(a) its members would otherwise have standing to sue in their own right; (b)

25   the interests it seeks to protect are germane to the organization's purpose; and (c) neither

26   the claim asserted nor the relief requested requires the participation of individual members

27   in the lawsuit.'" *Stavrianoudakis* v. *U.S. Fish and Wildlife Service*, 108 F.4th 1128, 1143

28   (9th Cir. 2024), quoting *Cent. Sierra Env't Res. Ctr.* v. *Stanislaus Nat'l Forest*, 30 F.4th

-16-

1  929, 937 (9th Cir. 2022) (quoting *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S.

2  333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

3        30.    Here, WGA members who have been subjected to MMC, including Olive

4  Hill and Wonderful, clearly have standing to challenge the MMC Statute. Ensuring that its

5  members—local and regional family farmers—are not subject to unconstitutional labor

6  laws is "germane" to WGA's purpose. And although Olive Hill is a co-plaintiff, facial

7  constitutional claims requesting declaratory and injunctive relief "'do not require

8  individualized proof.'" *Stavrianoudakis,* 108 F.4th at 1143, quoting *Columbia Basin*

9  *Apartment Ass'n*, 268 F.3d at 799. Thus, WGA has standing to challenge the

10  constitutionality of the MMC Statute.

11        31.    Defendant California Agricultural Labor Relations Board is a state agency

12  with its principal office at 1325 J Street, Suite 1900, Sacramento, California 95814-2944.

13  The ALRB has statutory authority to order parties to MMC and to issue orders imposing

14  CBA terms pursuant to California Labor Code § 1164 *et seq*. On November 22, 2024, the

15  ALRB directed Olive Hill into MMC, at the request of the UFW, the labor organization

16  certified on January 10, 2024, to represent Olive Hill's agricultural employees pursuant to

17  the so-called MSP "election" procedures, Lab. Code § 1156.37 *et seq*.

18        32.    Defendant Victoria Hassid is Chairperson of the ALRB. Defendants Isadore

19  Hall III, Barry Broad, Ralph Lightstone, and Cinthia N. Flores are members of the ALRB.

20  In their official capacities, each member of the Board is responsible for the exercise of

21  statutory powers vested in the Board, *inter alia*, "to determine the unit appropriate for the

22  purpose of collective bargaining, to investigate and provide for hearings, to determine

23  whether a question of representation exists, to direct an election by a secret ballot pursuant

24  to the provisions of Chapter 5 (commencing with section 1156), and to certify the results

25  of such election, or to certify a labor organization pursuant to section 1156.37 and to

26  investigate, conduct hearings and make determinations relating to unfair labor practices."

27  *See* Lab. Code § 1142(b). The Board is also charged with the responsibility of overseeing

28  the MMC process, and enforcing a final order of the Board imposing a MMC "contract."

-17-

33.     Defendant Santiago Avila-Gomez is Executive Secretary of the ALRB. The Executive Secretary is appointed by the Board, and has been delegated by the Board "such powers as it deems appropriate" to perform its statutory functions in connection with the administrative determinations, certification, and investigation of the MSP, and under the MMC Statute. (Lab. Code §§ 1142(b), 1145.) On behalf of the Board, Executive Secretary Avila-Gomez and issued and signed various orders pertinent to the conduct of the MMC proceedings at issue here.

34.     Each of these individuals is named in his or her official capacity as Board members, officers, or personnel of the ALRB.

35.     The true names and capacities of defendants DOES 1 through 10 are unknown to Plaintiffs, and Plaintiffs will seek leave of court to amend this Complaint to allege such names and capacities as soon as they are ascertained.

## III.    JURISDICTION AND VENUE

36.     This case is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Due Process Clause, Equal Protection Clause, Fourteenth Amendment and First Amendment of the United States Constitution.

37.     The case presents a federal question within this Court's jurisdiction under Article III, § 2 of the United States Constitution and 28 U.S.C. §§ 1331 and 1343.

38.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

39.     Venue is proper in this Court under 28 U.S.C. § 1391 because Wonderful has its principal place of business in the County of Kern, and because a substantial part of the events giving rise to this claim occurred in this District. Defendant ALRB is located in this District as well.

## IV.    THE MMC STATUTORY SCHEME

40.     MMC is a highly expedited, compulsory contracting process, whereby a Board-appointed "mediator" decides the terms of a collective bargaining agreement between the union and the employer, which then becomes an enforceable order of the Board. The terms of that "contract" are subject to limited, discretionary administrative

-18-

review. By its own terms, the MMC contract may be imposed on an employer by a final Board order as soon as 60 to 90 days after the parties are directed into the process.

41.    Under Labor Code section 1164 *et seq*., a certified labor union may file a declaration with the Board stating that the parties have not been able to reach an agreement and requesting that the Board order the parties to "mandatory mediation and conciliation" of their issues. The declaration may be filed at any time at least 90 days after an initial demand to bargain has been made by a certified labor organization.

42.    Upon issuance of an order directing MMC, the parties must select a mediator within seven days. Labor Code section 1164(b) requires the party compelled into MMC to pay for one-half of the cost of the mediator's hourly rate. In other words, the employer must pay 50 percent of the cost of a compulsory arbitration process into which the employer was forced, without its consent.

43.    The mediator can communicate "informally" and off the record with the parties to "clarify or resolve issues." Cal. Code of Regulations, tit. 8 ("Regs."), § 20407(a)(2). At the conclusion of the mediation period, unless the parties mutually agree to extend the period for another 30 days, the mediator certifies that the mediation phase of the MMC process has been "exhausted." Lab. Code § 1164(c). The mediator, now acting as an arbitrator, presides over the "on-the-record" phase of MMC, including the presentation of witnesses, the admission of exhibits, the administering of oaths, and the power to sanction employers who refuse to "participate or cooperate" in the MMC process, including by adopting the proposed contract terms of the union. *See* Regs., § 20407(a). Absent agreement, and based on the "record" of testimony and admitted evidence, the mediator dictates the terms of the collective bargaining agreement—a function beyond the role of "mediator" in the ordinary sense of that term.

44.    The statutory "mediator" has broad discretion to set the terms in accordance with his own views of industrial policy, and may impose conditions on one employer that are not imposed on a competitor; in fact, nothing in the MMC Statute prohibits dissimilar terms between similar agricultural businesses. The mediator "may consider" certain

statutory factors to guide his decision-making, such as "[t]he financial condition of the employer and its ability to meet the costs of the contract," but there is no legal requirement that he apply those criteria in reaching his decision. Lab. Code § 1164(e). The statutory criteria are "nonexclusive" and do not preclude the "mediator" from considering factors not listed. Nor does the statute provide guidance as to how he should weigh each listed factor, should he decide to apply them.[3] Even so, the statutory provisions that allow the mediator to consider these factors in resolving myriad disputed contract terms, or that direct that his particular determinations have some minimal support in the record, provide zero assurance that similarly situated employers will receive the same or similar results under the law.

45.     The California Court of Appeal explained why this is "the very antithesis of equal protection":

> Inevitably, each imposed CBA will still be its own set of rules applicable to
> one employer, but not to others, in the same legislative classification
> concerning such matters as wages, benefits, working conditions, hiring,

---

[3] Section 1164(e) states: "In resolving the issues in dispute, the mediator may consider those factors commonly considered in similar proceedings, including:

(1) The stipulations of the parties.

(2) The financial condition of the employer and its ability to meet the costs of the contract in those instances where the employer claims an inability to meet the union's wage and benefit demands.

(3) The corresponding wages, benefits, and terms and conditions of employment in other collective bargaining agreements covering similar agricultural operations with similar labor requirements.

(4) The corresponding wages, benefits, and terms and conditions of employment prevailing in comparable firms or industries in geographical areas with similar economic conditions, taking into account the size of the employer, the skills, experience, and training required of the employees, and the difficulty and nature of the work performed.

(5) The average consumer prices for goods and services according to the California Consumer Price Index, and the overall cost of living, in the area where the work is performed."

-20-

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

disciplinary and termination procedures, union dues, union membership

requirements, duration of the CBA, and other terms and conditions of

employment and/or of the employer-union relationship. Thus, the necessary

outworking of the MMC statute is that each individual employer (within the

class of agricultural employers who have not entered a first contract) will

have a distinct, unequal, individualized set of rules imposed on it.

*Gerawan Farming, Inc.* v. *ALRB*, 187 Cal. Rptr. 3d 261, 294-95 (2015), *rev'd*, 3 Cal. 5th 1118 (2017).

46.     After the "mediator" decides the terms of the collective bargaining agreement, only the employer and the union—but not the farm laborers, who are excluded from participating in MMC—have seven days to petition the ALRB for modification of that decision. Lab. Code § 1164.3(a). ALRB review is discretionary, highly deferential, and limited to considering whether certain provisions are "unrelated to wages, hours, or other conditions of employment," "based on clearly erroneous findings of material fact," or "arbitrary or capricious." *Id.*

47.     The mediator's "report" to the Board setting forth the CBA terms to be imposed must include "the basis for the mediator's determination" and "shall be supported by the record." Lab. Code § 1164(d). A party may challenge the mediator's report by seeking Board review within seven days. *Id*., § 1164.3(a). Review is discretionary, and the grounds for review are narrow.[4] If the Board determines that a *prima facie* case for review has not been made, or if no petition for review is filed, the report becomes the final order of the Board. *Id*., §§ 1164.3(b), (d). If, upon review, the Board finds that one or more grounds for review have been established, it will order the mediator to modify the problematic terms of the CBA. *Id*., § 1164.3(c).

---

[4] The grounds for such review are that a provision of the CBA set forth in the mediator's report is (1) unrelated to wages, hours, or other conditions of employment, (2) based on clearly erroneous findings of material fact, or (3) arbitrary or capricious in light of the mediator's findings of fact. Lab. Code § 1164.3(a). If a prima facie case for review is not shown, or if no petition is filed, the report becomes the final order of the Board. *Id*.

48.    Within 30 days after the ALRB's order becomes final, the employer and the union may seek review before either a California appeals court or the California Supreme Court. Lab. Code § 1164.5(a). The workers may not challenge the terms imposed, because the Board does not deem farm laborers as "parties" to MMC. Judicial review is limited to examining whether the ALRB "acted without, or in excess of, its powers or jurisdiction;" the ALRB failed to "proceed[] in the manner required by law;" or "[t]he order or decision of the [ALRB] was procured by fraud or was an abuse of discretion." *Id.*, § 1164.5(b). A court may also determine whether the order violates the U.S. Constitution or the California Constitution. *Id.*, § 1164.5(b)(4).

Although the employer (or labor organization) may seek judicial review of the final ALRB order, the parties are required to immediately implement the terms of the "contract" imposed under MMC. *See* Lab. Code § 1164.3(f)(2). The filing of a petition for review does not stay the final Board order unless the court finds, "by clear and convincing evidence," that the petitioner will be irreparably harmed by the implementation of the Board's order and has a likelihood of success on appeal. *Id.*, § 1164.3(f)(3). A bond must be posted by the party seeking review "in the amount of the entire economic value of the contract as determined by the board as a condition to filing a petition for a writ of review." Lab. Code § 1164.5(d). "[T]he 'entire economic value of the contract' means the difference between the employees' existing wages and economic benefits and those set forth in the contract." (*Ibid.*).

49.    The MMC order is treated by law as if it were a consensual collective bargaining agreement, with the consequence that employees may not seek to decertify the union until the end of the contract's final year. By invoking MMC, therefore, a union facing the prospect of decertification can maintain its position as exclusive bargaining representative for years, without any showing of support by the workers it purportedly represents. There is at least one important distinction between the *enforceability* of an MMC "agreement" and a consensual CBA: In the event the employer violates a term of the

-22-

1  former, it exposes itself to the possibility of a contempt citation for violation of a decision

2  and order of a State agency, as opposed to facing merely a claim for contractual damages.

3       50.    The MMC Statute does not provide any right of participation of farmworkers

4  in any aspect of the process, through and including judicial review. *See, e.g.*, Lab. Code §

5  1164.3(a). It does not require consent of bargaining unit to abandon consensual bargaining

6  in favor of forced contracting. Farmworkers have no right to intervene in proceedings

7  challenging the union's standing to invoke MMC, *see, e.g.*, *Wonderful Nurseries LLC*,

8  Admin Order No. 2024-12 (2024), to object to the MMC process itself or to the "contract

9  terms" imposed, *Gerawan Farming, Inc.*, 39 ALRB No. 11 (2013), and have no right to

10 even silently observe the MMC proceedings, *see, e.g., Gerawan Farming, Inc.*, 39 ALRB

11 No. 13 (2013), even though they will be bound by the Board's final order. Once imposed,

12 farmworkers are barred from even petitioning for a decertification election during most of

13 the term of the MMC "contract."

14 **V.    WONDERFUL'S PROCEDURAL BACKGROUND**

15      **A.    The Majority Support Petition ("MSP") Certification**

16      51.    On Friday, February 23, 2024, the UFW filed with the Board a majority

17 support petition, or MSP, alleging that there were 350 employees in the bargaining unit,

18 and that the MSP was "accompanied by evidence of support by a majority of the

19 employees currently employed in the unit as required by Section 1156.37(c) of the Act."

20 (Exhibit 1.) Pursuant to section 1156.37(e)(1), the Board must within five days make "an

21 administration determination" as to whether the petitioning union provided proof of

22 majority support. The employer must provide a list of all current employees (along with

23 addresses, telephone numbers, job classifications, etc.) within 48 hours after the petition is

24 served. Lab. Code § 1156.37(d).

25      52.    Wonderful filed its Employer's Response to Petition for Certification on

26 Monday, February 26, 2024. (Exhibit 2). In addition to producing payroll information

27 which revealed the MSP grossly underrepresented the number of current employees in the

28 bargaining unit (thereby lowering the threshold required to demonstrate proof of majority

-23-

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

support by approximately 50%), Wonderful submitted employee signature exemplars along with 148 employee declarations in which workers claimed to have been misled into signing card authorizations, or informed the Board that did not want to be represented by the UFW in contract negotiations. (Exhibit 3; Exhibit 4). The ALRB, acting through its Regional Director, concluded it lacked statutory authority to investigate allegations of misconduct, including those relating to forgery of signatures, stating: "[N]either the Act, regulations, nor proposed regulations require or contemplate a procedure whereby the Regional Director must compare signatures of workers to make her determination as to the showing of majority support." (Exhibit 4).

53.     On Friday, March 1, the Regional Director determined that the UFW had provided 327 authorization cards (out of 640 employees determined to comprise the bargaining unit), or a bare majority showing of 51%. (Exhibit 3). On Monday morning, March 4, 2024, the ALRB certified the UFW as the exclusive representative of Wonderful's agricultural laborers (the "Certification") (Exhibit 5.) That evening, the UFW sent a letter requesting Wonderful to bargain over the terms of a CBA (Exhibit 6), thus triggering the 90-day period before MMC may be demanded. *See* Lab. Code § 1164(a)(2).[5]

**B.     The ALRB Refuses To Stay The Legal Effect Of The Certification Pending Resolution Of Wonderful's "Election" Objections**

54.     Both prior to and immediately after the ALRB's certification of the UFW, Wonderful made repeated attempts to stay the legal effect of the Certification, or at least to hold the MMC process in abeyance pending investigation of employee allegations that UFW representatives falsely assured Wonderful's agricultural laborers that their authorization cards were *not* a vote for the union, but were needed to obtain or confirm a $600 payment from the federal government for COVID-19 related relief.

---

[5] The UFW did not ask for available dates for contract negotiations until May 2, 2024, (Exhibit 7), or roughly 60 days after the union was certified and Wonderful's bargaining obligations incepted.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

55.     The ALRB rejected these requests, concluding that the MSP Statute "does not provide a mechanism for a party to request the Board stay the certification." *See, e.g.,* ALRB Admin. Order No. 2024-02, at 2 (March 6, 2024); ALRB Admin. Order No. 2024-04 (March 18, 2024); ALRB Admin. Order No. 2024-08 (April 12, 2024) (citing Lab. Code § 1156.37(f)(3), which explicitly states that post-certification objection proceedings "shall not diminish the duty to bargain or delay the running of the 90-day period" between the union's initial demand to bargain and its right to invoke the MMC process, pursuant to Labor Code section 1164(a)).[6]

**C.     The ALRB Denies The Farm Workers' Request To Intervene**

56.     On April 22, 2024, the investigative hearing examiner ("IHE") appointed by the ALRB to preside over the post-certification objections hearing denied the request of certain of the Wonderful Employees to intervene in the election objection proceedings. (Exhibit 9.) On May 6, 2024, the Board affirmed the IHE's order. (Exhibit 10.) The Board also refused the workers' California Public Records Act ("PRA") requests to inspect the 327 authorization cards deemed to be valid proof of majority support or to even disclose whether the cards of the workers who made the PRA requests were included as part of the "proof" of majority support.[7]

**D.     Wonderful Is Compelled Into MMC**

57.     On June 26, 2024, the UFW petitioned the ALRB to refer Wonderful into MMC. *See* ALRB Admin. Order No. 2024-23 (July 10, 2024) (Exhibit 8). The Board rejected Wonderful's request to defer MMC until the Kern County Superior Court

---

[6] The administrative orders of the Board are available at https://www.alrb.ca.gov/legal-searches/decision-index/admin-orders/administrative-orders-2024/

[7] The MSP process is in stark contrast to the card check procedure under the NLRB, where upon the union's demand for recognition based on authorization cards, the **employer** compares the authorization cards to payroll records, and thus has the ability to review signatures (from employee personnel files) and question their authenticity, and may request a secret ballot election in lieu of voluntary recognition of the union. (*See* ¶¶ 14-15 *supra*.)

1    adjudicated Wonderful's pending constitutional challenge to the MSP Statute,[8] and

2    referred the parties into MMC on July 10, 2024, finding that the UFW satisfied "the

3    statutory and regulatory criteria for referral to MMC." Those "criteria" were: (a) that the

4    UFW is certified as the exclusive bargaining representative of Wonderful's agricultural

5    employees, (b) it has been 90 days since the union's initial request to bargain, and (c) the

6    parties have not entered into a CBA. *See id*., at p. 3 (citing MMC Statute, § 1164(a)(2), and

7    Regs., § 20400(b)).

8        58.    The Board concluded it was without authority "to declare or refuse to

9    enforce the provisions of [the MSP Statute] or [the MMC Statute] as unconstitutional," *id*.,

10   at p. 5. Wonderful did not ask the ALRB to do that which the California Constitution

11   prohibited administrative agencies from doing, *see* Cal. Const., article III, § 3.5. It asked

12   the Board (a defendant in the pending Kern County Superior Court proceedings) to merely

13   defer its decision to compel Wonderful into MMC pending a judicial determination as to

14   whether the MSP "election" Certification was the invalid result of a constitutionally

15   defective process.

16       **E.    The Superior Court Preliminarily Enjoins Enforcement Of The MSP**

17   **Statute**

18       59.    On July 18, 2024, the Superior Court granted Wonderful's motion for

19   preliminary injunction, finding that (i) "Wonderful is likely to prevail on its due process

20   challenges to Labor Code section 1156.37," (ii) "the harm suffered by Wonderful if it is

21   forced to comply with a process that is likely unconstitutional while waiting until the

22   Agricultural Labor Relations Board's final order becomes effective to challenge the

23   certification (which Wonderful credibly contends is erroneous) is largely irreparable," and

24   (iii) "the public interest weighs in favor of preliminary injunctive relief given the

25   ───────────────

26   [8] On May 13, 2024, Wonderful filed a verified petition for writ of mandate and complaint
     challenging the constitutionality of the MSP Statute alleged, *inter alia*, that the

27   certification process of the MSP Statute, facially and as applied, violates the Due Process
     Clauses of the California and United States Constitutions, and violates the Separation of

28   Powers and the Judicial Powers Clauses of the California Constitution.

-26-

constitutional rights at stake in this matter, … [and] Wonderful has met its burden that a preliminary injunction should issue until the matter may be heard fully on the merits."[9] The Ruling enjoined the Board and UFW from: (1) enforcing the certification; and (2) continuing to conduct the post-certification objections proceedings. The Preliminary Injunction Order ("PI Order") was entered on August 12, 2024.

60. On July 19, 2024, the day after the Superior Court issued its Ruling, the Board notified the parties that the post-certification objections proceedings (ALRB Case No. 2024-RM-002) and the MMC proceedings (ALRB Case No. 2024-MMC-001) were stayed pending further notice from the ALRB. The following month, on August 12, 2024, the ALRB and the UFW both sought a stay of the PI Order. On August 23, 2024, the Superior Court overruled the Board's and UFW's demurrers. The Superior Court declined the ALRB and UFW's request for a stay of the Preliminary Injunction on September 12, 2024.

**F.    The Court of Appeal Vacates The Preliminary Injunction Pending Appeal**

61. On August 20, 2024, the ALRB and UFW filed separate Notices of Appeal of the PI Order in the California Court of Appeal (Fifth District) ("5th DCA"), Case Numbers F088515 and F088520 (the "Appeals"). The Appeals were consolidated on September 23, 2024.

62. On September 12 and 13, 2024, the ALRB and UFW filed separate petitions for a writ of supersedeas vacating the PI Order pending resolution of the Appeals (the "Supersedeas Writ"). In addition, the ALRB and UFW each filed petitions for a writ of mandate directing the Superior Court to vacate its order overruling their demurrers on the

---

[9] The Superior Court held that Wonderful was not required to await a "final" order of the Board before seeking judicial relief, first, because Wonderful had brought a facial challenge to section 1156.37; second, because Wonderful did not have a plain, speedy, or adequate means to challenge the constitutionality of the MSP Statute; and third, that there was substantial uncertainty that Wonderful could ever obtain judicial review of the certification.

1  basis of failure to exhaust administrative remedies, and dismiss the underlying action (the

2  "Writ Proceedings").

3    63.    On October 24, 2024, the Fifth DCA issued the Supersedeas Writ and

4  ordered Wonderful to file written returns in the Writ Proceedings within 30 days, without

5  explanation. The UFW immediately demanded that the MMC process resume. On October

6  30, 2024, Defendant Avila-Gomez, the ALRB Executive Secretary, issued a "Notice

7  Lifting Stay" in the MMC proceedings, notifying the parties that the objections hearing

8  would resume forthwith. Hearings before the IHE (the fourth assigned by the ALRB to

9  oversee the objections hearing) recommenced on December 10-13, 2024. Future hearing

10  dates are calendared for January, 2025.

11    64.    On December 6, 2024, on motion from Wonderful, the Fifth DCA granted

12  the appeal of the PI Order calendar priority, so the appeal will be placed on the first

13  available calendar once it is fully briefed.

14    **G.    The UFW Asks the Board to Withdraw Its MMC Petition**

15    65.    The MMC mediator, Matthew Goldberg, was empaneled by the ALRB on or

16  about November 12, 2024. He presided over the first "off-the-record" confidential

17  mediation session on December 19, 2024. The mediator also set the "on-the-record"

18  arbitration phase of the MMC proceedings for February 25, 2025 – February 27, 2025.

19    66.    On February 26, 2025, the UFW asked the Board to withdraw the UFW's

20  MMC petition. (Exhibit 11) The UFW's reason given was the reduction in Wonderful's

21  workforce over the next 12 months, due to its winding down of certain of its operations.

22  On March 3, 2025, the Board issued a "Notice of Petitioner's Withdrawal of Mandatory

23  Mediation and Conciliation Request," stating that "[i]n the absence of statutory or

24  regulatory language addressing the withdrawal of a request for MMC, the decision to

25  withdraw is noted and no further MMC proceedings are expected." (Exhibit 12). The UFW

26  has since given no indication that it intends to resume MMC proceedings.

27

28

## VI.    OLIVE HILL'S PROCEDURAL BACKGROUND

### A.    The Majority Support Petition ("MSP") Certification

67.    On January 10, 2024, the UFW submitted a majority support petition, which was accompanied by authorization cards allegedly signed by 47 Olive Hill agricultural employees. The ALRB certified the UFW as the bargaining representative for Olive Hill's farmworkers on January 16, 2024.

68.    On January 26, 2024, the UFW sent a letter requesting Olive Hill to bargain over the terms of a CBA (Exhibit 13), thus triggering the 90-day period before MMC may be demanded. *See* Lab. Code § 1164(a)(2).

### B.    The MMC Process Has Begun

69.    The MMC mediator, Matthew Goldberg, presided over the first "off-the-record" confidential mediation session on February 11, 2025. The mediator also scheduled a follow-up session on March 13, 2025.

70.    The UFW failed to provide an updated proposal sufficiently in advance of the March 13, 2025 mediation session, and the mediator pushed the session to May 22, 2025.

71.    Olive Hill and the UFW met on May 22, 2025 for off-the-record mediation. The UFW did not meaningfully participate and no progress was made during the May 22, 2025 session. The on-the-record arbitration phase of MMC has been scheduled before the MMC mediator, Matthew Goldberg, for October 8-10, 2025.

72.    When the arbitration phase of MMC concludes, the mediator shall file his report with the ALRB within 21 days "that resolves all of the issues between the parties and establishes the final terms of a collective bargaining agreement, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process." Lab. Code § 1164(d).

## VII.    THE LEGAL AND PRACTICAL CONSEQUENCES OF MMC

73.    The certification of a labor organization is akin to the grant of a monopoly right to a public utility or common carrier, whereby the state designates the union as the

workers' exclusive bargaining representative. *See Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.,* 24 Cal.3d 458, 481-82 (1979), quoting *James* v. *Marinship Corp.,* 25 Cal.2d 721, 731 (1944); *see also J. I. Case Co.* v. *NLRB,* 321 U.S. 332, 335 (1944) (likening terms of collective bargaining agreement to "to the tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service). Once certified, nothing – other than the passage of 90 days after the union's initial demand to bargain – stands between the employer and a State-imposed MMC "contract."

### A. Compelled Association

74.    The MMC "contract" forces WGA members, including Wonderful and Olive Hill, and the Employees to associate with the UFW against their will. *See Janus* v. *American Federation of State, County, and Mun. Employees, Council 31* 585 U.S. 878, 892 (2018) (*Janus*) ("[f]reedom of association . . . plainly presupposes a freedom not to associate]; *see also Roberts* v. *U.S. Jaycees,* 468 U.S. 609, 623 (1984) ("Infringements on [the right to associate for expressive purposes] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."). A compulsory CBA infringes on the right of *workers*—including the Employees—to speak and to associate, because the ALRA bars their right to seek to remove the union during the term of the MMC "agreement." That amounts to state-compelled association, a direct impingement on the Employees' liberty interests.

75.    In upholding the NLRA against a constitutional due process challenge, the U.S. Supreme Court held that laborers have a "fundamental right" to organize and to select representatives of their own choosing. *See Jones & Laughlin,* 301 U.S. at 33, citing *American Steel Foundries* v. *Tri-City Council,* 257 U.S. 184, 209 (1921) (Taft, C.J.) (the employees' right of self-organization was "essential to give laborers opportunity to deal on an equality with their employer"). This right of self-determination "is guaranteed by the federal Constitution as an incident of freedom of speech, press and assemblage, and it is

-30-

1  not dependent upon the existence of a labor controversy between the employer and his

2  employee." *See County Sanitation Dist.* v. *L.A. Cty. Employees*, 38 Cal.3d 564, 587-88

3  (1985) (citations omitted); *accord id.*, at 596 (Bird, C.J., concurring), *citing American Steel*

4  *Foundries*, *supra* at 209.

5        76.    Congress did not create this "fundamental right" when it enacted the NLRA;

6  rather, it "safeguarded" *existing constitutional protections* against state interference in the

7  associational rights of workers. *Jones & Laughlin*, 301 U.S. at 33-34. As the Supreme

8  Court has explained, "[e]mployees have as clear a right to organize and select their

9  representatives for lawful purposes as the [employer] has to organize its business and

10  select its own officers and agents." *Amalgamated Workers v. Edison Co.*, 309 U.S. 261,

11  263-64 (1940). Thus, the NLRA's prohibition against government interference in the

12  exercise of those choices, "'instead of being an invasion of the constitutional right of

13  either, was based on the recognition of the rights of both.'" *Jones & Laughlin*, 301 U.S. at

14  34, quoting *Texas N.O.R. Co.* v. *Ry. Clerks,* 281 U.S. 548, 570 (1930).

15        77.    Conversely, there could be "no clearer abridgement" of free choice than to

16  grant exclusive bargaining status to a union "selected by a minority of its employees,

17  thereby impressing that agent upon the nonconsenting majority." *Int'l Ladies' Garment*

18  *Workers' Union* v. *NLRB,* 366 U.S. 731, 737 (1961). Regulations that infringe on the

19  freedom not to associate or that compel association may be justified only "to serve

20  compelling state interests, unrelated to the suppression of ideas, that cannot be achieved

21  through means significantly less restrictive of associational freedoms." *Smith* v. *Regents of*

22  *University of California,* 4 Cal.4th 843, 853 (1993) (internal quotation marks omitted).

23  Assuming that the State may place any limitations on the employee's right to withdraw his

24  or her support for a union, "the resulting burden on freedom of association requires that the

25  procedure be carefully tailored to minimize the infringement." *Ibid*.

26        78.    Where either the union (or the MMC contract) enjoys majority support, the

27  State can claim the sacrifice of the labor rights of both employer and individual employees

28  is necessary to enable the union to effectively represent the best interests of the bargaining

1    unit as a whole. There is no requirement that the MMC contract (or the UFW itself) enjoys

2    majority support. Quite the contrary, the workers have no opportunity to vote on the forced

3    contract, let alone to participate in (or to observe even silently) the MMC process. *See*

4    *Gerawan Farming, Inc.* v. *ALRB*, 40 Cal.App.5th 241, 278 (2019) (*Gerawan II*) (no

5    constitutional right of public access to on-the-record MMC proceedings).

6            79.    The impairment of the associational rights of workers goes well beyond the

7    subordination of the individual's economic interests to the collective. On information and

8    belief, every MMC contract imposed by the ALRB includes a so-called "union security"

9    clause – a provision in union contracts which require the employer to fire any worker who

10   refuses to surrender a portion of his wages to the union as "union dues" or "agency fees."[10]

11   Because the Board deems union security clauses to be a standard or "typical" provision in

12   virtually every union agreement, the employer's refusal to accede to this clause has been

13   held to constitute bad faith bargaining, *even where the employer has been compelled into*

14   *MMC. See Gerawan III,* 52 Cal.App.5th at 183-184 & n. 19. Upon information and belief,

15   any MMC "contract" imposed on WGA members, including Wonderful and Olive Hill,

16   will contain a forced-unionism or "union security" clause, as has every other MMC

17   "contract" issued by the Board.[11]

18   _____

19   [10] *See also Gerawan Farming, Inc.* v. *ALRB,* 52 Cal.App.5th 141, 169 (2020) (*Gerawan III*) (quoting testimony by UFW First-Vice President Elenes) (emphasis added) ("Well,

20   obviously ... we have an obligation to represent all employees .... ***And again, all our***

21   ***contracts have some type of union security language*** that indicates that the employees are either going to pay agency fees or going to pay dues, membership dues. And obviously we

22   need that to be able to collect dues, be able to collect agency fees so that we can fund the work that we're going to have to do to administer the contract and continue improving the

23   conditions of other farm workers."); Order Granting Motions to Intervene, ECF 46 at 13 &

24   n.6 (recognizing that "ALRB defendants do not seriously dispute" the Employees'

25   allegation that "the MMC process permits such clauses to be routinely included in MMC-produced agreements").

26   [11] A facial challenge based on the First Amendment, here the forced subsidization of union speech via union security clauses, is subject a more relaxed standard than other facial

27   challenges. *See Moody* v. *NetChoice, LLC,* 603 U.S. 707, 723 (2024) (the "less

28   demanding" standard in First Amendment cases is "whether 'a substantial number of [the

-32-

80.    Requiring an employer to fire an employee who refuses to subsidize the union's speech-related activities infringes on the freedom of association between the employee and employer. Plaintiffs have standing to seek redress for any injury due to direct violations of their own associational rights, including not only which employees must be fired, but – under the detailed and comprehensive seniority, layoff, promotion, and disciplinary rules that are a staple of every MMC contract – which employees can be rehired. A state-imposed contract containing a forced-unionism clause constitutes "state action" under 42 U.S.C. § 1983, imposing a direct infringement on First Amendment rights, and therefore falls under the restrictions of *Janus*, which barred state-mandated and enforced forced-unionism schemes. 585 U.S. at 916 ("It is ... not disputed that the State may require that a union serve as exclusive bargaining agent for ... employees — itself a significant impingement on associational freedoms that would not be tolerated in other contexts. We simply draw the line at allowing the government to go further still and require all employees to support the union irrespective of whether they share its views").

81.    These infringements do not strictly involve regulation of hours, pay, or working conditions. They directly impact First Amendment rights, particularly as the MMC "contract" is imposed upon the employer and the employees by the State. To again consider the analogy with a grant of a monopoly to a public utility: "The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds." *West Virginia State Board of Education* v. *Barnette*, 319 U.S. 624, 639 (1943).

## B.    Freedom Of Labor

82.    Farmworkers have some "generalized due process right to choose one's field of private employment," *Conn* v. *Gabbert,* 526 U.S. 286, 291-92 (1999), a right recognized

law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep'").

-33-

1  by Justice Brandeis in the last of the Court's unanimous Kansas Act decisions. *See Dorchy*

2  *II*, 272 U.S. at 311 (Brandeis, J.) ("The right to carry on business — be it called liberty or

3  property — has value. To interfere with this right without just cause is unlawful."); *see*

4  *also Ry. Employees' Dep't* v. *Hanson,* 351 U.S. 225, 234 (1956) ("[T]he right to work,

5  which the Court has frequently included in the concept of 'liberty' within the meaning of

6  the Due Process Clauses may not be denied by the Congress."). The right to hold specific

7  private employment "free from unreasonable governmental interference comes within the

8  'liberty' and 'property' concepts of the Fifth Amendment." *Greene* v. *McElroy*, 360 U.S.

9  474, 492 (1959); *Merritt* v. *Mackey*, 827 F.2d 1368, 1370 (9th Cir. 1987) ("It is

10  indisputable that an individual may have a protected property interest in private

11  employment."). An employer has standing to redress for injuries it suffers as a

12  consequence of the deprivation of constitutional rights of its employees.[12]

13       83.    A compulsory CBA affects the "freedom of labor." *Wolff I*, 262 U.S. at 542.

14  For example: A compulsory *collective* bargaining agreement inherently eliminates an

15  ***employee's right to individually bargain with the employer***. An individual worker may

16  negotiate on the basis of his own best interests. A union has leeway to "subordinate the

17  interests of an individual employee to the collective interests of … the bargaining unit." *14*

18

---

19  [12] *See, e.g.*, *Truax* v. *Raich,* 239 U.S. 33, 38 (1915) ("The fact that the employment is at
20  the will of the parties, respectively, does not make it one at the will of others. The
    employee has manifest interest in the freedom of the employer to exercise his judgment
21  without illegal interference or compulsion and, by the weight of authority, the unjustified
    interference of third persons is actionable although the employment is at will."). *Wolff I*,
22  262 U.S. at 541 (emphasis added), is singularly instructive in this regard:

23
       We are considering the validity of the act as compelling the employer to pay
24       the adjudged wages, and as forbidding the employees to combine against
         working and receiving them. The penalties of the act are directed against
25       effort of either side to interfere with the settlement by arbitration. Without
         this joint compulsion, the whole theory and purpose of the act would fail.
26       *The State cannot be heard to say, therefore, that upon complaint of the*
         *employer, the effect upon the employee should not be a factor in our*
27       *judgment.*
28

CONSOLIDATED COMPLAINT FOR
                                                          DECLARATORY AND INJUNCTIVE RELIEF

*Penn Plaza LLC* v. *Pyett*, 556 U.S. 247, 269 (2009). Indeed, a union has "powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents." *Steele* v. *Louisville & Nashville R.R. Co.*, 323 U.S. 192, 202 (1944).

84.    A compulsory CBA affects **the right to strike**. "Collective-bargaining contracts frequently have included certain waivers of the employees' right to strike." *Mastro Plastics Corp.* v. *NLRB*, 350 U.S. 270, 356 (1956). Based on information and belief, *every* MMC contract imposed by the ALRB includes such a waiver.

85.    A compulsory CBA affects **the right to redress for employment grievances.** A union generally has "discretion" when performing its functions under "the collective-bargaining system." *Electrical Workers* v. *Foust*, 442 U.S. 42, 51 (1979). As a result, a worker has little ability to "force unions to process … claims" that the unions wish to drop. *Id*. Based on information and belief, every MMC contract supplants the right of workers to pursue claims as an individual with an intricate grievance and arbitration scheme whereby the union controls which workers are permitted to avail themselves of the process.

86.    A compulsory CBA affects **the right to vote on employment terms**. Workers ordinarily may vote (a so-called "ratification vote") on collective bargaining agreements. *See NLRB* v. *Rockaway News Supply Co.*, 345 U.S. 71, 73 (1953). But under the MMC Statute, the "contract" takes effect by force of law, and without submission to the workers for their approval.

87.    The compulsory CBA in this case directly affects **the right of workers to hold the bargaining representative accountable** for its actions. Workers ordinarily have the right to "petition … for a decertification election, at which they would have an opportunity to choose no longer to be represented by a union." *Brooks* v. *NLRB*, 348 U.S. 96, 100–01 (1954). The MMC contract takes away that right. Under Labor Code section 1156.7(b), a collective bargaining agreement shall be a bar to a petition for election for the term of the agreement, but in any event such bar shall not exceed three years.

88.     An employee's interests in taking collective action, in pressing his own grievances, in voting, and in holding his bargaining representative to account are therefore in tension with the union's own interests in perpetuating its monopoly control over the bargaining rights of agricultural laborers (and, of course, its financial interest in continuing to compel farmworkers to hand over a portion of their paycheck as union fees). "It is difficult to assume that the incumbent union has no self-interest of its own to serve by perpetuating itself as the bargaining representative." *NLRB* v. *Magnavox Co.*, 415 U.S. 322, 325 (1974). The union invoking MMC has an interest in obtaining an "agreement" backed by the coercive power of the State, precisely *because* it diminishes the farmworker's right to self-determination and his take-home pay.

89.     The necessary outworking of the MMC process is to empower the union to seize fees from unwilling workers; to require WGA members thrust into MMC, including Wonderful and Olive Hill, to fire workers who refuse to subsidize the UFW; and to bar farm laborers from seeking to decertify the union until the final year of the "contract." At the same time, it forces employees (and their employer) to associate with a union they cannot dislodge, to pay union fees under a CBA they did not ratify, and to relinquish myriad rights, including (as is standard in every MMC contract) the right to strike.

**C.      Freedom Of Contract**

90.     A compulsory CBA involves a total government takeover of the operations of the workplace—hours and breaks, pay and seniority, working conditions, and more – imposed by force of law. It leaves the workers and the employer no flexibility at all, because it dictates precisely how long the employee must work, how much he must be paid, or whether employees may engage in constitutionally protected rights of collective action, including whether to replace or oust their bargaining representative.

91.     A CBA "is more than a contract; it is a generalized code to govern a myriad of cases . . . covering the whole employment relationship." *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578-79 (1960). Agreements reached through consensual negotiation are "an effort to erect a system of industrial self-government." *Id.* at 580.

-36-

92.    A compulsory CBA involves a takeover of labor-management relations of the workplace by the State — hours and breaks, hiring and firing, pay and seniority, working conditions, the adjustment of grievances, and more – all imposed by force of law. Unlike (e.g.) general minimum wage or maximum hours requirements where the state imposes floors or ceilings, California has undertaken to dictate every single term of the employment relationship at one particular workplace, including by curtailing the ability of farm laborers to exercise their constitutionally protected right to replace or oust their bargaining representative. This goes well beyond general police power legislation.

93.    Juxtaposed against this near complete takeover of one employer's economic relationship with its farm workers is the absence of any due process afforded the ostensible beneficiaries of the MMC Statute's protections. Farm workers are prevented from "intervening" in MMC proceedings, denied any statutory right of judicial review of the "contract," and barred from even observing in silence the "on the record" arbitral phase of MMC. *See Gerawan Farming, Inc*., 39 ALRB No. 11, at 2, 7 (2013) ("The statutes and regulations governing MMC do not provide any mechanism for third parties to "intervene" in MMC proceedings," and concluding that intervention by workers "would be inconsistent with the structure of MMC and would undermine its functioning."); *Gerawan Farming, Inc*., 39 ALRB No. 13 (2013) (barring worker access to the arbitration phase of MMC on the grounds that their presence was not in the public interest), aff'd, *Gerawan II*, 40 Cal.App.5th at 278. The workers must depend on the employer to raise their rights in the MMC proceedings, or via the statutory review procedures. Moreover, the Employees will inevitably suffer unconstitutional demands for union dues and/or agency fees from a state-imposed CBA resulting from the inexorable MMC process. *Cf. Janus*, 585 U.S. at 916 ("We ... draw the line at allowing the government to go further still and require all employees to support the union irrespective of whether they share its views").

-37-

## VIII.  THE MERITS OF PLAINTIFFS' CONSTITUTIONAL CHALLENGES CAN AND SHOULD BE DECIDED NOW

94.     There are no exhaustion or abstention considerations standing in the way of this Court deciding the merits of Plaintiffs' federal constitutional challenges now, *before* WGA members thrust into MMC, including Olive Hill, suffer further injury. Even before the inevitable imposition of a MMC contract, Olive Hill has suffered, and continues to suffer, from being thrust into an unconstitutional process.

95.     In *Axon Enterprise, Inc.* v. *Federal Trade Commission*, 598 U.S. 175 (2023) (*Axon*), the Supreme Court explained that the plaintiff, who brought a facial challenge based on "being subjected" to "unconstitutional agency authority," would suffer the same constitutional injury regardless of whether he prevailed on his separation of powers claim before the agency, i.e., his claim arose from subjection to an unconstitutional proceeding. *Id.* at 191. As *Axon* explained: "The court could of course vacate the FTC's order. But Axon's separation-of-powers claim is not about that order; indeed, Axon would have the same claim had it *won* before the agency. The claim, again, is about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker." *Ibid*. In other words, a "here-and-now injury," *Seila Law LLC* v. *CFPB*, 591 U.S. 197, 212 (2020), once inflicted cannot be undone, since "[j]udicial review of [plaintiffs'] structural constitutional claims would come too late to be meaningful." *Axon*. 598 U.S. at 192.

96.     Federal precedent tilts decisively in favor of expeditious judicial resolution of this facial constitutional challenge. "The questions of law presented in these proceedings arise under the Constitution, not under the statute whose validity is challenged." *See Johnson* v. *Robison,* 415 U.S. 361, 367 (1974) (citation and quotation marks omitted). A declaratory relief action is uniquely suited to the expeditious resolution of pure questions of law, especially those involving the constitutionality of statutes. One of the reasons why declaratory relief is appropriate is to avoid requiring a plaintiff to expose himself to the risk of violating the law in order to challenge it. *See, e.g.*, *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 128-129 (2007) ("[W]here threatened action

-38-

1   by *government* is concerned, we do not require a plaintiff to expose himself to liability

2   before bringing suit to challenge the basis for the threat") (emphasis original); *Maryland*

3   *Right to Life State Political Action Committee* v. *Weathersbee*, 975 F.Supp. 791, 794 (D.

4   Md. 1997) (plaintiff "not required to violate state law to challenge it as violative of the

5   Constitution, he need only face 'a credible threat of prosecution'") (quoting *International*

6   *Soc'y for Krishna Consciousness* v. *Eaves,* 601 F.2d 809, 819 (5th Cir.1979)).[13]

7         97.     The threat here is indisputably real. Although the MMC process is moving

8   forward, the Board, as an administrative agency, cannot decide the constitutionality of the

9   MMC Statute. *See* Cal. Const. art. III, § 3.5. As the Supreme Court has held, "exhaustion

10   of state administrative remedies should not be required as a prerequisite to bringing an

11   action pursuant to [42 U.S.C.] § 1983." *Patsy* v. *Florida Board of Regents*, 457 U.S. 496,

12   516 (1982). *See also Knick* v. *Township of Scott*, 139 S. Ct. 2162, 2167 (2019) (quoting

13   *Heck* v. *Humphrey*, 512 U.S. 477, 480 (1994) (invoking "the settled rule is that 'exhaustion

14   of state remedies is not a prerequisite to an action under [ 42 U.S.C.] § 1983.'"). Moreover,

15   the Employees are not parties to the aforementioned Board proceedings, nor to the MMC

16   process, nor to the state court action challenging the MSP Statute,[14] having been denied

17

18

19

---

20   [13] The justiciability of Plaintiffs' facial constitutional challenges is explained by the
21   distinction between reviewing a decision by the ***administrator*** made "under" the statute
    and reviewing the decision by the ***Legislature*** that created the statutory scheme. The
22   decision by the agency involves the application of a particular provision of the law to a
    particular set of facts or circumstances. Under those circumstances, a court should be
23   reluctant to inject itself via interlocutory rulings. Among other reasons, these interim
    agency orders and discretionary decisions may or may not prove dispositive, or even
24   relevant, as to the final agency action.

25   [14] Since the Employees moved to intervene, they filed an independent lawsuit challenging
26   the MSP Statute in state court (Case No. BCV-25-100649, Kern Sup. Ct.) which has been
    "reassigned for all purposes and transferred to" the same judge hearing Wonderful's
27   challenge to the MSP Statute (Case No. BCV-24-101649, Kern Sup. Ct.). As the Court has
28   already noted, the constitutionality of that statute is not challenged here. ECF 46 at 4 & 14.

1    intervention in those proceedings, and thus their federal case cannot and should not be

2    delayed.[15]

3        98.    As for the availability of state court judicial review, the MMC Statute

4    provides only discretionary and limited review. *See* Lab. Code § 1164.5.[16] Moreover, it

5    would be an exercise in futility to ask a lower state court to disagree with the California

6    Supreme Court's holding in *Gerawan I* (*see* ¶ 5, *supra*), or to expect the California

7    Supreme Court to overturn its own decision. *Cf. Sweet* v. *Cupp*, 640 F.2d 233, 236 (9th

8    Cir. 1981) (noting, in a habeas case: "A number of circuits have held that a petitioner may

9    be excused from exhausting state remedies if the highest state court has recently addressed

10   the issue raised in the petition and resolved it adversely to the petitioner, in the absence of

11   intervening United States Supreme Court decisions on point or any other indication that

12   the state court intends to depart from its prior decisions."). "[T]he futility doctrine …

13   promotes comity by requiring exhaustion where resort to state courts would serve a useful

14   function but excusing compliance where the doctrine would only create an unnecessary

15   impediment to the prompt determination of individuals' rights." *Id.*[17]

16       99.    The circumstances here also do not support this Court exercising discretion

17   to abstain, *Younger* v. *Harris*, 401 U.S. 37 (1971), from deciding Plaintiffs' or the

18   Employees' federal constitutional claims.[18] First, regardless of whether Olive Hill or

19   Wonderful (or any companies which are members of WGA) could obtain full review on

---

20,21   [15] The only administrative proceedings involving the Employees are three separate but related unfair labor practice charges filed in April 2024, which remain pending.

22,23   [16] This is so, even though that holding is distinguishable from the procedural posture of Olive Hill's case, i.e., Gerawan's employees could seek to decertify the union **before** the MMC contract was imposed.

24,25,26   [17] Although some of Plaintiffs' and the Employees' federal constitutional arguments have not been addressed by the California Supreme Court, *see* ¶¶ 5-9, *supra*, it would be inefficient (to say the least) for this Court to resolve only some of their federal constitutional challenges.

27,28   [18] "There is no discretion to abstain in cases that do not meet the requirements of the abstention doctrine being invoked." *Martinez* v. *Newport Beach City*, 125 F.3d 777, 780 (9th Cir. 1977) (citations omitted).

-40-

the merits in state court at some indefinite time in the future, *Younger* abstention requires state proceedings to be pending. *See Ankenbrandt* v. *Richards*, 504 U.S. 689, 705 (1992) ("Absent any *pending* proceeding in state tribunals, therefore, application by the lowers courts of *Younger* abstention was clearly erroneous.") (emphasis original). The Supreme Court recently reaffirmed, in *Sprint Communications, Inc.* v. *Jacobs*, 571 U.S. 69 (2013), the limited "scope" of the types of state proceedings warranting *Younger* abstention. "'[O]nly exceptional circumstances … justify a federal court's refusal to decide a case in deference to the States,'" 571 U.S. at 78 (quoting *New Orleans Public Service, Inc.* v. *Council of City of New Orleans* (*NOPSI*), 491 U.S. 350, 368 (1989)). Those circumstances are: (1) "state criminal prosecutions"; (2) "certain 'civil enforcement proceedings'"; and (3) "'civil proceedings involving certain orders … uniquely in furtherance of the state courts' ability to perform their judicial functions.'" 571 U.S. at 78, quoting *NOPSI*, 491 U.S. at 368. The only relevant ongoing state proceedings here involving the MMC Statute are the mediation and negotiations before the mediator, which do not trigger *Younger*.[19]

100.    In *Sprint*, the Supreme Court held that the Iowa Utility Board's (IUB) proceedings to resolve the question of whether Voice over Internet Protocol (VoIP) calls were subject to intrastate regulation "does not fall within any of the three exceptional categories … and therefore does not trigger *Younger* abstention." 571 U.S. at 70, 79. The only category potentially applicable was civil enforcement proceedings.[20] However, such

---

[19] In *Sprint*, as in *NOPSI*, the Supreme Court "assume[d] without deciding … that an administrative adjudication and the subsequent state court's review of it count as a 'unitary process' for *Younger* purposes," instead answering the question whether the "initial [administrative] proceeding is of the 'sort … entitled to *Younger* treatment." 571 U.S. at 592 (quoting *NOPSI*, 491 U.S. at 369).

[20] The IUB proceeding "was civil, not criminal in character, and it did not touch on a state court's ability to perform its judicial function." *Sprint*, 571 U.S. at 78-79 (providing as examples of the latter a civil contempt order or requirement for posting bond pending appeal). Regarding the third *Sprint* category, the Ninth Circuit defines the relevant question as whether the federal plaintiff "question[s] the *process* by which [state] courts compel compliance" with state orders. *See Cook* v. *Harding*, 879 F.3d 1035, 1041 (9th Cir. 2018) (emphasis original). Under this definition, for example, "[t]he mere existence of the

proceedings "have generally concerned state proceedings 'akin to a criminal prosecution' in 'important respects.'" *Id*. at 79, quoting *Huffman* v. *Pursue, Ltd.*, 420 U.S. 592, 604 (1975). In other words, enforcement actions "initiated by 'the State in its sovereign capacity'" "to sanction the federal plaintiff, *i.e.,* the party challenging the state action, for some wrongful act." 571 U.S. at 79-80 (quoting *Trainor* v. *Hernandez*, 431 U.S. 434, 444 (1977).) The IUB proceedings were "initiated" by a "private corporation" and the IUB's "adjudicative authority … was invoked to settle a civil dispute between two private parties, not to sanction Sprint for commission of a wrongful act." 571 U.S. at 80. The Supreme Court emphasized the importance of the "quasi-criminal context," expressly disapproving of the attempt to "extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest," as "irreconcilable with [the Court's] dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" *Id.* at 81-82 (quoting *Hawaii Housing Authority* v. *Midkiff*, 467 U.S. 229, 236 (1984)). In other words, one of the three "exceptional categories" must be satisfied before "additional factors," i.e., "important state interests" and "adequate opportunity to raise [federal] challenges" are considered. *Sprint*, 571 U.S. at 81.

101.    The MMC proceedings are similar in relevant respects to the IUB proceedings the Supreme Court held did not trigger *Younger*, having been "initiated" by the UFW (a private party and not the state) following the parties failure to reach a CBA (and not to punish WGA members thrust into MMC, including Olive Hill, for any alleged wrongful conduct). (Indeed, *Gerawan I* characterized MMC as a "quasi-legislative" proceeding.) Even if Board review of the mediator's report and thereafter judicial review

appeal bond requirement is not enough," a plaintiff must "actually *challenge* this appeal bond requirement." *Dignity Health* v. *Dept. of Industrial Relations, Division of Labor Standards Enforcement*, 445 F.Supp.3d 491, 497-98 (N.D. Cal. 2020).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    of the Board's resulting order is sought, such review is initiated by a "party," and not the

2    state. (Lab. Code §§ 1164.3 & 1164.5.)[21]

3        102.    More pertinent, the Ninth Circuit did not disturb the district court's holding

4    in *Lopez* v. *Shiroma*, 2014 WL 3689696, at **17-18 (E.D. Cal. July 24, 2014), aff'd in

5    part, rev'd in part, and remanded, 668 Fed. Appx. 804 (9th Cir. 2016), that ongoing ALRB

6    proceedings did not warrant *Younger* abstention. In that case, the district court concluded:

7            The facts of this case are similar to the facts of *Sprint* and *Readylink* in that

8            ongoing ALRB proceedings were initiated to resolve a dispute between

9            private parties. Plaintiff sought the Board's approval and oversight when she

10           petitioned for a decertification election. Later, Plaintiff, Gerawan and the

11           UFW sought review from the ALRB when each alleged objections to aspects

12           of the election. Plaintiff alleges that Defendant [ALRB Regional Director]

13           Shawver filed some enforcement actions against Gerawan during these

14           proceedings. However, this Court finds that these activities are secondary to

15           the larger issue in dispute—which is whether the decertification election was

16           conducted properly. This is a dispute between Plaintiff, her employer and the

17           Union; not, at this juncture, between the ALRB and Gerawan or the UFW.

18           Thus, this is not the sort "exceptional case" where *Younger* applies.

19
20   2014 WL 3689696, at *8.[22] In sum, the exceptional circumstances allowing discretionary

21   *Younger* abstention are not present here.

22   _____

23   [21] Further indicia of the MMC process not being quasi-criminal is the California Supreme
     Court's characterization of the MMC process as "result[ing] in 'quasi-legislative action'"
24   and "a continuation of the ordinary bargaining process." (*Gerawan I*, 3 Cal.5th at 1133,
     1156.)

25   [22] In *ReadyLink Healthcare, Inc.* v. *State Comp. Ins. Fund,* 754 F.3d 754, 760 (9th Cir.
26   2014), the Ninth Circuit held that *Younger* abstention did not attach to a decision of the
     California Department of Insurance, when the adjudication was initiated to resolve a
27   dispute between an employer and a state insurance fund that acted as a private party,
28   explaining that "[i]f the mere 'initiation' of a judicial or quasi-judicial administrative

-43-

**FIRST CAUSE OF ACTION**

**VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT**

**OF THE U.S. CONSTITUTION**

**(Compulsory Arbitration)**

**(Against All Defendants)**

**(42 U.S.C. § 1983)**

103.    Plaintiffs and the Employees incorporate by reference and reallege each allegation set forth in Paragraphs 1 through 102 above.

104.    "No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, §1.

105.    42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

106.    California's law mandating compulsory arbitration and allowing the ALRB to impose contract terms on certain parties without imposing similar terms on similarly situated parties violates both due process and equal protection.

107.    In depriving Plaintiffs and the Employees of these rights, as more fully described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

108.    An actual and substantial controversy exists between Plaintiffs and the Employees, on the one hand, and Defendants and the UFW, on the other hand, regarding the MMC process. The controversy is of sufficient immediacy and reality to warrant the

_____

proceeding were an act of civil enforcement, *Younger* would extend to every case in which a state judicial officer resolves a dispute between two private parties."

-44-

issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

109.    Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

## A.    California's Compulsory Arbitration Scheme Deprives Farm Owners Of Liberty And Property Without Due Process Of Law

110.    Since the Magna Carta, the essence of due process is that "there can be no proceeding against life, liberty, or property . . . without the observance of . . . general rules." *See, e.g.*, *Hagar* v. *Reclamation District No. 108*, 111 U.S. 701, 708 (1884); *Hurtado* v. *California*, 110 U.S. 516, 535-36 (1881) ("Law must be not a special rule for a particular person or a particular case, but 'the general law,' and thus excluding, as not due process of law, special, partial, and arbitrary exertions of power under the forms of legislation.") (cleaned up). "The words 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in Magna Carta." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 276 (1855); *see also Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 847 (1992) ("The guaranties of due process, though having their roots in Magna Carta's '*per legem terrae*,'[23] … have in this country become bulwarks also against arbitrary legislation.") (citations and quotations omitted). Traditionally, "law of the land" has been always understood to require some measure of generality. An enactment that applied only to a fixed and identifiable class of people would not qualify as the law of the land. *See* Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672 (2012).

[23] The Latin term *per legem terrae* translates to "by the law of the land" or "by due process of law."

111.    "From the earliest time, it was understood that the due process right was 'intended to secure the individual from the arbitrary exercise of the *powers of government*.'" *Martinez* v. *High*, 91 F.4th 1022, 1032 (9th Cir. 2024) (Bumatay, J., concurring in the judgment, emphasis original) (quoting *Hurtado*, 110 U.S. at 527); *see also Daniels* v. *Williams*, 474 U.S. 327, 331 (1986) (quoting *Wolff* v. *McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government, *Dent* v. *West Virginia*, 129 U.S. 114, 123 (1889)"). These precedents remain valid. *See, e.g., United States* v. *Winstar Corp.*, 518 U.S. 839, 897–98 (1996) (plurality opinion of Souter, J., joined by Stevens, O'Connor, and Kennedy, JJ.) (reaffirming "*Hurtado* [and] its principle of generality"); *United States* v. *Lovett*, 328 U.S. 303, 317 (1946) ("[T]hose who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons."). The law today continues to reflect "the Framers' concern that a legislature should not be able unilaterally to impose a substantial deprivation on one person." *Plaut* v. *Spendthrift Farm, Inc.*, 514 U.S. 211, 242 (1995) (Breyer, J., concurring in the judgment).

112.    The California Supreme Court attempted to portray the MMC process as merely "a continuation of the ordinary bargaining process," and compulsory arbitration as a mere "bargaining tool." *Gerawan I*, 3 Cal.5th at 1157. But compulsion is not bargaining. *Virginian Ry. Co.*, 300 U.S. at 543, 548.

113.    Neither Olive Hill, Wonderful, nor the Employees agreed to compulsory arbitration as a "bargained-for" exchange. *Pyett*, 556 U.S. at 257; *see also Volt Info. Scis., Inc.* v. *Bd. of Trs. of Leland Stanford Junior Univ*, 489 U.S. 468, 479 (1989) (arbitration "is a matter of consent, not coercion"). Instead, the employers were forced into this process based on the exercise of the State's "coercive power" over its employment relationship, *Blum* v. *Yaretsky*, 457 U.S. 991, 1004 (1982), on demand by a private, self-interested actor. "The terms of the 'agreement' determined by the arbitrator [are] imposed upon [the employer] by force of law." *Gerawan I*, 3 Cal.5th at 1091 (citation omitted)). The *ad hoc*, arbitrary drafting of private contracts by a "mediator," which is then imposed by a state

-46-

1   agency, without any chance for workers or owners to disapprove, is a coercive substitute

2   for collective bargaining.

3          114.   The imposition of the MMC order has the legal effect of barring workers,

4   including the Employees, from seeking to decertify the union until the final year of the

5   contract, no matter how large a majority of the workers wish to rid themselves of the

6   union. This "makes these [farmworkers] and others similarly situated [] prisoners of the

7   Union." *Emporium Capwell Co.* v. *W. Addition Cmty. Org.*, 420 U.S. 50, 73 (1975)

8   (Douglas, J., dissenting). The systematic elimination of the farmworkers' right to labor,

9   replacing in its stead a complex scheme of rules and restrictions imposed by arbitral fiat,

10  unquestionably infringes upon liberty and property interests of employees and their

11  employer.

12      **B.    The U.S. Supreme Court Has Already Concluded That Compulsory**

13            **Arbitration Schemes Similar To California's MMC Statute Violate Due**

14            **Process**

15         115.   In his monumental study of the Taft Court, Professor Robert Post states that

16  the most striking feature about *Wolff Packing* "is its unanimity," which he ascribes to the

17  Justices' shared recognition of "a sphere of individual liberty that was beyond the

18  administrative management of the state."[24] As with the Kansas Act invalidated in *Wolff,*

19  the MMC unconstitutionally intrudes on "the freedom of contract and of labor secured by

20  the Fourteenth Amendment." *Wolff I*, 262 U.S. at 540.

21         116.   In *Wolff I*, the U.S. Supreme Court examined a Kansas statute that, among

22  other provisions, required employers "to pay the wages fixed" by the state agency in

23  compulsory arbitration proceedings, and forbade the workers to "strike against them." *Id*.

---

24  [24] Robert Post, *The Taft Court: Making Law for a Divided Nation: 1921-1930* (Oliver

25  Wendell Holmes Devise History of the Supreme Court of the United States), Vol. 10, Ch.

26  5 at 793 (2023) (Cambridge University Press). *See also* David A. Schwarz, *Compelled
    Consent:* Wolff Packing *and the Constitutionality of Compulsory Arbitration*, 12 NYU J.

27  of Law & Liberty 14 (2018) (comparing the MMC contracting regime with the Kansas act

28  struck down in *Wolff Packing*).

at 540. The joint compulsion scheme in *Wolff Packing* was not about the "regulat[ion] [of] wages or hours of labor either generally or in particular classes of business." *Wolff II*, 267 U.S. at 565. *Wolff Packing* dealt with a "system of compulsory arbitration" eerily similar to MMC, one that produced individualized, state-imposed labor contracts that extended no further than the employer and its workers subject to this joint compulsion. *Id*. at 569.

117.    The compelled contracting scheme in *Wolff Packing* was a response to post-World War I strikes, which threatened to cripple the nation's railroads, coal mines, steel mills, and other heavily unionized industries. In 1920, Kansas created an administrative agency, the so-called "Court of Industrial Relations," or "CIR," to thwart labor strife in industries "affected with a public interest," defined to include businesses "engaged in the manufacture of food, and clothing, and the production of fuel." *Wolff I*, 262 U.S. at 533.

118.    The Kansas Act required such businesses and their employees to continue operations and employment "on terms fixed by an agency of the State if they cannot agree. . . . [T]he act gives the Industrial Court authority to permit the owner or employer to go out of the business, if he shows that he can only continue on the terms fixed at such heavy loss that collapse will follow," a "privilege" which the Supreme Court described as "generally illusory," in light of the requirements to obtain that relief. *Id*., at 533-534. It "compel[led]" employers and employees in the food, clothing, and fuel industries "to continue in their business and employment on terms fixed by an agency of the state, if they cannot agree." *Id.* Worker rights were also constrained: "A laborer dissatisfied with his wages is permitted to quit, but he may not agree with his fellows to quit or combine with others to induce them to quit." *Id*.

119.    Once subjected to the CIR's wage and hour orders, an employer could avoid compliance only by application for permission to limit or cease operations, "if said application found to be in good faith and meritorious."[25] The employer's only means of exit would be to demonstrate the ruinous financial consequences of the order. In contrast,

---

[25] 1920 Kan. Sess. Laws ch. 29, § 16.

the MMC Statute provides no *ex ante* mechanism to allow the employer to avoid similar consequences, even if the economic impacts of the terms to be imposed are (theoretically) considered by the arbitrator in fixing wages, hours, benefits and other conditions of employment.

120.    As with MMC, the Kansas scheme depended on the power of the State to compel employees and their employer to submit to a coercive process "to secure such continuity of the business as the legislature believes would result from the settlement of industrial disputes by compulsory arbitration." Alpheus Mason, *The Labor Decisions of Chief Justice Taft,* 78 U. Pa. L. Rev. 585, 620, n. 79 (1930). Though Wolff Packing's business losses the previous year were due to world-wide business conditions beyond the company's control, the CIR concluded that "'the laboring man is not in a position to take advantage of rising markets or prosperous conditions.'"[26] As such, "[t]he purpose of the Act was to ensure that laborers employed in 'these essential industries…receive a fair wage and that capital invested therein shall receive a fair return,'" regardless of whether the result would further plunge Wolff Packing's operations into the red.[27]

121.    *Wolff Packing* involved the very kind of selective deprivation of liberty that "due process of law" in its fundamental sense prohibits. The *Wolff* trilogy invalidated a "system of compulsory arbitration" through which the state imposed bespoke contracts extending no further than a given employer and its workers. *Wolff II*, 267 U.S. at 569. In distinguishing the Kansas scheme from laws of general application, the Court noted that the state did "*not* … regulate wages or hours of labor either generally or in particular classes of business." *Id*. at 565 (emphasis added). It explicitly *refused* to decide whether

---

[26] Schwarz, *Compelled Consent, supra* n.17 at 58 (footnotes and internal quotations omitted).

[27] *Id*. As Professor Post explains, Chief Justice Taft "apparently based his [initial draft] decision on the theory that preparing human food was not 'affected with the public interest.' In his final, published version, however, Taft merely cast strong doubt on this question and decided that, even if the Wolff Packing Company were clothed with the public interest, its owners and workers could not be ordered to continue in business "on terms fixed by an agency of the State." Post, at 793, quoting *Wolff I*, 262 U.S. at 534.

1  the same requirements "would be valid" if they had been made "either general or

2  applicable to all businesses of a particular class." *Id*. at 569. There can be no doubt, in

3  short, that *Wolff Packing* rested—at least in part—on "the traditional 'rule of law'

4  assumption that generality in the terms by which the use of power is authorized will tend to

5  guard against its misuse to burden or benefit the few unjustifiably." *Winstar Corp.*, 518

6  U.S. at 897 & 898, n. 43).

7      122.    *Wolff Packing*'s condemnation of *selective* deprivations of liberty has a firm

8  grounding in the text and history of the Due Process Clause. In contrast, *Lochner* and other

9  pre-New Deal "substantive due process" cases struck down laws of *general* application,

10  including those prohibiting all bakers from working for more than sixty hours a week,

11  *Lochner* v. *New York*, 198 U.S. 45 (1905), or general regulations setting minimum wages

12  for all workers in particular industries, e.g., *Adkins* v. *Children's Hospital,* 261 U.S. 525

13  (1923).

14      123.    The New Deal Court's rejection of *Lochner* is consistent with democratic,

15  majoritarian values. In contrast, invalidating a selective law "does not disable any

16  governmental body from dealing with the subject at hand," but instead "merely means that

17  the prohibition or regulation must have a broader impact." *Railway Express Agency* v. *New

18  York*, 336 U.S. 106, 112 (1949) (Jackson, J., concurring).

19  

**SECOND CAUSE OF ACTION**

20  **VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT**

21  **OF THE U.S. CONSTITUTION**

22  **(Lack of Adequate Safeguards)**

23  **(Against All Defendants)**

24  **(42 U.S.C. § 1983)**

25      124.    Plaintiffs incorporate by reference and reallege each allegation set forth in

26  Paragraphs 1 through 102 above.

27      125.    MMC violates due process by depriving the employer with no exit from

28  compulsory arbitration or any safeguards to secure a reasonable rate of return.

-50-

126.    "No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, §1.

127.    42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

128.    In depriving Plaintiffs thrust into MMC of these rights, as more fully described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

129.    An actual and substantial controversy exists between Plaintiffs, on the one hand, and Defendants and the UFW, on the other hand, regarding the MMC process. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

130.    Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

131.    In the context of public utility regulation, the U.S. Supreme Court has set out constitutional limitations on the ratemaking power of the national government to guard against the risk of confiscation that arises if the rates in question are not high enough to allow for recovery of the fixed investments in the enterprise. *See Fed. Power Comm'n* v. *Hope Natural Gas,* 320 U.S. 591 (1944). While these rules leave regulators of public utilities, playing a role not unakin to the mediator, some discretion in making these

-51-

1    calculations, they do not grant unchecked power to set up a rate schedule that fails to allow

2    the company to recover sufficient revenues to avoid operating at a loss.

3        132.    The U.S. Supreme Court has recognized that a collective bargaining

4    agreement "may be likened to the tariffs established by a carrier, to standard provisions

5    prescribed by supervising authorities for insurance policies, or to utility schedules of rates

6    and rules of service." *See J.I. Case*, 321 U.S. at 335. MMC forces the employer to enter

7    into a collective bargaining arrangement without providing any exit right or mechanism

8    that secures the employer "a just and reasonable return" on its extensive investment in all

9    aspects of its business operations.

10        133.    In *Birkenfeld* v. *City of Berkeley,* 17 Cal. 3d 129 (1976), the California

11    Supreme Court struck down a Berkeley Charter Amendment that imposed "a blanket

12    rollback of all controlled rents" and would prohibit any adjustments in maximum rents

13    except under a unit-by-unit procedure which, the court determined, was unworkable. *Id*. at

14    136. Although the law required a reasonable rate of return, the Court held that it did not

15    provide adequate safeguards to reasonably allow the rent board to adjust rents to allow for

16    such a return, *id*. at 170-71, because there was no provision under the law that would

17    permit <u>timely</u> adjustments <u>before</u> the existing rent caps forced the property owners to sell

18    (or to abandon) their properties rather than to maintain them at a loss. *See id*. at 165.

19        134.    *Birkenfeld* held that "whether a regulation of prices is reasonable or

20    confiscatory depends ultimately on the result reached, . . .  *such a regulation may be*

21    *invalid on its face when its terms will not permit those who administer it to avoid*

22    *confiscatory results in its application to the complaining parties.* It is to the possibility of

23    such facial invalidity that our present inquiry is directed." *Ibid*. (emphasis added); *Cotati*

24    *Alliance for Better Housing* v. *City of Cotati,* 148 Cal.App.3d 280, 286, fn. 5 (1983), citing

25    *Birkenfeld* ("[C]ourts may review the facial validity of a rent control ordinance for *possible*

26    confiscatory effects *before* the ordinance has been allowed to become operative and actual

27    rent ceilings imposed."). *See also Calfarm Ins. Co.* v. *Deukmejian,* 48 Cal. 3d 805, 819

28    (1989) ("The just compensation safeguarded to the utility by the Fourteenth Amendment is

-52-

a reasonable return on the value of the property used at the time that it is being used for the public service. . . ."); *Bayscene Resident Negotiators* v. *Bayscene Mobilehome Park*, 15 Cal.App.4th 119, 134 (1993), citing *Birkenfeld*, and holding that the compulsory arbitration scheme in question "must "provide [ ] . . . [mobile home] park owners with a 'just and reasonable return on their property.'").

## THIRD CAUSE OF ACTION

## VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

### (Unlawful Delegation)

### (Against All Defendants)

### (42 U.S.C. § 1983)

135.    Plaintiffs and the Employees incorporate by reference and reallege each allegation set forth in Paragraphs 1 through 102 above.

136.    The MMC Statute's delegation of coercive state power to a private, self-interested union violates due process of law.

137.    "No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, §1.

138.    42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

139.    In depriving Plaintiffs and the Employees of these rights, as more fully described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

-53-

140.    An actual and substantial controversy exists between Plaintiffs and the Employees, on the one hand, and Defendants and the UFW, on the other hand, regarding the MMC process. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

141.    Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

142.    Under the MMC Statute, the union – not the State of California – decides whether, when, and which employer it will target for forced contracting. The ALRB operates without any discretionary decision-making or control over the union's targeting. Its role in "referring" an employer into MMC requires nothing more than to confirm that 90 days have elapsed since the union's initial request to bargain. The MMC Statute "abdicate[s] effective state control over state power [to] private parties, serving their own private advantage, [who] may unilaterally invoke state power" over another private party. *Fuentes* v. *Shevin*, 407 U.S. 67, 69-70 (1972).

143.    In *Fuentes*, the Supreme Court struck down the delegation of regulatory authority to private parties – that case involved state power to replevy goods from another – as a violation of the Due Process Clause: "No state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plaintiff provide any information to the court on these matters. The State acts largely in the dark." *Ibid*.

144.    There is nothing novel about the *Fuentes'* due process rationale undergirding the U.S. Supreme Court's "private nondelegation" doctrine. It has been applied in myriad cases, all having one thing in common: it is anathema to due process to allow a private,

self-interested party to wield governmental authority over the property or liberty interests of another private individual. In the context of industrial regulation, a "majority" of industry participants "whose interests may be and often are adverse to the interests of others in the same business" may not "regulate the affairs of an unwilling minority." *See Carter* v. *Carter Coal Co.*, 298 U.S. 238, 311 (1936). Regarding zoning decisions, a legislature may not delegate a power to some property owners to "virtually control and dispose of the property rights of others" when they can "do so solely for their own interest." *Eubank* v. *City of Richmond*, 226 U.S. 137, 143–44 (1912); *see also Roberge*, 278 U.S. at 121–22. A creditor may not simply freeze a debtor's wages or seize his goods without making some showing before a judge. *See Sniadach* v. *Family Finance Corp. of Bay View*, 395 U.S. 337 (1969); *N. Ga. Finishing, Inc.* v. *Di-Chem, Inc.*, 419 U.S. 601, 606–07 (1975).[28]

145.    "These opinions still stand for the proposition that a legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property in which other individuals have a property interest, without supplying standards to guide the private parties' discretion." *General Elec.*, 936 F.2d at 1455 ("Otherwise, "administrative decision-making [will be] made potentially subservient to selfish or arbitrary motivations or the whims of local taste.") (citation and quotations omitted).

146.    Most recently, the Supreme Court reaffirmed the rule in the context of landlord-tenant law. *See Chrysafis* v. *Marks*, 141 S.Ct. 2482 (2021) (tenant may not

_____

[28] Although the Supreme Court was "given the opportunity in [*City of Eastlake* v. *Forest City Enterprises, Inc*., 426 U.S. 668 (1976)] to overrule the *Lochner*-era cases of *Eubank* and *Roberge,* the Court chose instead to distinguish them," noting that these cases "involved delegations by 'the legislature to a *narrow segment* of the community, not to the people at large.'" *Silverman* v. *Barry*, 727 F.2d 1121, 1126 (D.C. Cir. 1984) (citing *City of Eastland*, *supra* at 677); accord *Rice* v. *Vill. of Johnstown, Ohio*, 30 F.4th 584, 589 (6th Cir. 2022) ("The Court has never overruled *Eubank* or *Roberge.* And these cases have made occasional appearances in the Court's later opinions."); *Boerschig* v. *Pipeline*, 872 F.3d 701, 707 (5th Cir. 2017), citing *General Elec.*, 936 F.2d at 1455 ("Although this so-called 'private nondelegation' doctrine has been largely dormant in the years since, its continuing force is generally accepted.").

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    unilaterally prevent eviction by self-certifying financial hardship, where the landlord has

2    no access to a hearing to contest that certification). The due process violation in each of

3    these cases involved vesting self-interested, private actors with unfettered and

4    unreviewable power while divesting the government of any residual discretion over how

5    that power may be invoked.

6          147.    A state may not delegate power of decision to individuals who "are not

7    bound by any official duty, but are free to withhold consent for selfish reasons or

8    arbitrarily," *Roberge*, 278 U.S. at 122, because it incentivizes self-interested persons "to

9    seek personal gain by placing arbitrary conditions on the liberty of their adversaries. "

10   *Texas* v. *United States*, 300 F. Supp. 3d 810, 843 (N.D. Tex. 2018), *rev'd on other*

11   *grounds, Texas* v. *Rettig*, 987 F.3d 518 (5th Cir. 2021). This is "a situation where the

12   Legislature has delegated authority to the very individuals who are to be the subject of the

13   regulations." *Antoine* v. *Department of Public Health,* 33 Cal.App.3d 215, 227-28 (1973).

14   *See also Department of Transportation* v. *Ass'n of American Railroads,* 575 U.S. 43, 62

15   (2015) (Alito, J., concurring) ("When it comes to [a legislative delegation to] private

16   entities, however, there is not even a fig leaf of constitutional justification."). Put another

17   way, "nothing opens the door to arbitrary action so effectively as to allow those officials to

18   pick and choose only a few to whom they will apply legislation," *Railway Express Agency*,

19   336 U.S. at 112 – except perhaps where that official power is wielded by a private, self-

20   interested union against an employer.

21         148.    Under MMC, the mediator fixes the terms of the MMC "agreement." The

22   Board may review them, within the narrow parameters allowed by the MMC Statute. But

23   *no one* – other than the union triggering the compulsory arbitration process – gets to decide

24   whether, when, and which employers will be compelled into MMC. Once that happens,

25   both the employer and employees have no avenue to avoid the coercive results of this

26   process. Because bargaining to an agreement is no longer consensual, the employer and

27   employees cannot refuse to accede to terms, or engage in other, permitted tactics in any

28   arms-length negotiation. *See NLRB* v. *Insurance Agents' International Union*, 361 U.S.

-56-

477, 487–489 (1960) (employers and unions in collective bargaining "proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest. . . . The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized."). Although the employer can walk out of "negotiations," this will not forestall the arbitral decree. A contract will be imposed, regardless of whether the employer participates in the process. *See* Regs., § 20407(a)(1) ("The failure of any party to participate or cooperate in the mediation and conciliation process shall not prevent the mediator from filing a report with the Board that resolves all issues and establishes the final terms of a collective bargaining agreement, based on the presentation of the other party."). Likewise, employees are denied for the period of the contract any avenue to dismiss an unwanted and/or ineffective representative.

149.    An administrative agency may subdelegate to private entities so long as the entities "function subordinately to" the administrative agency and the agency "has authority and surveillance over [their] activities." *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U.S. 381, 399 (1940). But here, the ALRB has no say-so whatsoever as to which employer will be subjected to the coercive power of the State, leaving open the risk of a collusive arrangement between a union and a competitor of the farmer targeted for MMC.

150.    Second, the forced contract enriches and entrenches the union, allowing it to invoke the power of the State to force farmworkers to choose between losing their jobs and remitting a portion of their salary in agency fees, while barring a decertification election until the end of the term of the MMC contract. The conflict of interest is made more palpable by the inability of the farmworkers to ratify that "agreement," or to participate (or even observe) the process triggered by the union's demand.

1
2
3
4
5

**FOURTH CAUSE OF ACTION VIOLATION OF DUE PROCESS UNDER THE**

**FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**

**(Role of the Mediator)**

**(Against All Defendants)**

**(42 U.S.C. §1983)**

6    151.    Plaintiffs and the Employees incorporate by reference and reallege each

7    allegation set forth in Paragraphs 1 through 102 above.

8    152.    "No State shall ... deprive any person of life, liberty, or property, without due

9    process of law; nor deny to any person within its jurisdiction the equal protection of the

10   law." U.S. Const. amend. XIV, §1.

11   153.    42 U.S.C. § 1983 states: "Every person who, under color of any statute,

12   ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be

13   subjected, any citizen of the United States or other person within the jurisdiction thereof to

14   the deprivation of any rights, privileges, or immunities secured by the Constitution and

15   laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

16   proceeding for redress."

17   154.    In depriving Plaintiffs and the Employees of these rights, as more fully

18   described below, Defendants acted under color of state law. This deprivation under color

19   of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

20   155.    An actual and substantial controversy exists between Plaintiffs and the

21   Employees, on the one hand, and Defendants and the UFW, on the other hand, regarding

22   the MMC process. The controversy is of sufficient immediacy and reality to warrant the

23   issuance of a declaratory judgment. This Court should exercise its discretion to issue a

24   declaratory judgment because the declaratory judgment will serve a useful purpose in

25   clarifying and settling the legal issue involved, and the judgment will finalize the

26   controversy and offer relief from uncertainty.

27
28

156.    Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

### A.    MMC Impermissibly Combines "Mediation" And "Adjudication" Functions In One Decision-Maker

157.    Under MMC, a party is forced to submit to a hybrid mediation/arbitration process in which the decision-maker is expected to engage in "off-the-record" or *ex parte* settlement communications and then adjudicate the dispute. The coercive, hybrid process violates due process.

158.    The fairness of mediation is predicated on the voluntary nature of the process, *Travelers Casualty and Surety Co.* v. *Superior Ct.*, 126 Cal. App. 4th 1131, 1140 (2004), and the absolute inadmissibility of communications made in the course of mediation. Cal. Evid. Code §§1119, 1121*; see also Cassel* v. *Superior Court,* 51 Cal.4th 113, 118-19 (2011). The Evidence Code's mediation confidentiality provisions are "clear and absolute," and bar the discoverability or admissibility "'in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which . . . testimony can be compelled to be given,'" of anything spoken or written in connection with the mediation proceeding. *Cassel*, 51 Cal.4th at 117-18 (quoting Cal. Evid. Code § 1119 (a), (b)). These provisions "must be strictly applied and do not permit judicially crafted exceptions or limitations, even where competing public policies may be affected." *Id*. at 118.

159.    During MMC, the mediator engages in "off-the-record" discussions whereby the parties share their best offers to settle the dispute voluntarily, whether during plenary mediation sessions or via *ex parte* communications. All off-the-record MMC communications are subject to the mediation confidentiality protections. *See* Regs., § 20407(a)(2) ("All communications taking place off the record shall be subject to the limitations on admissibility and disclosure provided by Evidence Code section 1119(a) and (c), and shall not be the basis for any findings and conclusions in the mediator's report.").

-59-

1  At the same time, the mediator is required to obtain "on-the-record" evidence in an

2  arbitration setting, where the parties present their conflicting positions as to critical terms

3  and conditions of the CBA.

4       160.    To be sure, parties may *choose* to engage in settlement discussions with the

5  judge presiding over their dispute. Under MMC, the employer's consent is not required.

6  MMC compels the employer into a different choice: Refuse to participate (and have the

7  mediator impose terms proposed by the union, *see* Regs., § 20407(a)(1)), or participate

8  involuntarily in the MMC's hybrid mediation/arbitration process (without consenting to

9  the admixture of both roles in the same person).

10       161.    This undermines the neutrality of the decision-maker and the decision-

11  making process. *First*, it creates the inherently coercive dynamic whereby a party

12  understands that the mediator may compel terms not agreed to by either party. This "settle,

13  or else" dynamic infects the entire process, whereby a party is, in effect, coerced into

14  making concessions for fear that the adjudication of the same term may yield a worse

15  result.

16       162.    *Second*, the purpose of the mediator's privilege is to insulate the decision-

17  maker from learning the parties' private settlement positions. But the MMC process inverts

18  these protections by creating a structurally biased procedure whereby the mediator ***is*** the

19  decision-maker who obtains privileged communications, and then adjudicates any terms

20  still in dispute. It is not possible for the mediator to banish all recollection of those off-the-

21  record communications in resolving disputed issues and fixing contract terms. Whatever

22  the mediator learns "off-the-record" has the danger, and certainly the appearance, of

23  biasing the mediator's determination of the provisions of the "agreement."

24       163.    *Third*, in arbitrations as well as judicial proceedings, *ex parte*

25  communications are presumed to inject bias into the decision-making process, and are to

26  be avoided. *See* Cal. R. Ct. 3.820(b); *Maaso* v. *Singer,* 203 Cal.App.4th 362, 375 (2012)

27  (affirming vacating an arbitration award based on *ex parte* communications between the

28  neutral arbitrator and the party arbitrator, holding that such communications "undermine

-60-

the fairness and integrity of the arbitration process"). Yet MMC allows and encourages *ex parte* communications, thus violating fair process and creating an appearance of bias, whether or not prohibited under regulations. *See Sangamon Valley Television Corp.* v. *United States,* 269 F.2d 221, 224 (D.C. Cir. 1959).

### B.    The MMC Statute Precludes Admissibility Or Judicial Review Of "Off-The-Record" Or *Ex Parte* Mediation Communications

164.    Judicial review presumes the ability of the parties to present, and the court to consider, the substantive communications in the underlying proceeding. The same holds true in agency proceedings. For example, under the Rule 1.1 of the California Public Utilities Commission's Rules of Practice and Procedure, the PUC may impose penalties or issue orders to ensure the integrity of the formal record and to protect the public interest when an *ex parte* violation has been found. *See* Cal. Pub. Util. Code §§ 701, 2107, 2108.

165.    When an administrative adjudicator uses "evidence" outside the record there is a denial of a fair hearing. As to that "evidence," there has been no hearing at all. *Cf. Morgan* v. *United States*, 304 U.S. 1 (1938) (right to a hearing denied where Secretary of Agriculture fixed maximum rates to be charged by stock yard market agencies in reliance on evidence taken by investigating personnel, with whom the Secretary conferred *ex parte*, accepted their recommendations, and issued an order, without allowing plaintiff to challenge the evidence.). If a trial-type hearing of the sort mandated by MMC is required by due process of law – clearly this is the case, given that the mediator's report "shall include the basis for the mediator's determination [and] shall be supported by the record," Lab. Code § 1164(d) – such review is impossible where the record does not disclose the evidence and communications that may have influenced the mediator's decision. *See United Steelworkers of Am.* v. *Marshall* (D.C. Cir. 1980) 647 F.2d 1189, 1215 (noting "general concern that whenever the record fails to disclose important communications that may have influenced the agency decision maker, the court cannot fully exercise its power of review").

166.   But under MMC, "off-the-record" communications are subject to the limitations on admissibility and disclosure, *see* Cal. Evid. Code §1119(a)-(c), and "shall not be the basis for any findings and conclusions in the mediator's report." *See* Regs., 20407(a)(2). These communications are obviously not a part of the record that may be reviewed in evaluating a "mediator's" decision. They are "absolutely" barred from any discovery.[29] Cross-examination of the mediator is prohibited under the Board's regulations. *See* Regs., § 20407(a)(2); *see also Hess Collection Winery,* 29 ALRB No. 6 at 7 (2003). It is also foreclosed by "simple notions of due process," since the mediator cannot defend himself without violating the mediation confidentiality statutes. *Cf. Solin* v. *O'Melveny & Myers,* 89 Cal.App.4th 451, 463, 467 (2001) (dismissing malpractice action which could not be resolved without breaching the attorney-client privilege).

167.   Accordingly, once rendered the mediator's decision is effectively immunized from a challenge based on the (mis)use of confidential information, or the failure to consider relevant (albeit confidential) information, in reaching his decision. This leaves the aggrieved party with no practical means to overturn the findings of the mediator, and no ability of the court to conduct any judicial review of communications immunized from discovery or admissibility.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**

**(Requirement of Parties to Pay MMC Mediation Costs)**

**(Against All Defendants)**

**(42 U.S.C. § 1983)**

168.   Plaintiffs incorporate by reference and reallege each allegation set forth in Paragraphs 1 through 102 above.

---

[29] The MMC Statute does not contain any "express statutory exception" to Cal. Evid. Code § 1119 that would permit a court to obtain a communication protected by the mediator's privilege. *Cassel*, 51 Cal.4th at 124.

-62-

169.    The MMC Statute violates due process by requiring "parties" to bear half the costs of a compelled contracting process.

170.    "No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, §1.

171.    42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

172.    In depriving Olive Hill and Wonderful (and other WGA member employers also thrust into MMC) of these rights, as more fully described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

173.    An actual and substantial controversy exists between Plaintiffs, on the one hand, and Defendants and the UFW, on the other hand, regarding the MMC process. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

174.    Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

175.    Labor Code section 1164(b) states:

Upon receipt of a declaration pursuant to subdivision (a), the board shall immediately issue an order directing the parties to mandatory mediation and

-63-

conciliation of their issues. The board shall request from the California State Mediation and Conciliation Service a list of nine mediators who have experience in labor mediation. The California State Mediation and Conciliation Service may include names chosen from its own mediators, or from a list of names supplied by the American Arbitration Association or the Federal Mediation Service. The parties shall select a mediator from the list within seven days of receipt of the list. If the parties cannot agree on a mediator, they shall strike names from the list until a mediator is chosen by process of elimination. If a party refuses to participate in selecting a mediator, the other party may choose a mediator from the list. ***The costs of mediation and conciliation shall be borne equally by the parties.***

176.   The MMC process is not a matter of consensual agreement. It is a compelled contracting process, whereby upon demand by an agricultural employer or a certified labor organization, the Board shall "immediately issue an order directing the parties to mandatory mediation and conciliation of their issues." An employer which has no desire or intention to invoke this process is ordered into this process. Whether or not the employer chooses to participate in the choice of mediator, or to even participate in the MMC process itself, a contract shall be imposed.

177.   Under Labor Code section 1164(d), the mediator, acting as an arbitrator, "resolves all of the issues between the parties and establishes the final terms of a collective bargaining agreement, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process." The mediator also determines the "entire economic value of the collective bargaining agreement" if the parties are unable to agree. Lab. Code § 1164(d).

178.   The statute requires the "parties" to each bear one-half of the costs of mediation and conciliation. The statute makes no allowance based on financial need, the costs of the mediator's hourly fees, or other expenses incurred.

-64-

179.    The State may not require a party compelled into a state legal proceedings by order of the State to pay for one-half the public costs of a mediator, who is also imposed by force of law. *California Teachers Assn.* v. *State of California* (1999) 20 Cal.4th 327, 354-55, 357 (invalidating provision requiring dismissed or suspended public teachers to pay for one-half the public cost of the administrative law judge as in "total and fatal conflict with controlling constitutional principles and is invalid on its face.")

**SIXTH CAUSE OF ACTION**

**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**

**(Compulsory Arbitration)**

**(Against All Defendants)**

**(42 U.S.C. § 1983)**

180.    Plaintiffs incorporate by reference and reallege each allegation set forth in Paragraphs 1 through 102 above.

181.    The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

182.    42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

183.    In depriving Plaintiffs of these rights, as more fully described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

184.    An actual and substantial controversy exists between Plaintiffs, on the one hand, and Defendants and the UFW, on the other hand, regarding the MMC process. The

-65-

controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

185.    Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Equal Protection Clause under the Fourteenth Amendment to the U.S. Constitution.

186.    The core of equal protection is equal treatment — those that are similarly situated shall be treated similarly. The corollary is that the state cannot "pick and choose" only a few to whom it will apply legislation. Both principles are violated by the MMC Statute: *first*, by empowering a self-interested union to compel the regulation of individual employers of its choosing; and *second*, by requiring a private mediator to draw individualized classifications that have no rational relationship to the statute's purpose.

187.    A private MMC mediator is not a judge or elected official, but acts in every practical aspect as a quasi-legislator or quasi-judicial officer in fixing the terms of the MMC contract, subject only to a highly deferential standard of administrative and judicial review. A private union is not a prosecutor. But, just as a prosecutor can choose his defendants, here a union can decide, whether for reasons of expediency, profit, or punitive intent, to target a weak employer (with fewer employees) or a successful employer (with many employees). The union has unilateral power to decide which employer will be targeted (some perhaps never), or when, opening the door to collusive arrangements *between* the union and the employer, to the detriment of employees who otherwise would never ratify a consensual CBA imposing agency fees.

188.    A legislative body may adopt laws of a "less than comprehensive fashion by merely 'striking the evil where it is felt most,'*[but] its decision as to where to 'strike' must have a rational basis in light of legislative objectives. Hays* v. *Wood*, 25 Cal.3d 772, 791

1  (1979) (emphasis added). The MMC Statute provide no guidance as to "where to strike,"

2  in terms of the targeting of a specific employer, leaving that decision entirely to the union.

3        189.   The California Supreme Court, in essence, concluded in *Gerawan I* that the

4  statutory purpose is to allow the mediator to make individualized, discretionary decisions,

5  and on that basis, any decision is rationally related to that purpose, so long as it is

6  "supported by the record," meaning that the mediator was able to point to other, "typical"

7  terms or provisions in another CBA submitted as evidence, regardless of the other trade-

8  offs involved in any consensual, arms-length, labor contract negotiation.

9        190.   But reducing rational basis scrutiny to such a tautology violates equal

10  protection by necessitating that individuals, all similarly situated with respect to the

11  statute's aim, be treated distinctly. What results from this process is "special legislation"

12  without any rational basis to distinguish why this employer was singled out, why the

13  differences or similarities as to its business justify treating it differently from other

14  employers, or how such distinctions were made. This is, as the California Court of Appeal

15  held (before being reversed), "'the very antithesis of equal protection.'"

16        191.   A statute violates equal protection if it "intentionally treated [one individual]

17  differently from others similarly situated and[] there is no rational basis for the difference

18  in treatment." *Vill. of Willowbrook* v. *Olech*, 528 U.S. 562, 564 (2000). Such an equal

19  protection claim can give rise to a facial constitutional violation where the disparate

20  treatment is "occasioned by express terms of a statute." *Ibid.*; *see also Gerhart* v. *Lake*

21  *Cnty., Mont.*, 637 F.3d 1013, 1022 (9th Cir. 2011). While evidence of unequal or arbitrary

22  application (present here) certainly supports a finding that a statute facially violates equal

23  protection, if a statute "lays down no rule by which its impartial execution can be secured

24  or partiality and oppression prevented," and thereby allows arbitrary distinctions to be

25  drawn, it necessarily violates equal protection. *See, e.g., Yick Wo* v. *Hopkins*, 118 U.S.

26  356, 370, 372-73 (1886) (licensing decisions must be based on established standards,

27  rather than upon the whim or caprice of the licensor).

28

-67-

CONSOLIDATED COMPLAINT FOR
                                                        DECLARATORY AND INJUNCTIVE RELIEF

192.    For purposes of equal protection analysis, the relevant classification is comprised of any employer where the union has been certified to represent the bargaining unit. The distinction within that class as to which employers will be subjected to MMC is left entirely to the discretion of the union. While it is beyond dispute that California has the authority to regulate employment, *see Schaezlein* v. *Cabaniss*, 135 Cal. 466 (1902), the Legislature may not leave "the question as to whether or how these things shall be done or not done to the arbitrary disposition of [an] individual," *id*., at 470, particularly where that individual is neither disinterested nor accountable for his decisions. The manner by which the MMC Statute permits the targeting of one employer is a perfect example of an instance where the individual has been irrationally singled out from other, similarly situated employers.

193.    It is these specific distinctions as to how similarly situated persons are treated, and not the legislative device of compulsory arbitration in the abstract, that must be rationally related to the legislative goals. *Gerhart*, 637 F.3d at 1022. In *Gerhart*, the Ninth Circuit explained that the district court had made a "crucial error in its analysis of the rational basis requirement "by misconstruing for what there must be a rational basis. The court explained that it was not the legislative act — in that case, denying Gerhart's construction permit application — that must be justified as rational, but rather the decision to "treat[] Gerhart differently" than similarly situated individuals under the statute. *Id*. at 1023; *see also Hodel* v. *Indiana*, 452 U.S.314, 332 (1981). The only conceivable rationale for the distinction drawn between otherwise similarly situated employers within the statute's classification is an irrational and illegitimate one.

194.    Even where rational basis review applies, justifications for legal discrimination "must find some footing in the realities of the subject addressed by the legislation. *Heller* v. *Doe*, 509 U.S. 312, 321 (1993). The only stated purpose of the MMC Statute is to promote stability in bargaining relationships and foster collective bargaining. But the objective of imposing **some** CBA on **some** employers is accomplished no matter **which** employer a union chooses to compel into MMC, and no matter **what** terms the

-68-

1  mediator ultimately supplies. The imposition of *any* individual term of a CBA on a

2  particular employer, then, is not rationally related to the statute's purpose — *all* terms,

3  whatever their content, would be equally related to the statutory goal of imposing *some*

4  CBA.

5       195.   Based on this statutory objective, the statute might plausibly differentiate

6  between those employers with an existing CBA and those without — treating those classes

7  of employers distinctly may bear a rational relationship to the statutory purpose of

8  promoting collective bargaining. But even within that class, the statute does not

9  discriminate rationally. The only difference between Olive Hill, Wonderful and those

10  employers not forced into MMC is that the union chose Olive Hill and Wonderful (and

11  similarly situated members of WGA), for reasons that the statute *does not* consider, and

12  the ALRB *may not* consider

13       196.   As the California Court of Appeal explained in *Gerawan Farming*,

14  "[B]ecause the mediator has no power to extend the enactment [of a CBA] to other

15  agricultural employers," each regulated employer forms a "class of one," without any

16  means to insure the differences or similarities between contracts bear a rational

17  relationship to the statutory purpose. *Id.,* 187 Cal. Rptr. 3d at 293. It is not the potential for

18  an individuated outcome, but the <u>certainty</u> that each employer will be subjected to an

19  individual legislative act, which makes the classification intentional. It is the <u>lack</u> of any

20  nexus between the statutory purpose and the distinctions drawn by any individual mediator

21  which makes the classification arbitrary. *See Barsky* v. *Bd. of Regents of Univ.*, 347 U.S.

22  442, 470 (1954) (finding constitutional violation where "a State licensing agency lays bare

23  its arbitrary action, or if the State law explicitly allows it to act arbitrarily").

24       197.   The California Supreme Court believes that the mediator is guided by

25  various statutory factors that ensure that similarly situated individuals will be treated alike.

26  *See* Lab. Code § 1164(e) (listing "factors commonly considered in similar proceedings").

27  These are not standards at all. It is impossible to replicate bargaining (because the mediator

28  cannot understand, based on his review of "comparable" CBAs, the trade-offs that were

-69-

1  made as part of a consensual negotiation); he cannot find any equivalence for a fair

2  adjustment of dozens of competing terms in any agreement.

3      198.    Because the statute does not pass any judgments as to the sort of terms that

4  would foster collective bargaining and stability, a mediator could consider one employer's

5  wages with relation to "comparable firms" and choose to impose a wage increase, a wage

6  decrease, or no change at all, with equal justification.

7      199.    It is no answer to argue that, by design, the MMC Statute requires the

8  mediator to make subjective, individualized determinations; disparate treatment is to be

9  expected, because no two employers are alike. The MMC Statute's lack of an independent

10  purpose cannot be rescued by analogy to the exercise of prosecutorial or administrative

11  enforcement discretion. This argument fails for the same reason the MMC Statute suffers

12  from a basic constitutional defect: it provides only arbitrary classifications. The State

13  cannot simultaneously argue that the MMC Statute affords adequate guiding standards to

14  the mediator <u>and</u> that it is intended to enable subjective determinations that are insulated

15  from rational basis review. *See Merrifield* v. *Lockyer*, 547 F.3d 978, 991 (9th Cir.

16  2008) ("We cannot simultaneously uphold the licensing requirement under due process

17  based on one rationale and then uphold Merrifield's exclusion from the exemption based

18  on a completely contradictory rationale.").

**<u>SEVENTH CAUSE OF ACTION</u>**

**<u>FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

**(Against All Defendants)**

**(28 U.S.C. §§ 2201, 2202; 42 U.S.C. § 1983)**

23      200.    Plaintiffs and the Employees incorporate by reference and reallege each

24  allegation set forth in Paragraphs 1 through 102 above.

25      201.    Plaintiffs and the Employees desire a judicial determination of their rights,

26  the Board's duties, and the constitutionality of the mandatory mediation and conciliation

27  procedures under Labor Code section 1164 *et seq*., including that part of section 1164(b)

28  relating to the payment of the cost of mediation and conciliation.

-70-

202.    A declaration is necessary and appropriate at this time so that Plaintiffs, the Employees, Defendants, and the UFW may be relieved from the uncertainty and insecurity giving rise to this controversy. A proper remedy to challenge an unconstitutional statute or regulation is an action for declaratory and injunctive relief.

203.    Notwithstanding anything to the contrary under law, an injunction may be granted to prevent the execution of a public state statute, by officers of the law, where the statute violates the U.S. Constitution. *See e.g., Ex parte Young,* 209 U.S. 123 (1908); *Citizens Comm. for Hudson Valley* v. *Volpe*, 297 F. Supp. 809, 814 (S.D.N.Y. 1969).

204.    In depriving Plaintiffs and the Employees of due process, equal protection under the law and/or First Amendment rights, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983 by, *inter alia*, a temporary and permanent injunction restraining the enforcement of the MMC Statute. As such, Plaintiffs and the Employees have stated a cause of action under section 1983.

205.    The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

206.    Pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983, Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process and Equal Protection Clauses under the Fourteenth Amendment to the U.S. Constitution.

**EIGHTH CAUSE OF ACTION**

**VIOLATION OF THE FIRST AMENDMENT OF THE U.S. CONSTITUTION**

**(Right to Freedom of Speech and Association)**

**(Against All Defendants)**

**(42 U.S.C. § 1983)**

207.    The Employees incorporate herein by reference and reallege each allegation set forth in Paragraphs 1 through 102 above.

208.    California's law mandating compulsory arbitration and allowing the ALRB to impose contract terms on certain parties, including a forced unionism or "union security" provision upon farmworkers, violates the First Amendment rights of both free speech and association. *Janus*, 585 U.S. at 916, 929-30; *see* ¶79 & n. 11 *supra*.

209.    In depriving and/or threatening to deprive the Employees of these rights, as more fully described above, Defendants acted and are acting under color of state law. This deprivation under color of state law is actionable under, and may be redressed by, 42 U.S.C. § 1983.

210.    An actual and substantial controversy exists between the Employees, on the one hand, and Defendants and the UFW, on the other hand, regarding the infringement of First Amendment rights by the MMC process.

211.    Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the First Amendment to the U.S. Constitution.

**NINTH CAUSE OF ACTION**

**VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT**

**OF THE U.S. CONSTITUTION**

**(Denial of Participation in Proceedings Affecting Rights)**

**(Against All Defendants)**

**(42 U.S.C. § 1983)**

212.    The Employees incorporate herein by reference and reallege each allegation set forth in Paragraphs 1 through 102 above.

-72-

213.    The MMC Statute violates the Employees' due process rights because it excludes them from a government process — MMC — that will decide legal and workplace rights. The Employees are therefore deprived of any pre-deprivation process, and are left on the outside, not even allowed to look in. *Gerawan Farming, Inc*., 39 ALRB No. 13 (2013) (barring worker access to the arbitration phase of MMC on the grounds that their presence was not in the public interest), *aff'd*, *Gerawan II*, 40 Cal.App.5th at 278.

214.    In depriving the Employees of the rights described above, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

215.    An actual and substantial controversy exists between the Employees and the Defendants regarding the MMC process, in which the Employees have no right or power to participate. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

216.    Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

1.    An order declaring that the Defendants violated Plaintiffs' and the Employees' rights protected under the Fourteenth Amendment of the United States Constitution and under 42 U.S.C. § 1983 by enforcing the MMC Statute against Olive Hill and Wonderful, and declaring that Labor Code section 1164 *et seq*. is unconstitutional on its face.

2.     An order preliminarily and then permanently enjoining Defendants and their agents and all other persons or entities in active concert or privity or participation with them, from enforcing Labor Code section 1164 *et seq.*

3.     An entry of judgment for Olive Hill, Wonderful and the Employees for nominal damages of $1 against Defendants in their individual capacities;

4.     An award to Plaintiffs and the Employees of reasonable attorneys' fees and costs incurred in connection with this action from Defendants under 42 U.S.C. §§ 1983 and 1988, California Code of Civil Procedure section 1021.5, and any other relevant provision of law.

5.     For such other and further relief as this court deems just and proper.

Dated: July 23, 2025

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
BARSAMIAN & MOODY

By          */s/ David A. Schwarz*
               DAVID A. SCHWARZ

Attorneys for Plaintiffs

Dated: July 23, 2025

Respectfully submitted,

By          */s/ W. James Young*
               W. JAMES YOUNG
               JAMES R. HARVEY

Attorneys for Intervenor-Plaintiffs

-74-